# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RUBIK'S BRAND LIMITED,

                Plaintiff,

      -against-

FLAMBEAU, INC.,

             Defendant.

Civil Action No. 1:17-cv-6559 (PGG)

REDACTED

---

## DEFENDANT FLAMBEAU, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

Anthony A. Tomaselli (*pro hac vice*)
anthony.tomaselli@quarles.com
Kristin Graham Noel (*pro hac vice*)
kristin.noel@quarles.com
Matthew J. Duchemin (*pro hac vice*)
matthew.duchemin@quarles.com
Anita Marie Boor (*pro hac vice*)
anita.boor@quarles.com
QUARLES & BRADY, LLP
33 East Main Street, Suite 900
Madison, WI 53703
Tel.: 608-251-5000

*Attorneys for Defendant Flambeau, Inc.*

## TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................ 1

II.   FACTUAL BACKGROUND ......................................................................... 3

    A.   Mr. Rubik Began Patenting His 3x3 Puzzle Cube in the Mid-1970s. ...................... 3

    B.   Ideal Began Selling the Cube in 1980, then Was Sued on the Nichols Patent. ......... 4

    C.   Ideal Applied to Register the 3x3 Cube Design as a Trademark in 1982. ................. 5

    D.   After a Decline, Puzzle Cubes Gained Popularity Due to Speed Cubing. ................. 6

    E.   RBL Began Licensing the RUBIK'S BRAND to Toy Manufacturers in 2013. ........... 6

    F.   Flambeau Launched Its DUNCAN-Branded Quick Cube in 2016. .......................... 7

    G.   RBL Sued Flambeau in August 2017 with No Evidence of Actual Confusion. ......... 8

III.   LEGAL STANDARDS ................................................................................. 8

IV.   ARGUMENT .................................................................................................. 9

    A.   The 3x3 Cube Design Is Functional. .............................................................. 9

        i.   The 3x3 Cube Design is utilitarian functional. .............................................. 9

        ii.   The 3x3 Cube Design is aesthetically functional. ......................................... 15

    B.   RBL Cannot Show the Required Probability of Confusion. .................................... 16

    C.   RBL Cannot Support Either Lanham Act or New York Statute Dilution. ............... 19

    D.   RBL's Registration Was Procured By Fraud. ..................................................... 22

    E.   The Court Should Decline to Award RBL Any of Flambeau's Profits. .................. 24

V.   CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*,
  973 F.2d 1033 (2d Cir. 1992) ................................................................. 18

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*,
  696 F.3d 206 (2d Cir. 2012) ............................................................. 9, 15

*Cuisinarts, Inc. v. Robot-Coupe Intern. Corp.*,
  580 F. Supp. 634, 222 U.S.P.Q. 318 (S.D.N.Y. 1984) ........................... 25

*Desly Int'l Corp. v. Otkrytoe Aktsionernoe Obshchestvo*,
  No. 13CV2303ENVLB, 2017 WL 5157614 (E.D.N.Y. Nov. 6, 2017) ................... 24

*Gallo v. Prudential Residential Servs. Ltd. P'ship*,
  22 F.3d 1219 (2d Cir. 1994) ..................................................................... 8

*George Basch Co. v. Blue Coral, Inc.*,
  968 F.2d 1532 (2d Cir. 1992) ................................................................. 25

*Giggle, Inc. v. netFocal, Inc.*,
  856 F. Supp. 2d 625 (S.D.N.Y. 2012) ...................................................... 19

*Hicks v. Baines*,
  593 F.3d 159 (2d Cir. 2010) ..................................................................... 9

*In re Morton-Norwich Products, Inc.*,
  671 F.2d 1332 (C.C.P.A. 1982) ............................................................... 10

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*,
  80 F.3d 749 (2d Cir. 1996) ..................................................................... 25

*Jay Franco & Sons, Inc. v. Franek*,
  615 F.3d 855 (7th Cir. 2010) .......................................................... 13, 15

*Laurel Rd. Bank v. CommonBond, Inc.*,
  No. 18 CIV. 7797 (ER), 2019 WL 1034188 (S.D.N.Y. Mar. 5, 2019) ................. 11

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
  209 F. Supp. 3d 612 (S.D.N.Y. 2016) ................................................ 16, 17

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA*,
  720 F. App'x 24 (2d Cir. 2017) ............................................................... 16

*Miss Universe, L.P., LLLP v. Villegas*,
  672 F. Supp. 2d 575 (S.D.N.Y. 2009) ................................................ 20, 22

*Moseley v. V Secret Catalogue, Inc.*,
    537 U.S. 418 (2003)...................................................................................................... 21

*MPC Franchise, LLC v. Tarntino*,
    826 F.3d 653 (2d Cir. 2016)........................................................................................ 22

*Nabisco, Inc. v. PF Brands, Inc.*,
    191 F.3d 208 (2d Cir.1999)......................................................................................... 21

*Polaroid Corp. v. Polarad Elecs. Corp.*,
    287 F.2d 492 (2d Cir. 1961)........................................................................................ 16

*Romag Fasteners, Inc. v. Fossil, Inc.*,
    No. 18-1233 (U.S. Apr. 23, 2020) .............................................................................. 25

*Schutte Bagclosures Inc. v. Kwik Lok Corp.*,
    193 F. Supp. 3d 245 (S.D.N.Y. 2016)........................................................................ 13

*Schutte Bagclosures, Inc. v. Kwik Lok Corp.*,
    699 F. App'x 93 (2d Cir. 2017) .................................................................................. 13

*Selevan v. New York Thruway Auth.*,
    711 F.3d 253 (2d Cir. 2013).......................................................................................... 9

*Specialized Seating, Inc. v. Greenwich Indus.*,
    616 F.3d 722 (7th Cir. 2010) ...................................................................................... 23

*Specialized Seating, Inc. v. Greenwich Indus., L.P.*,
    472 F. Supp. 2d 999 (N.D. Ill. 2007) .................................................................... 22, 23

*Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*,
    202 F.3d 489 (2d Cir. 2000)........................................................................................ 24

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
    532 U.S. 23 (2001).................................................................................................. 9, 11

*Ty Inc. v. Perryman*,
    306 F.3d 509 (7th Cir. 2002) ...................................................................................... 20

*Weinstock v. Columbia Univ.*,
    224 F.3d 33 (2d Cir. 2000)............................................................................................ 9

## Statutes

15 U.S.C. § 1125(c)(2)(B) ................................................................................................ 21

15 U.S.C. § 1125(c)(2)(C) ................................................................................................ 21

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................................. 8

**Regulations**

37 C.F.R. § 11.1 ...................................................................................................................... 24

Defendant Flambeau, Inc. ("Flambeau") respectfully moves for summary judgment on Plaintiff Rubik's Brand Limited's ("RBL") complaint.

## I.   <u>INTRODUCTION</u>

This is a trademark dispute. RBL asserts rights in the design of a three-dimensional puzzle cube ("the 3x3 Cube Design"), with the following elements:

- A black cube;
- Having nine square-shaped color patches on each of its six faces;
- With the color patches on each face being the same in the start/solved position;
- Consisting of the colors red, white, blue, green, yellow, and orange.

(St. ¶¶ 3. 124, 195).[1]

Flambeau, through its division Duncan Toys Company, sells a white puzzle cube called the Duncan Quick Cube. (St. ¶¶ 8-9, 185-186). The Quick Cube's color patches have different shades, shapes, and orientation than the 3x3 Cube Design's. (St. ¶¶ 186-189). Notwithstanding, RBL filed a complaint asserting the Quick Cube infringes the 3x3 Cube Design. (Dkt. 1).

RBL's claims are premised on a functional design that cannot serve as a trademark. The 3x3 Cube Design is essential to the use or purpose of the cube—to scramble and solve the cube. (*See infra* § IV.A). RBL does not dispute that the cube's color patches enable it to be scrambled and solved. (St. ¶¶ 204-211). And both parties' experts agree that primary and secondary colors—like those of the 3x3 Cube Design—enable faster and easier solving. (St. ¶¶ 230-238).

Functionality is confirmed by the numerous utility patents that cover the 3x3 Cube Design, including the cube's 3x3 grid of smaller segments on each face, and the cube's use of color as a means of scrambling and solving the puzzle. (St. ¶¶ 20-79, 241-249). It is axiomatic that a patented design cannot serve as a trademark. This issue is dispositive of the entire case.

RBL's predecessors were aware of these puzzle cube patents—they held rights to several and were sued on another. (St. ¶¶ 345-369). But, the predecessors were not content with just

---

[1] "St." refers to Flambeau's Rule 56.1 Statement of Material Facts, filed concurrently herewith.

patent rights and decided to improperly double dip by applying to register the 3x3 Cube Design as a trademark. (St. ¶¶ 93-127). In the process, RBL's predecessors withheld the patents from the USPTO, even after the examining attorney requested them. (St. ¶¶ 369-376). These actions constitute fraud, mandating cancellation of RBL's registration. (*See infra* § IV.D).

On top of these fundamental flaws, RBL has failed to muster sufficient evidence to show that confusion or dilution is likely. (*See infra* § IV.B-C). The undisputed facts show:

- After over four years of coexistence and nearly three years of litigation, RBL has failed to present a single instance of actual confusion, and RBL has not put forth any survey evidence on confusion or dilution (St. ¶¶ 288-292);

- The Duncan Quick Cube is different from the 3x3 Cube Design because the Duncan Quick Cube has a white base, while the 3x3 Cube Design requires a black base, and the Duncan Quick Cube's segments have different shades, shapes, and orientation than the Design's (St. ¶¶ 293-307);

- The Duncan Quick Cube is always branded with the well-known DUNCAN mark, and RBL's cube is always branded with the RUBIK'S mark (St. ¶¶ 308-309);

- Flambeau adopted the Duncan Quick Cube in good faith by seeking and receiving advice on how to avoid both patent and trademark infringement (St. ¶¶ 310-313);

- The 3x3 Cube Design is so commonly used in the marketplace that it no longer indicates a cube authorized by RBL (if it ever did) (St. ¶¶ 314-318);

- Flambeau and RBL are not in the same markets—RBL does not make or sell its own cubes, but merely licenses the RUBIK'S brand to manufacturers (St. ¶¶ 323-327); and

- Flambeau's customers are large retail stores with sophisticated purchasers who exercise due diligence with their purchases (St. ¶¶ 328-332).

Regarding dilution, RBL has no evidence that the 3x3 Cube Design is famous or distinctive to RBL (as opposed to the RUBIK'S name, which is not asserted). (St. ¶¶ 333-337). To the contrary—the marketplace is saturated with dozens of different brands of cubes bearing the 3x3 Cube Design. (St. ¶¶ 314-318). The Design is generic, not famous.

Finally, RBL cannot recover Flambeau's profits on its dilution claim because Flambeau's actions were not willful. (*See infra* § IV.E). Moreover, the Court should decline to award profits entirely because they are not supported by the equities. (*Id.*).

2

## II.  FACTUAL BACKGROUND

This case concerns puzzle cubes, which are as their name implies—puzzles because they can be scrambled and solved, and cubes because they have six equal, square faces. (St. ¶¶ 11-12). The faces are subdivided into smaller segments (e.g., smaller cubes) that bear external indicia (e.g., colors). (St. ¶¶ 13-14).

Puzzle cubes have been known and used for decades. Patents from the 1960s and early 1970s disclose and claim "manipulable toys" that have "outer surfaces" in a "variety of colors" (St. ¶¶ 20-23) and specifically puzzle cubes that have "colored surfaces [that] when properly arranged [have] one distinct color on each of the six faces" (St. ¶¶ 24-25).

Today, there are dozens of different versions and brands of puzzle cubes. (St. ¶¶ 314-318). A common version is the 3x3—where each face of the puzzle cube is composed of three rows of three smaller cubes bearing a distinct color, and the cube is "solved" when all smaller cubes of the same color make up a single face. (St. ¶¶ 15-19).

### A.  Mr. Rubik Began Patenting His 3x3 Puzzle Cube in the Mid-1970s.

In January 1975, Ernö Rubik, the individual RBL credits with inventing the 3x3 puzzle cube,[2] applied to patent his puzzle cube, shown right, with the Hungarian government (St. ¶¶ 32-39). Hungarian Patent No. 170062 ("the '062 Patent") issued in October 1976. (St. ¶ 34). Per the '062 Patent, "the nine solid pieces forming any face surface of the cube are arranged so that they may rotate together and at the same time." (St. ¶ 37). Mr. Rubik applied to patent the same 3x3 puzzle cube with the Belgian government, and was issued Belgian Patent No. 887,875 ("the '875 Patent") in July 1981 (St. ¶¶ 40-45).

---

[2] RBL acknowledges that the 3x3 puzzle cube was also independently invented by Terutoshi Ishige, which resulted in Japanese Patent No. S53-120946 ("the Ishige Patent"). (St. ¶¶ 28-31).

Mr. Rubik continued to pursue patents for his cubes, including ones that could be scrambled and solved by color. In October 1980, Mr. Rubik applied for another patent with the Hungarian government, and was issued Hungarian Patent No. 180387 ("the '387 Patent"). (St. ¶¶ 46-50). The '387 Patent references the Ishige Patent as disclosing a 3x3 puzzle cube "of which the 9 small cube faces located on each of the faces of the large cube can be arranged by rotation so that each large cube face contains the same color of small cube faces." (St. ¶ 48). The '387 Patent claims an embodiment of a puzzle cube with colors on its external surfaces. (St. ¶ 50).

In August 1981, Mr. Rubik applied for patents with the U.S. Patent and Trademark Office ("USPTO"). U.S. Patent Nos. 4,378,116 ("the '116 Patent") and 4,378,117 ("the '117 Patent") issued in March 1983. (St. ¶¶ 51-60). The '116 Patent discloses puzzle cubes scrambled and solved by color: "The surfaces of the small cubes forming each surface of the large cube are colored … [and] can be assembled into the predetermined logical order of sequence by simultaneously rotating the nine toy elements forming the surfaces of the 'large cube.'" (St. ¶ 54). The '117 Patent makes similar disclosures. (St. ¶¶ 57-59).

**B. Ideal Began Selling the Cube in 1980, then Was Sued on the Nichols Patent.**

In late 1979, Ideal Toy Company ("Ideal") was granted exclusive rights to make and sell Mr. Rubik's puzzle cubes in the U.S. under the "Rubik's" name. (St. ¶¶ 80-82). Ideal debuted the 3x3 "Rubik's Cube" at the New York City Toy Fair in February 1980. (St. ¶¶ 83).

In early 1981, Moleculon Research Corporation ("Moleculon"), contacted Ideal about U.S. Patent No. 3,655,201 ("the Nichols Patent"). (St. ¶ 84). The Nichols Patent, issued in April 1972, disclosed a puzzle cube where, if "its component parts are properly arranged[, it] present[s] one distinct coloration on each of its six faces." (St. ¶¶ 24-26). The parties discussed licensing, but the negotiations broke down and Moleculon filed suit in May 1982. (St. ¶¶ 85-87). The litigation lasted over seven years with two appeals to the Federal Circuit. (St. ¶¶ 87-92).

4

**C.   Ideal Applied to Register the 3x3 Cube Design as a Trademark in 1982.**

In April 1982, while negotiating with Moleculon (St. ⁋⁋ 84-87),

Ideal applied to register a trademark, shown right, for "a black cube

having nine color patches on each of its six faces with the color patches

on each face being the same and consisting of the colors red, white,



blue, green, yellow, and orange" (St. ⁋ 93). As applied for, the white face is adjacent to the

yellow face. (St. ⁋⁋ 93-97).

The examiner refused registration because the design "appears to be the configuration of

applicant's goods [and] primarily functional in nature." (St. ⁋⁋ 98-99). Ideal argued in response

that "the design features of [the] product ... are not essential to effective competition…. Cube

puzzles … can be formed of any color plastic…. They need not be formed of black." (St. ⁋⁋ 103-

104). "The color patches need not be square" or "the precise colors used by applicant." (St. ⁋⁋

105-106). Ideal cited three court decisions that reportedly found the design not functional. (St. ⁋

107). Ideal then assigned its IP rights, including the pending application, to CBS, Inc. ("CBS").

(St. ⁋⁋ 108-109).

The examiner refused registration a second time in an office action dated January 17,

1983, again based on functionality. (St. ⁋⁋ 110-111). The examiner noted that the cited decisions

were from preliminary injunctions and ordered that "Applicant must set forth the registration

number of any patents which cover the goods in the application." (St. ⁋⁋ 112-114).

CBS (or Ideal on its behalf) filed a response in May 1983. Despite knowing of numerous

patents covering three-dimensional puzzles, CBS did not identify any. (St. ⁋⁋ 115-116). Instead,

CBS cited two additional court decisions that it (wrongly) asserted were "determinative as to the

issue of non-functionality." (St. ⁋ 117). The first decision mentioned the '062 Patent, but did not

mention any subsequent patents that disclose color as an external indicia. (St. ⁋ 118). And the

decision mistakenly found that Ideal "do[es] not have any patent rights in the United States to the puzzle cube." (St. ¶ 119). The second decision did not address patents at all. (St. ¶ 120).

A new examiner was then assigned to the file and approved publication the same day, resulting in U.S. Registration No. 1,265,094 ("the '094 Registration"). (St. ¶¶ 121-222).

### D.  After a Decline, Puzzle Cubes Gained Popularity Due to Speed Cubing.

The Rubik's Cube experienced an initial boom, followed by a bust. By 1982, sales were trending downward, and by 1984, popularity had "dropped off dramatically" (St. ¶¶ 128-129).

More recently, however, puzzle cubes are growing in popularity due to speed cubing (St. ¶ 131), a competitive activity where "speed cubers" strive to be the fastest to solve the cube (St. ¶ 130). The World Cubing Association ("WCA"), the largest organization for speed cubing, reports that the number of first-time competitors in 2017 was about five times more than the number of competitors in 2012. (St. ¶¶ 132-133).

Competitors at WCA events may use any brand of puzzle cube (St. ¶ 135)—and there are dozens to choose from (St. ¶¶ 314-318). But the puzzle cubes must meet WCA requirements in order to be competition-eligible. (St. ¶¶ 134-135). Specifically for 3x3 puzzle cube events, the WCA requires that the cube "use a color scheme with one unique color per face" and the "colors of the colored parts must be solid, with one uniform color per face," each color "distinct from the other colors." (St. ¶¶ 141-142). The cubes "must be clean" with no "markings" that "distinguish any piece from a similar piece," except for a single logo on one center piece. (St. ¶¶ 142-143).

### E.  RBL Began Licensing the RUBIK'S Brand to Toy Manufacturers in 2013.

The '094 Registration was eventually assigned to RBL in 2013. (St. ¶¶ 126-127). RBL is not a toy manufacturer; it does not make or sell puzzle cubes. (St. ¶¶ 4-5). Rather, RBL licenses the RUBIK'S brand and the 3x3 Cube Design to toy manufacturers, like Hasbro. (St. ¶¶ 6, 149, 325). One of RBL's licensed products is the 3x3 Rubik's Cube.  (St. ¶ 150).

RBL requires its licensees to follow a style guide. (St. ¶ 151). Per the guidelines, the 3x3 Rubik's Cube, shown right, must have a black base and uniform, square patches in six colors specified by Pantone color number. (St. ¶¶ 152-154). The 3x3 Rubik's Cube is branded with RUBIK'S in its center white segment, and its packaging is branded with RUBIK'S in several locations. (St. ¶¶ 156-160).



### F.  Flambeau Launched Its DUNCAN-Branded Quick Cube in 2016.

Flambeau is a manufacturer and seller of plastic goods. (St. ¶ 7). Flambeau's toy division, Duncan Toys Company, is a well-known and respected brand in the toy industry. (St. ¶¶ 9, 176). The DUNCAN name has been used for toys, games, and playthings since 1929, and itself is a registered mark.  (St. ¶¶ 177-178).  The DUNCAN Yo-Yo has been sold for decades and has been inducted into the National Toy Hall of Fame. (St. ¶ 179).

In 2015, Flambeau began looking into developing a DUNCAN-branded 3x3 puzzle cube for speed cubing. (St. ¶ 180). Duncan reviewed catalogues from various manufactures, ordered samples, and selected a cube that had features favorable for speed cubing. (St. ¶ 181). The selected cube, shown right, was branded the "Duncan Quick Cube." (St. ¶ 182).

The Duncan Quick Cube has a white base and patches in six fluorescent-toned colors, with the yellow face opposite the white face. (St. ¶¶ 186-188). The inner corners of the smaller cube segments are cut away for "corner cutting," a technique for faster solving. (St. ¶ 189). The Duncan Quick Cube is always branded with DUNCAN, and so is its packaging. (St. ¶¶ 192-193).

Prior to launching the Duncan Quick Cube in the U.S., Flambeau sought and received freedom to operate opinions from its outside legal counsel. (St. ¶¶ 183-184, 310). <span>REDACTED</span>

7

REDACTED

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

After receiving these opinions, Flambeau began selling the Duncan Quick Cube in March 2016. (St. ¶ 185). Flambeau's customers are retail stores, like Target and Staples. (St. ¶¶ 327).

### G.  RBL Sued Flambeau in August 2017 with No Evidence of Confusion.

RBL filed suit in August 2017 for (1) trademark infringement, (2) false designation of origin, and (3) trademark dilution, all under the Lanham Act, (4) common law trademark infringement, and (5) unfair business practice under N.Y. Gen. Bus. Law § 360-1. (Dkt. 1). Flambeau asserted affirmative defenses of invalidity and non-infringement, and counterclaimed to cancel RBL's registration, based on both functionality and fraud. (Dkt. 24).

### III.  LEGAL STANDARDS

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A defendant is entitled to summary judgment where the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in its favor on an essential element of a claim on which the plaintiff bears the burden of proof." *Selevan v. New York Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (internal citations omitted). A "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment…. [M]ere conclusory allegations or denials … cannot by themselves

8

create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs. Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). In the words of the Second Circuit, this is the time for RBL "to put up or shut up." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

## IV.   **ARGUMENT**

Summary judgment is appropriate in this case. First, the asserted 3x3 Cube Design is functional and thus not protectable as a trademark. Second, RBL cannot show likelihood of confusion. All the factors support the contrary—e.g., the Duncan Quick Cube's design is dissimilar to the 3x3 Cube Design, Flambeau acted in good faith, and there is no evidence of any actual confusion. Third, for similar reasons, RBL cannot show likelihood of dilution. And there is no evidence that the 3x3 Cube Design itself is famous (as opposed to the RUBIK's name, which is not asserted). Rather, prevalent use of the Design by third-party puzzle cubes has rendered it generic. Finally, the Court should decline to disgorge Flambeau's profits because the equities weigh against an award, and lack of willfulness precludes any award for federal dilution.

### A.  The 3x3 Cube Design Is Functional.

"The 'functionality' of a mark can be demonstrated by, *inter alia*, showing that the mark has either traditional 'utilitarian' functionality or 'aesthetic' functionality." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 217 (2d Cir. 2012).

### i.  The 3x3 Cube Design is utilitarian functional.

A product feature is utilitarian functional and, thus, cannot serve as a trademark if (1) it is essential to the use or purpose of the article or (2) it affects the cost or quality of the article. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001). Utilitarian functionality is

9

further analyzed by the *Morton-Norwich* factors: (3) whether utility patents disclose the design's functional advantages; (4) whether advertising touts the design's functional advantages; (5) whether there are alternative designs that function as well; and (6) whether the design results from simple or cheap manufacturing. 671 F.2d 1332, 1340-1341 (C.C.P.A. 1982).

*First*, the 3x3 Cube Design is essential to the use or purpose of the article bearing its design—e.g., the 3x3 Rubik's Cube. The intended use and purpose of the 3x3 Rubik's Cube is for it to be scrambled and solved by color. (St. ¶¶ 204-205). Per RBL, the cube is a "colour-matching puzzle that's a great mental challenge" with "the aim … to twist and turn [the puzzle] to return it to its original state, with every side having one solid colour." (St. ¶¶ 163-164).

The 3x3 Cube Design—with its six faces of three rows of three smaller cubes, each bearing one of six distinct colors—is essential to that aim. The smaller cubes allow the puzzle to be twisted and turned. (St. ¶¶ 206-209). And the six distinct colors allow the puzzle to be scrambled and solved. (St. ¶¶ 210-211). RBL's own solving guides and lesson plans provide step-by-step instructions on how to solve the cube by its six specific colors. (St. ¶¶ 165-175).

*Second*, the 3x3 Cube Design improves the quality of the 3x3 Rubik's Cube. Color is the superior external indicia for puzzle cubes. The average person is able to discern and match colors more quickly and easily than numbers and shapes. (St. ¶ 214). And numbers and shapes are not as intuitive as color—e.g., a cube with numbers may not require matching, but ordering. (St. ¶¶ 215-216). Per Mr. Rubik, he used colors on his puzzle cube because color is "very simple and … very easy to distinguish" and is "the most simple way to mark the solved state." (St. ¶¶ 217-218).

The 3x3 Cube Design does not use just any colors—it uses three primary colors, two secondary colors, and white for its color patches; and it uses black for its background. (St. ¶ 195, 197). Lee Loetz, a toy designer with over 23 years of experience in toy design, analyzed the Design's color combination and concluded that it provides "maximum contrast." (St. ¶ 240).

10

Puzzle cubes that use maximum contrasting colors are more quickly and easily solved than those with less contrasting colors because it is easier to distinguish the cube segments and match like to like. (St. ¶¶ 228-236). Consider a cube with six shades of orange—the solver would need to take time and mental energy to distinguish the shades, sometimes on opposite sides of the cube, which slows the solving. (St. ¶¶ 237-238). The same is true to a lesser degree if even two colors in the combination are less contrasting. (St. ¶¶ 236). These considerations are particularly important to speed cubers (St. ¶ 239), supporting functionality. *See, e.g.*, *Laurel Rd. Bank v. CommonBond, Inc.*, No. 18 CIV. 7797 (ER), 2019 WL 1034188, at *6 (S.D.N.Y. Mar. 5, 2019) (finding design with "contrasting colors" functional because it facilitated readability).

*Third*, utility patents claim and disclose the functional advantages of the 3x3 Cube Design—a fact of which RBL is well aware.  For a time, RBL advertised that its 3x3 Rubik's Cube was patented, but then removed the reference after the rights expired. (St. ¶¶ 246-249). Utility patents provide "strong evidence" that the features therein claimed and disclosed are functional. *TrafFix*, 532 U.S. at 29-32. In such cases, the trademark holder "must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device." *Id.* at 30. RBL cannot do so here.

The '062 Hungarian Patent—the first of Mr. Rubik's patents—plainly claims and discloses a 3x3 puzzle cube with each face of the cube comprised of nine smaller cube segments arranged in three rows of three, just like the drawing from the '092 Registration (St. ¶¶ 39, 125):

| '062 Rubik Patent | '092 Registration |
|---|---|
|  |  |

Other patents claim and disclose the same 3x3 array (St. ¶¶ 30, 45, 48, 64, 68, 71) and/or using color as an external indicia:

- Claiming an "[embodiment of [a] spatial logic toy … characterized by … colors … on the external surfaces of the toy elements …." (St. ¶ 50).

- "The surfaces of the small cubes forming each surface of the large cube are colored … [and] can be assembled into the predetermined logical order … by simultaneously rotating the nine toy elements forming the surfaces of the 'large cube.'" (St. ¶ 54).

- "The small cubic elements forming the plane surfaces of the large cube are either colored or indicated with numbers, figures or any other symbols. Accordingly, by rotating the cubes, several combinations become possible …." (St. ¶ 58).

- "In the "Ideal 'Rubik's Cube' …, each face is colored uniformly with a distinct color, but repeated rotation of the various faces scrambles the individual cubie faces. The object of the game then is to continue to rotate the cube faces in order to return the cubies to their original position so that all sides of the cube have a solid color." (St. ¶ 64).

- "A puzzle cube in a 3x3x3 version has been discussed and previously known…. [N]ine outer surfaces of the cube elements are respectively provided with one and the same color, so that in the starting position each side of the cube body is one color." (St. ¶ 68).

Mr. Loetz, who holds numerous utility patents, charted these patents' disclosures and concluded that they cover the relevant features of the 3x3 Cube Design.[3] (St. ¶¶ 241-244).

RBL may argue that the patents do not claim the precise colors specified in the '092 Registration—but this misses the point.[4] The proper analysis is not whether the 3x3 Rubik's Cube infringes the patent claims, but rather whether the patents' disclosures show the features of the asserted design serve a utilitarian function. *Jay Franco & Sons, Inc. v. Franek*, 615 F.3d 855, 857 (7th Cir. 2010) (affirming functionality based on utility patents). The patent claims "need not be so specific" as to support a finding of patent infringement—it is enough for the disclosure to simply explain the design's utilitarian advantages. *Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 193 F. Supp. 3d 245, 267 (S.D.N.Y. 2016), *aff'd*, 699 F. App'x 93 (2d Cir. 2017).

---

[3] The chart is included as Appendix 5 to Mr. Loetz's expert report. (St. ¶ 241).

[4] To the extent the Design requires precise colors, the Quick Cube does not use those colors. As explained below, RBL's asserted design is either so narrow (e.g., restricted to a black base and six specific colors), that no reasonable jury could find the Quick Cube infringes (with its white base and different colors). Or, the asserted design is so broad that it is not protectable.

*Fourth*, RBL touts the functional advantages of the 3x3 Cube Design. RBL's marketing materials tell the history of a "solid Cube [that] twisted and turned - and still it did not break or fall apart. With colourful stickers on its sides, the Cube got scrambled and thus emerged the first 'Rubik's Cube.'" (St. ¶ 161). "Colour is a key aspect of the DNA of Rubik's Cube, with its multiple squares of red, orange, yellow, green, blue and white." (St. ¶ 162). "Turn and twist the sides of the Cube so that each of the six faces only have one colour." (St. ¶ 163).

*Fifth*, supposed "alternative designs" do not function as well as the 3x3 Cube Design. As to the overall shape of the puzzle, a cube is more easily handled and manipulated than other shapes, like a sphere or pyramid. (St. ¶ 250). Moreover, the 3x3 puzzle cube presents a sweet spot in level of difficulty. A 2x2 puzzle is not so difficult, but a 4x4 puzzle much more so. (St. ¶¶ 251-252). The 3x3 puzzle presents a challenge, but an achievable one. (St. ¶ 253).

As to the external indicia, color presents a functional advantage over other options, like numbers and shapes, because it is more intuitive and more quickly and easily distinguished. (St. ¶¶ 213-218). Imagine being presented a puzzle cube with numerals 1 through 9 scrambled on the smaller segments. Which is the 6? Which is the 9? Should like numbers be matched on a single face? Should the numbers be ordered across the rows? Is a secondary game involved, like forming the day's date or solving a Sudoku challenge? (*See* St. ¶¶ 61, 72).

Moreover, the WCA requires competitors to use cubes with distinct colors and no markings. (St. ¶¶ 136-144). Cubes with numbers and shapes are not competitively eligible. (*See id.*). RBL's corporate representative conceded that a puzzle cube maker that was not able to promote its cubes for WCA competition would be at a competitive disadvantage. (St. ¶ 278).

An insufficient number of color combinations have the same advantages as the 3x3 Cube Design's specific color combination. (St. ¶¶ 254-261). As discussed above, puzzle cubes benefit from having maximum contrast between their six sides. (St. ¶¶ 228-239). To achieve maximum

13

contrast, a puzzle cube maker is limited to colors that are opposite each other on the color wheel, namely the three primary colors and the three secondary colors, plus black and white. (St. ¶ 254). That yields eight color options for six sides. (*Id.*).

But practical constraints make these options even more limited. White provides the best background for a logo, so puzzle cube makers typically make one side white. (St. ¶ 255). Blue and purple are difficult for the average person to distinguish, so puzzle cube makers typically use only one of those two colors. (St. ¶¶ 256-258). With one side fixed on white, and another side fixed on either blue or purple, only five different combinations of maximum contrasting colors remain for the other four sides.[5] (St. ¶ 259). Yet there are undisputedly more than five puzzle cube makers and sellers in the industry. (St. ¶ 260). There are not enough preferred color combinations for each cube maker or seller to have their own.

Lastly, as to the cube's base, black is a superior option because it is known in the industry that colors show more brilliantly against a black background. (St. ¶ 262).

***Sixth***, the 3x3 Cube Design results from simple and cheap manufacturing. Originally, the base of the 3x3 Rubik's Cube was manufactured from black plastic and the color patches were applied with colored stickers. (St. ¶¶ 268-269). For practical reasons, the stickers did not extend to the edges of the smaller cube segments, creating a black grid. (St. ¶ 270). In essence, manufacturing constraints created the 3x3 Cube Design at-issue in this case. (St. ¶ 267).

Manufacturing the base from a single type of plastic generates efficiencies in sourcing material, molding parts, and assembly. (St. ¶ 272). Moreover, black plastic is generally more readily available and cheaper than other colors (St. ¶ 273), and applying the color patches with stickers is an inarguably cost-effective means of creating the external indicia. (St. ¶ 274).

For all the considerations above, the 3x3 Cube Design is utilitarian functional.

---

[5] Mr. Loetz reached this number after applying color theory and practical constraints. (St. ¶ 259).

### ii.   The 3x3 Cube Design is aesthetically functional.

A mark is aesthetically functional and, thus, cannot serve as a trademark, if allowing its exclusivity would put competitors at a disadvantage. *Christian Louboutin*, 696 F.3d at 219-20. In other words, "where an ornamental feature is claimed as a trademark and trademark protection would significantly hinder competition by limiting the range of adequate alternative designs, the aesthetic functionality doctrine denies such protection." *Id.* at 222 (internal quotations omitted).

RBL contends that *every* 3x3 puzzle cube infringes RBL's trademark rights—it is just a matter of degree. (St. ¶ 275). In effect, RBL seeks to hold a monopoly over all 3x3 puzzle cubes, but U.S. trademark law forbids this overreach. "Granting a producer the exclusive use of a basic element of design (shape, material, color, and so forth) impoverishes other designers' palettes." *Jay Franco*, 615 F.3d at 860. "[T]he more rudimentary and general the element—all six-sided shapes rather than an irregular, perforated hexagon; all labels made from tin rather than a specific tin label; all shades of the color purple rather than a single shade—the more likely it is that restricting its use will significantly impair competition." *Id.*

In other words, to the extent that RBL holds *any* trademark rights over the design of a 3x3 puzzle cube, those rights must be limited to allow other puzzle cube makers into the puzzle cube market. RBL cannot have exclusive rights over "all six-sided shapes." *See id.* Nor can RBL have exclusive rights over color patches using "all shades" of the primary and secondary colors (minus purple). *See id.* RBL refuses to acknowledge these precepts, instead choosing to assert its Design to anticompetitive effect.

Thus, the Court should find the Design functional, grant summary judgment on RBL's entire case, and cancel the '094 Registration. Notably, the European Union's highest court came to a similar conclusion on a similar RBL design—that a "[t]hree-dimensional mark in the shape of a cube with surfaces having a grid structure" was functional. (St. ¶¶ 280-285).

**B.  RBL Cannot Show the Required Probability of Confusion.**

For all of the reasons above, the 3x3 Cube Design, as RBL asserts it, is not protectable as a trademark. To the extent that it is protectable, the Design is so narrow that no jury could reasonable find the Duncan Quick Cube creates a likelihood of confusion.

A plaintiff asserting either Lanham Act or common law trademark infringement must prove likelihood of confusion. *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 665 (S.D.N.Y. 2016), *aff'd sub nom. LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA*, 720 F. App'x 24 (2d Cir. 2017). The same is true for Lanham Act false designation of origin or unfair competition. *Id.* To avoid summary judgment on these claims, the plaintiff must demonstrate "'a probability of confusion, not a mere possibility.'" *Id.* at 666.

Courts assess likelihood of confusion using the following factors: (1) actual confusion; (2) the degree of similarity between the marks; (3) the defendant's good faith in adopting its mark; (4) the strength of the plaintiff's mark; (5) the quality of the products; (6) the competitive proximity of the products; (7) the likelihood of bridging any gap; and (8) customer sophistication. *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). An analysis of these factors shows RBL cannot meet its burden.

**First**, after over four years of coexistence and nearly three years of litigation, RBL concedes there is no actual confusion. (St. ¶¶ 286-287). Flambeau is aware of none (St. ¶¶ 290-291), and has found evidence to the contrary—that consumers are aware of many 3x3 puzzle cube makers and that not all 3x3 puzzle cubes originate from RBL (St. ¶ 292). Given the complete absence of actual confusion, and no survey evidence to substitute (St. ¶¶ 288-289), RBL cannot carry its burden of showing confusion is probable. *LVL XIII*, 209 F. Supp. 3d at 672.

**Second**, the overall impressions of the 3x3 Cube Design and the Duncan Quick Cube are different. RBL's Design specifies a black base with uniform, square-shaped segments and color

16

patches. (St. ¶¶ 195, 294, 298, 301). The Quick Cube has a white base, so the white "grid"
outlining the smaller cube segments is strikingly different from the black "grid" from RBL's
Design. (St. ¶ 295). In branding, white and black are perceived as opposites and thus a white
cube is unlikely to suggest affiliation with a black cube. (St. ¶¶ 296-297). Also, the faces of the
Quick Cube's smaller segments are not uniformly square—the inner corners are cut away,
forming four diamond-shaped holes around the center segment of each face. (St. ¶¶ 299-300).

| 3x3 Cube Design | Duncan Quick Cube |
|:---:|:---:|
|  | |

The color patches on the Duncan Quick Cube are different as well. Like the smaller cube
segments, the color patches are not uniformly square, but are cut away at the inner corners. (St.
¶¶ 302-303). And the Quick Cube patches use a bright, fluorescent color palette (St. ¶ 305),
which is distinct from the traditional primary and secondary colors specified by the 3x3 Cube
Design (St. ¶ 304). Moreover, the colors are oriented differently—the white face of the Quick
Cube is opposite the yellow face, which is not the case in the 3x3 Cube Design. (St. ¶¶ 306-307).

These are not trivial differences. In fact, they are differences that RBL's predecessors
emphasized to the USPTO in arguing that the 3x3 Cube Design was not anti-competitive and
thus eligible for registration:

> [T]he design features of applicant's product, as shown in the drawings, are not
> essential to effective competition or to any other factor. **Cube puzzles such as
> manufactured by applicant can be formed of any color plastic material
> desired. They need not be formed of black.** The black color of the plastic which
> forms the distinctive black grid pattern of the trademark serve absolutely no
> function in the use of the product.

Likewise, the color patches on the faces of the product are not functional. **The color patches need not be square as used by applicant nor need they be colored. And, if colored, they need not be the precise colors used by applicant.**

(St. ¶¶ 103-106 (emphasis added)).

On top of these differences, both parties prominently display their house marks on their respective products and packaging. (St. ¶ 309). "[T]he prominent presence of well-known trade names goes far toward countering any suggestion of consumer confusion arising from any of the other *Polaroid* factors." *See Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992). The DUNCAN mark is particularly strong—it has been continuously used since 1929 and is a well-known and respected name in the industry. (St. ¶¶ 176-179).

***Third***, Flambeau acted in good faith. Flambeau received opinions on both patents and trademarks before launching the Duncan Quick Cube. REDACTED



***Fourth***, RBL's 3x3 Cube Design is not a strong mark, it is generic. The market is saturated with dozens of non-RBL 3x3 puzzle cubes, many of which use the Design. (St. ¶¶ 314-317). RBL conceded that over half of competitors at WCA events use non-RBL puzzle cubes. (St. ¶ 318). Such evidence is "very persuasive" in showing that the mark is not exclusive to one

18

source, cutting against likelihood of confusion. *See Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625, 632 (S.D.N.Y. 2012).

*Fifth*, the Quick Cube and the Rubik's Cube are built for different quality of play. The Quick Cube is designed for speed solving, with the inner corners of its smaller segments cut away. (St. ¶¶ 319-320). This distinguishes the Quick Cube from traditional puzzle cubes, like the Rubik's Cube, which have square corners that are not as easy to twist and turn. (St. ¶¶ 321-322).

*Sixth and Seventh*, RBL and Flambeau occupy different spaces in the toy industry. RBL does not make or sell puzzle cubes, but rather licenses others to do so, such as large manufacturers like Hasbro. (St. ¶¶ 323-325). In contrast, Flambeau sells its Duncan Quick Cubes direct to retail stores, like Target and Staples. (St. ¶¶ 326-327).

*Eighth*, Flambeau's retail customers are sophisticated and take care in purchasing. (St. ¶¶ 328-332). These customers have dedicated individuals that negotiate purchases from toy makers at arms-length. (St. ¶¶ 329-330). RBL concedes that retailers, like those that buy the Duncan Quick Cube, are knowledgeable about the products they purchase. (St. ¶ 332).

For these reasons, the Court should enter summary judgment on RBL's trademark infringement and false designation of origin claims.

### C.  RBL Cannot Support Either Lanham Act or New York Statute Dilution.

*First,* RBL cannot support dilution under the Lanham Act, 15 U.S.C. § 1125(c). To do so, RBL must show: (1) the 3x3 Cube Design is famous; (2) Flambeau is using the Design in commerce; (3) Flambeau's use started after the Design became famous; and (4) likelihood of dilution. *Miss Universe, L.P., LLLP v. Villegas*, 672 F. Supp. 2d 575, 591 (S.D.N.Y. 2009).

RBL cannot show that the 3x3 Cube Design is famous, much less that it was famous in 2016 when the Quick Cube launched. RBL has no evidence that today's purchasing public associates the 3x3 Cube Design solely with RBL—it has no survey evidence on the topic. (St. ¶¶

333-335). RBL cannot rely on mere suggestion or attorney argument to support fame—it must have actual evidence.

RBL may attempt to rely on the RUBIK'S brand as a whole—but the RUBIK'S name is not asserted in this case. (*See* Dkt. 1). Essentially, RBL claims that because the RUBIK'S brand is well-known and associated with puzzle cubes, the 3x3 Cube Design is necessarily famous. But this logic does not hold.

Moreover, the record undermines any claim to fame. After the 3x3 Rubik's Cube's reported initial success, popularity fell off. (St. ¶¶ 128-129). An entire generation of purchasers separate any initial success from now. Today, there are dozens of non-RBL 3x3 puzzle cubes on the market to the point where the design is now generic. (St. ¶¶ 314-318). Such prevalent third-party use forecloses a dilution claim. *See Ty Inc. v. Perryman*, 306 F.3d 509, 514 (7th Cir. 2002).

RBL likewise cannot show likelihood of dilution. There are two types of dilution—dilution by blurring and dilution by tarnishment. *Miss Universe*, 672 F. Supp. 2d at 592.

Dilution by blurring is an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). Court analyze blurring based on: (i) similarity between the marks; (ii) inherent or acquired distinctiveness of the alleged famous mark; (iii) the extent to which the owner of the alleged famous mark engages in exclusive use; (iv) the degree of recognition of the alleged famous mark; (v) intent of the user of the accused mark; and (vi) any actual association. *Id.*

Each of these factors supports no likelihood of dilution by blurring. As explained more fully above in Section IV.II,[6] (i) the Duncan Quick Cube's design is dissimilar to the 3x3 Cube Design; (iii) the marketplace is saturated with non-RBL 3x3 puzzle cubes using the same or similar designs; (v) Flambeau adopted the Duncan Quick Cube's design in good faith with no

---

[6] The numerals in this sentence correspond to the relevant statutory subsections.

intent to trade-off of RBL; and (vi) there is no evidence of any actual association between the designs. As pointed out above, RBL has no survey evidence on (iv) the degree of recognition of the Design. Finally, (ii) the 3x3 Cube Design is not distinctive because it merely describes exactly what the product is—a 3x3 puzzle cube. *Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 217 (2d Cir.1999) (fish cracker only "moderately" distinctive), *abrogated on other grounds, Moseley v. V Secret Catalogue, Inc.,* 537 U.S. 418 (2003), *superseded by statute*.

Dilution by tarnishment is an "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C). Again, there is no evidence that there is any mistaken "association" between the designs. (St. ¶¶ 286-292). And RBL has no evidence that its reputation has been harmed at all, much less that it was harmed by Flambeau. (St. ¶¶ 335-337, 380) REDACTED

*Second,* RBL cannot support dilution under New York statute, Gen. Bus. Law § 360. To do so, RBL must show likelihood of dilution based on: "(i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark." *Miss Universe*, 672 F. Supp. 2d at 595. While similar to the factors above, "New York law does not permit a dilution claim unless the marks are 'substantially' similar," meaning they "must at least be similar enough that a substantial segment of the target group of customers sees the two marks as essentially the same." *Id.* For all of the reasons discussed above, RBL cannot make this showing. (*See* St. ¶¶ 286-292).

Accordingly, summary judgment is appropriate on RBL's two dilution claims.

### D.  RBL's Registration Was Procured By Fraud.

The Court should grant summary judgment finding that RBL's registration was procured by fraud. Fraud on USPTO occurs when an applicant knowingly makes false, material representations of fact in connection with an application to register a mark. *MPC Franchise, LLC v. Tarntino*, 826 F.3d 653, 658 (2d Cir. 2016). An omission of material fact, such as the existence of utility patents, can constitute fraud, warranting cancellation of the registration. *Specialized Seating, Inc. v. Greenwich Indus.*, *L.P.*, 472 F. Supp. 2d 999, 1016 (N.D. Ill. 2007). The '094 Registration's file history (Section II.C) conclusively establishes that RBL's predecessors, Ideal and CBS, knowingly withheld material information specifically requested by the examining attorney, namely information related to "any patents" covering puzzle cubes.

In May 1983—the month CBS (or Ideal) made its material omission to the USPTO—both Ideal and CBS undisputedly knew of several "patents which cover the goods in the application," i.e., patents covering puzzle cubes. (St. ¶¶ 345-368). Three years earlier, Ideal had entered into an exclusive license with Mr. Rubik and the relevant Hungarian authorities to market and sell Rubik's Cubes in the U.S. (St. ¶¶ 81-82, 346). By then, Mr. Rubik was the named inventor on several patents and applications—all disclosing three-dimensional puzzle cubes. (St. ¶¶ 32-60). His two U.S. patents explicitly disclose using color as an external indicia and referenced other patents doing the same. (St. ¶¶ 51-60). And Ideal applied for two of its own patents on puzzle cubes. (St. ¶¶ 61-68). CBS acquired Ideal's IP rights in 1982.  (St. ¶¶ 108-109).

On top of that, in May 1982, Ideal was sued for patent infringement on another U.S. patent based on its sales of the 2x2, 3x3, and 4x4 Rubik's Cubes. (St. ¶ 87). CBS inherited this litigation when it acquired Ideal's puzzle cube business. (St. ¶ 88). Suffice to say, Ideal and CBS were well aware of many patents covering puzzle cubes when the examiner asked for them.

Despite knowing about the patents, Ideal and CBS withheld them from the examiner to obtain a registered trademark on an already-patented item. (St. ¶¶ 369-374). And the deception worked—a new examiner allowed the '094 Registration to issue, but only after the original examiner twice expressed concerns about functionality. (St. ¶¶ 99, 110, 121). Had the examiner seen the patents she requested, her concerns would have been vindicated. (St. ¶¶ 375-376).

Jessie Roberts, who worked as trademark examiner and administrator with the USPTO for over 26 years, reviewed the file history of the '092 Registration and the known patents and confirmed that the application to register the 3x3 Cube Design should have been refused for functionality based on those patents. (St. ¶¶ 338-342). Ms. Roberts further concluded that Ideal's and CBS' failure to provide the known patents to the examiner after they were requested constituted fraud on the USPTO. (St. ¶¶ 343-344).

RBL may argue specific intent—that it is not enough to say that Ideal or CBS "should have known" about the patents—but this would be unavailing. Ideal and CBS *did* know about the patents and failed to provide them after the examiner explicitly requested them. (St. ¶¶ 345-374). Courts have found fraud on the USPTO under near-exact circumstances. *Specialized Seating*, 472 F. Supp. 2d at 1016 (fraud on the USPTO for failing to provide information on all related patents), *aff'd on other grounds*, 616 F.3d 722 (7th Cir. 2010).

RBL may also assert that some or all of the above patents were not germane to the applied-for design. But this was not for Ideal or CBS to decide. The examiner requested "*any* patents which cover the goods in the application," which were "three-dimensional puzzles." (St. ¶¶ 101, 114 (emphasis added)). After the examiner made her request for information, Ideal and CBS had an obligation to provide it. Their failure to do so perpetuated the fraud. 37 C.F.R. § 11.1 ("Fraud also may be established by a purposeful omission or failure to state a material fact,

which omission or failure to state makes other statements misleading, and where the other elements of justifiable reliance and injury are established.").

RBL continues to wield the fraudulently procured '094 Registration to anti-competitive effect, damaging Flambeau and other toy makers and sellers. Accordingly, the Court should cancel the '094 Registration and grant summary judgment on the related claims.

### E.  The Court Should Decline to Award RBL Any of Flambeau's Profits.

*First*, RBL cannot recover Flambeau's profits based on its dilution claim because Flambeau's conduct was not willful. Under Sec. 1125(c), "[t]he owner of the famous mark shall be entitled only to injunctive relief unless the person against whom the injunction is sought *willfully* intended to trade on the owner's reputation or to cause dilution of the famous mark." *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 500 (2d Cir. 2000). If "the defendant believed in good faith that his use of the mark did not constitute infringement, and is able to support that belief with more than conclusory allegations, then the court may find that defendant's infringement was not willful." *Desly Int'l Corp. v. Otkrytoe Aktsionernoe Obshchestvo*, No. 13CV2303ENVLB, 2017 WL 5157614, at *6 (E.D.N.Y. Nov. 6, 2017).

Flambeau acted in good faith by seeking and following the advice of counsel. (St. ¶¶ 310-313). Flambeau picked a conventional puzzle cube that was covered by expired patents and picked the opposite color that is specified in the '092 Registration. (St. ¶¶ 294-297). Flambeau prominently brands its cube and its packaging with its well-known DUNCAN mark. (St. ¶¶ 308-309). There is no evidence Flambeau set out to willfully pass off its cube as RBL's. Accordingly, the Court should find no willfulness and decline to award profits under Sec. 1125(c).

*Second,* the Court should decline to award RBL Flambeau's profits based on any of its claims because the equities weigh against disgorgement for any purpose, including deterrence. While willfulness is no longer a prerequisite to awarding profits on a trademark infringement

claim, *Romag Fasteners, Inc. v. Fossil, Inc.*, No. 18-1233 (U.S. Apr. 23, 2020), it remains relevant in deciding the equities, along with whether the defendant's actions caused sales to be wrongfully diverted, and whether the plaintiff's own hands are unclean, *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1539-1541 (2d Cir. 1992) (reversing award of profits because plaintiff failed to show defendant's infringement caused any sales diversion).

As discussed above, Flambeau acted in good faith, and no evidence indicates that any sales were wrongfully diverted. To the contrary—not a shred of evidence indicates that any person confused the Duncan Quick Cube for an RBL product. (St. ¶¶ 286-292). REDACTED ███████████████████████████████████████████████████████████ ████████████████ Moreover, RBL has unclean hands—it has wielded a fraudulently procured trademark registration to anti-competitive effect. (St. ¶ 344). In such cases, disgorgement is inappropriate. *George Basch*, 968 F.2d at 1540; *see also Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749 (2d Cir. 1996) (Lanham Act damages not available because the plaintiff offered no evidence of actual confusion or pecuniary loss); *Cuisinarts, Inc. v. Robot-Coupe Intern. Corp.*, 580 F. Supp. 634, 638, 222 U.S.P.Q. 318 (S.D.N.Y. 1984) (declining to order an accounting when defendant relied upon counsel).

## V.   **CONCLUSION**

For the foregoing reasons, Flambeau respectfully requests that the Court enter summary judgment dismissing RBL's case.

Respectfully submitted this <u>22nd</u> day of June 2020,

*/s/ Anthony Tomaselli*
Anthony Tomaselli

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on June 22, 2020, per Judge Gardephe's Rule IV.C,

the foregoing document was served on counsel of record for Plaintiff via e-mail:

Mark I. Peroff
Darren W. Sanders
Cassandra Tam
Peroff Saunders, P.C.
745 5th Avenue, Suite 500
New York, NY 10151
mark.peroff@peroffsaunders.com
dsaunders@peroffsaunders.com
ctam@peroffsaunders.com


*/s/ Anita Marie Boor*
Anita Marie Boor