# EXHIBIT 1; 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RUBIK'S BRAND LIMITED,

    Plaintiff,

  -against-

FLAMBEAU, INC.

    Defendant.

---

Civil Action No. 1:17-cv-6559 (PGG)

**REBUTTAL REPORT OF
RANY L. SIMMS**

INTRODUCTION

1. My name is Rany Simms. I have been retained by Peroff Saunders P.C. to write a Rebuttal Report in response to the Jessie Roberts Expert Report submitted in this case. I am a former Administrative Trademark Judge with the Trademark Trial and Appeal Board (TTAB) of the U.S. Patent and Trademark Office (USPTO or PTO), having retired in 2004. A résumé is attached as Exhibit 1.

SUMMARY

2. After having reviewed the relevant documents in this case (*see* Exhibit 2), and in view of relevant case law (*see* Exhibit 3), it is my opinion that the Plaintiff did not commit fraud in the prosecution of the underlying application (73358308, filed April 5, 1982). While Plaintiff did not specifically respond to the request for patent numbers by listing patents, its Response did discuss a Hungarian patent covering its puzzle toy device, and the copies of the cases Plaintiff submitted fully discussed any patents involved in those cases. Also, if a Plaintiff, in fact, had a good faith belief that its mark was non-functional and registrable, especially in view of decisions so holding, then Plaintiff could not commit fraud. Accordingly, Plaintiff made no false, material representation with intent to deceive the Office during the prosecution of its application, and, therefore, committed no fraud.

3. Moreover, Plaintiff's trade dress is not functional. The claims of U.S. Patent No. 4,378,116 covering the mechanism or inner workings of Plaintiff's puzzle toy do not show that Plaintiff's trade dress is functional. Federal courts and an administrative tribunal have come to this conclusion as well. The Examining Attorney specifically noted that courts had found Plaintiff's trade dress had achieved secondary meaning and invited Plaintiff to submit such a showing. Also, in a note to the file, the Examining Attorney had indicated that she would

1

approve the application with a sufficient showing of secondary meaning.  It is my conclusion that she considered Plaintiff's responses, including the decisions Plaintiff submitted, and that she decided to withdraw the functionality refusal and allowed the application after being satisfied by Plaintiff's showing of secondary meaning.

QUALIFICATIONS

4.  I began my career at the PTO as a Trademark Examining Attorney from 1972-1975.  From 1975 to 1980 I was an Interlocutory Attorney (Motions Attorney) with the TTAB.  From 1980-1981, I was an Acting Member of the TTAB before becoming an Administrative Trademark Judge.  This position was formerly called "Member."  I was an Administrative Trademark Judge with the TTAB from 1981 to 2004.

5.  As an Administrative Trademark Judge, sitting in panels of three judges, I wrote hundreds of trademark decisions in appeals from refusals to register trademarks (and service marks), in opposition proceedings brought against applications to register trademarks (and service marks), and in cancellation proceedings seeking to cancel registrations of trademarks (and service marks).  Many of these decisions were published in USPQ (United States Patent Quarterly) and are available on the LEXIS electronic database, and were also posted on the PTO website and available at TTABVUE.  In addition, I have written a number of articles for the Trademark Reporter (none in the last ten years) and have spoken on a number of occasions to various groups about practice and procedure before the TTAB.  I retired from the Office in 2004.  Since retirement I have been an expert witness in a number of trademark cases, and have given depositions in five of them, which are listed in Exhibit 1.

COMPENSATION

6.  I am being compensated at the hourly rate of $550 for the time spent for researching, writing reports, giving depositions and testifying in connection with this case.  This is my standard rate of compensation for trademark consultation.

DETAILED DISCUSSION

A.  Plaintiff's Application SN 73358308 Prosecution History (Reg. No. 1265094, issued Jan. 24, 1984)

7.  After Plaintiff's application was filed on April 5, 1982 (I shall refer to Rubik's Brand and its predecessors as "Plaintiff"), the Examining Attorney issued her first Office Action on July 27, 1982, refusing registration "because the design sought to be registered appears to be the configuration of applicant's goods and the configuration appears to be primarily functional in nature."  The Examining Attorney noted that applicant was entitled to respond by submitting evidence or argument supporting registrability of the mark.  The Examining Attorney also suggested that applicant amend its identification of goods to "Three-dimensional puzzles."

8.  Plaintiff responded by amending its identification of goods and contesting the refusal.  In so doing, Plaintiff discussed recent cases involving its trade dress and the issues of

functionality and secondary meaning (also called acquired distinctiveness).  Plaintiff argued that the trade dress design of its puzzle toy is not essential to effective competition by others because the puzzle toy need not be made of black plastic material with brightly colored square-shaped patches applied to the small cubes on the faces of its puzzle toy.  Plaintiff contended that the small cubes could be adorned with other colors or no color at all, or of different designs or shapes other than squares.  Plaintiff noted that the issues here had been considered by two District Courts and the Third Circuit Court of Appeals (in an appeal from one of the District Court's decisions), all holding, on motions for preliminary injunction, that the appearance of Plaintiff's cube puzzle was not functional and that the trade dress had achieved a secondary meaning.  Copies of those decisions were submitted with the response.

       9.  In one of those cases, *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.,* 685 F.2d 78 (1982), the Third Circuit modified a lower court's preliminary injunction against Plawner.  The Court, noting (in July 1982) that Ideal held no patent rights to the Rubik's Cube, observed that the lower court found that the particular colors used in the puzzle served "no purpose other than identification."  The District Court had found that, "given the wide variety of possible marks, the actual colors and patches used are non-functional."  Exhibits in this case showed others using different colors, shapes and markings including numbers, pictures of fruit and domino designs on their cube puzzles.  The Third Circuit held that the lower court did not err when it found that the particular trade dress used in Plaintiff's puzzle was non-functional.  Further, after discussing the evidence below of a consumer survey, extensive copying, mistaken returns of competitors' products, as well as Plaintiff's extensive advertising and sales, the Court held that there was no error in the finding that the trade dress had achieved secondary meaning.

      10.  Plaintiff also submitted a copy of *Ideal Toy Corp. v. Chinese Arts & Crafts Inc., et al.*, 530 F. Supp. 375 (SDNY 1981), wherein the Court granted Plaintiff's request for a preliminary injunction, finding that it had established a likelihood of success on the merits including the likelihood of proving that its trade dress was non-functional and that it had acquired a secondary meaning.  The Court observed, slip opinion, 7-9:

> A wide variety of possible patterns on each cube, other than solid colors, as well as a wide variety of colors, shapes and sizes could have been used by defendants in their products.  This is amply demonstrated by the great variety of cubes presented to this court—a variety which, in the court's view, does not begin to approach the limits of imagination or industry.
> …..Where there are a great number of available colors, shades of colors, and color combinations, plaintiff's distinct color combination must be considered non-functional.  The court does not find persuasive defendant Hansen's contention that there are limited colors available.

The court also noted, slip opinion, 14, Plaintiff's "exclusive arrangement with the owner of the patent in Hungary."

      11.  On Jan. 17, 1983, the Examining Attorney issued a second Office Action noting that registration had been refused on the basis on functionality.  The Examining Attorney observed that the court decisions referred to by Plaintiff involved preliminary injunctions.  "In each

decision, the court based the decision to enjoin the defendant's activities on findings of secondary meaning for the design and the packaging." The Examining Attorney then invited Plaintiff to submit evidence of secondary meaning if it believed that its trade dress was distinctive. In the final sentence, the Examining Attorney for the first time requested that Plaintiff "set forth the registration numbers of any patents which cover the goods in the application."

12. On May 31, 1983, Plaintiff responded by requesting reconsideration in light of the previously submitted decisions as well as two more recent decisions, arguing that "there can no longer be any doubt that the trademark at issue is non-functional and has attained secondary meaning and should therefore be passed for publication." Response, 2. Plaintiff stated that the two more recent decisions were final decisions, unlike the preliminary injunction rulings discussed in the previous response. The Response quoted from one of these decisions, *In the Matter of Certain Cube Puzzles,* Inv. 337-TA-112 (U.S. International Trade Comm. Dec. 30, 1982), slip op. 7-8, wherein Plaintiff was seeking to prevent the importation of cube puzzles which copied Plaintiff's trade dress:

> … When the Morton-Norwich [671 F.2d 1332, 213 USPQ2d 9 (CCPA 1982)] criteria are examined, it is clear that the design of Rubik's Cube is not functional. There are no utility patents disclosing the utilitarian advantage of the design sought to be registered as a trademark. In fact, the original Hungarian patent covering Professor Rubik's invention itself suggests the use of illustrations or numbers rather than colors. Ideal's advertising does not tout the utilitarian advantages of its design. There are also numerous alternatives available to the design adopted by Ideal including colored circles, triangles, or a clear plastic-based cube. Finally, there are no indications that Ideal's particular design results from a comparatively simple or cheap method of manufacturing. We, therefore, conclude that a trademark in the design of Ideal's Rubik's Cube would not impair competition in the United States by depriving other companies of various alternatives…

The ITC also found that the design had achieved a secondary meaning.

13. Plaintiff noted that another District Court also found secondary meaning in its trade dress. *CBS Inc. v. Logical Games, Inc.* (ED Va. 1982). Plaintiff argued that these decisions were determinative of the issues before the Examining Attorney or, at least, entitled to great weight. Plaintiff also submitted copies of declarations submitted in support of its motion for preliminary injunction from another civil action, *Ideal Toy Corp. v. Dajere, Inc., et al.* (SDNY 82 Civ. 2400). The declaration of Plaintiff's Senior Vice President/Sales stated that competitors could have used other shaped color panels and color combinations without affecting the structure of the puzzle toy or its operation. Further, according to this declaration, the unique color scheme Plaintiff selected identifies Plaintiff as the source of the puzzle toy and distinguishes those toys from the goods of others. The declaration also mentions the Hungarian inventor Rubik's Hungarian patent. Further, portions of research reports that had been submitted in the civil actions were submitted.

4

14.  Finally, there is also a Note to the File, reproduced at https.tsdrapi.uspto.gov/ts/cd/casedocs/bundle.pdf?sn=73358308 (p. 244), stating "this is [unclear] for Rubik's cube (the design)  I told him that survey evidence & affidavits would be sufficient to establish 2. meaning.  Kathy."  The Examining Attorney who issued the first two Office Actions was Kathleen Gallagher.  Thereafter, the mark was published for opposition on November 1, 1983.

15.  Plaintiff's Reg. No. 1265094 issued on January 24, 1984.  The description of the mark in the registration states:

> The drawing is lined for the colors red, green, orange, blue and yellow.
> The mark consists of a black cube having nine color patches on each of its six faces with the color patches on each face being the same and consisting of the colors red, white, blue, green, yellow and orange.

The registration indicates that it was issued under "Sec 2(f)."

B.  <u>The Roberts Expert Report and Roberts Discovery Deposition</u>

16.  Much of the Jessie Roberts Expert Report discusses Office examination procedure in general as well as the prosecution history of Plaintiff's application.  No response to this discussion is necessary unless noted below.

17.  According to Ms. Roberts, Defendant's expert witness, even though Plaintiff's responses and copies of recent court opinions mentioned the Hungarian patent covering the Rubik's Cube toy, Plaintiff's response "did not set forth or provide any patents, pending patent applications, or their numbers.  Applicant had a responsibility to reveal the patents relevant to the application because the inquiry was clearly made in the Office Action."  Expert Report, Par. 38.  If the relevant patents had been provided, according to Ms. Roberts, the Examining Attorney would have reviewed those patents to determine if they supported a functionality refusal.  She states that she herself "would have found the patents sufficient to support a refusal to register the matter presented in the trademark application as functional." *Id*., Par. 39.  She gives as reasons that the drawing of the invention in U.S. Patent No. 4,378,116 and Hungarian Patent Nos. 180,387 and 170,062 is similar to the drawing of the mark in the trademark application.  Second, in the "Background" and "Summary" in U.S. Patent No. 4,378,116, there is language that the surfaces of the small cubes are "colored or carry numbers, figures or other symbols" and "colors, figures, numbers or any other symbols…"  Further,

> That the U.S. patents and the Hungarian Patent No. 180,307 refer to the surfaces of the small cubes forming each side of the cube carrying the same color is also significant.  Without such color consistency on each side of the cube, the mechanism contained inside the cube would not support the function of the cube as a spatial logical toy.  A cube of this type with moving parts but without a consistent theme (colors, for example) presented on each side would be considered a "fidget" toy without any logic or purpose except to keep the user's fingers busy.  It would require no thought process or logic

5

> to solve the "puzzle" of a fidget cube. Therefore, the patents would have been considered relevant to the question of the functionality of the matter presented in the trademark application because the "look" of the cube was critical to its functioning as a spatial logical toy.

*Id.*, Par. 43. Without the submission of the patents, the Examining Attorney did not have the grounds to continue the functionality refusal. *Id.,* Par. 44.

18. Finally, according to Ms. Roberts, because Plaintiff did not set forth or provide any patents that covered the goods in the application, as the Examining Attorney had requested, "[s]uch an omission is considered fraud on the USPTO." *Id.,* Par. 59. Therefore, Plaintiff "committed fraud upon the USPTO because it withheld information that was within its control that was specifically requested by the Examining Attorney." *Id.*, Par. 64.

19. In the draft copy of her discovery deposition, 188-193, Ms. Roberts maintained that the use by others of different images, designs, numbers or colors on the faces of the small cubes also supported the functionality of the specific trade dress of Plaintiff's mark.

C. <u>The Fraud Issue</u>

20. Because the charge of fraud committed by Plaintiff in the prosecution of its application is the most serious allegation, I shall deal with that issue first. As explained below, there can be no fraud as a matter of law in the prosecution of Plaintiff's underlying application because Plaintiff (then Applicant) did not knowingly make any false, material representation with the intent to deceive the USPTO.

21. The Court of Appeals for the Federal Circuit has recently clarified what must be shown to prove fraud in the procuring of or maintaining a registration. *See In re Bose Corp.,* 580 F.3d 1240, 91 USPQ2d 1938 (Fed. Cir. 2009). In that case, the TTAB had found that Bose had committed fraud when its general counsel in a combined Sections 8 and 9 (15 USC §§1058 and 1059) post-registration declaration stated that the mark had been used on audio tape recorders and players when he knew or should have known that that statement was not true. Bose had in fact discontinued the manufacture and sale of those goods, although it was continuing to repair those goods and send the repaired items back to customers. On appeal, the Court distinguished a false from a fraudulent statement, indicating that a false statement was occasioned by misunderstanding, inadvertence or a mere negligent omission, while a fraudulent statement was one made with an intent to deceive, that is, the deception must be willful. The Court held "that a trademark is obtained fraudulently under the Lanham Act only if the applicant or registrant knowingly makes a false, material representation with the intent to deceive the PTO.*"* *Id.,* 91 USPQ2d at 1941. While the statement of continued use in the declaration was false and material, the Court stated that there can be no fraud if a false statement is occasioned by an honest misunderstanding or inadvertence without a willful intent to deceive. The Court restated the law, *id.,* 91 USPQ2d at 1939, that the party seeking to cancel a registration on the basis of fraudulent procurement bears a heavy burden of proof, which must be proven "to the hilt," with clear and convincing evidence, with "no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party" [citations omitted].

6

22. After the Federal Circuit clarified the elements of proof required for finding fraud in the *Bose* case, the TTAB has rarely found fraud. In fact, I am aware of only one published case in which fraud was found. *See Nationstar Mortgage LLC v. Mujahid Ahmad,* 112 USPQ2d 1361 (TTAB 2014). *Nationstar* involved an applicant who stated that he used the mark on services listed in the application prior to the filing date of his used-based application when he, in fact, did not. After reviewing his testimony, the Board concluded that his false statements were made knowingly with intent to deceive the PTO and not by mere inadvertence, reasonable mistake or misunderstanding. Those facts are clearly different from this case where there was no false statement whatsoever. It is not surprising, therefore, that Ms. Roberts cited no cases in support of her belief that fraud is committed by an applicant's failure to specifically respond to a request for information. I could find none.

23. Here, while Plaintiff may not have specifically responded to the last Office Action by listing particular patent numbers in its Response, the Hungarian patent was noted in a quotation on page 4 of its Response, as well as in the accompanying decision of the U.S. International Trade Commission. Based on my review of the prosecution history, it is apparent that there was no attempt to hide or conceal any patent, nor was there any false statement made that there was no U.S. patent (which had issued less than two months before the Response was submitted). Ms. Roberts apparently agrees. *See* Expert Report, Par. 56 ("Nor did Applicant clearly deny the existence of any patents that covered the goods in the application.").

24. As a former Examining Attorney, it is my experience that an Examining Attorney reviews his or her most recent Office Action to determine if all the refusals and/or requirements have been satisfied before approving an application for publication. It is my opinion, based on this experience, as well as the file history of Plaintiff's application, that the Examining Attorney fully considered Plaintiff's arguments on the issues of functionality and secondary meaning, including federal court and other decisions holding that Plaintiff's trade dress was not functional. In accordance with practice, the Examining Attorney would have reviewed her last Office Action to determine if there were any outstanding refusals or requirements. If she still maintained any refusal or requirement, she would have issued a new Office Action setting forth that refusal or requirement. She did not do so. Instead, she had not only invited a showing of secondary meaning in a previous Office Action, but she also acted, in accordance with her note to the file, by approving the application on the basis of Plaintiff's showing of secondary meaning. Of course, she would not have accepted this showing if she were continuing the refusal on the ground of functionality. That is because if, in fact, she thought the trade dress sought to be registered was functional, then any argument and evidence tending to show secondary meaning is irrelevant, because those arguments and evidence cannot establish registrability in view of this absolute bar to registration. *TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, at 33, 58 USPQ2d 1001, at 1007 (2001), and Trademark Manual of Examining Procedure (TMEP) (Oct. 2018) §§1202.02 and 1202.02(a)(ii). That was also the law at the time of the prosecution of Plaintiff's application (1982-1984)—that is, that no amount of secondary meaning evidence can overcome a functionality refusal.

25. The fact that an Examining Attorney will review the last Office Action before allowing the application or issuing a final refusal is implicitly acknowledged by Ms. Roberts

when she indicates that a final refusal may be issued by the Examining Attorney "because Applicant did not overcome the substantive objections raised by the first Office Action....[or] because Applicant did not provide an adequate response to a request by the Examining Attorney to submit more information to assist the Examining Attorney in the examination process." Expert Report, Par. 28. Of course, the Examining Attorney would not be able to determine these deficiencies in the response unless he or she were to review the last Office Action.

26. It is also the case that "[f]raud will not lie against an applicant who holds an honest, good faith belief in its right to register a mark and signs an application with the statutorily prescribed ownership statement which is phrased in terms of subjective belief." *Daniel J. Quirk, Inc v. Village Car Co.,* 120 USPQ2d 1146, 1149 (TTAB 2016).

D. The Functionality Issue

27. It should be noted that when Plaintiff's application was pending in the Office, there was no specific statutory prohibition of registration on the ground of functionality. Properly analyzed, this refusal would have been under Sections 1, 2 and 45 of the Act, 15 USC §§1051, 1052 and 1127. In 1998, the Act was amended to specifically bar registration on the basis of functionality. Sec. 2(e)(5) of the Act, 15 USC §1052(e)(5).

28. In considering the question of functionality of a product design or configuration, it should be remembered that the fact that a product or a product feature performs some function (for example, a distinctively designed bottle may perform the function of holding a liquid) should not be confused with a situation where a superior design or configuration of a product permits the object to perform better in that particular design or configuration. "[I]t is the 'utilitarian' *design* of a 'utilitarian' *object* with which we are concerned." *In re Morton-Norwich Products, Inc., supra,* at 1338, 213 USPQ2d at 14. *See* TMEP §1202(a)(v).

> [A] utility patent must be examined in detail to determine whether the disclosed configuration is really primarily functional or just incidentally appears in the disclosure of a patent. There is no doubt that many non-functional shapes and configurations happen to be described or pictured as an incidental detail in functional patents.

J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, §7:89.30 (5th ed. 2018)

29. Trade dress is functional and, therefore, cannot serve as a trademark, if a feature of the trade dress is "essential to the use or purpose of the article or if it affects the cost or quality of the article." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165, 34 USPQ2d 1161, 1163-64 (1995) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850, n.10, 214 USPQ 1, 4, n.10 (1982)). TMEP §1202.02(a) and (a)(i). "Expanding on the meaning of this phrase, we have observed that a functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.'" *TrafFix Devices v. Marketing Displays, supra*, 58 USPQ at 1006, quoting from *Qualitex, supra*. In *TrafFix Devices,* 58 USPQ2d at 1007, the Supreme Court observed that where a manufacturer seeks to protect arbitrary, incidental, or ornamental features of a product found in the patent claims, such as

arbitrary curves in the legs or an ornamental pattern painted on the springs, functionality will not be established if the manufacturer can prove that those aspects do not serve a purpose within the terms of the utility patent.

30. In accordance with Federal Circuit precedent, a determination of functionality involves the consideration of the following factors, often referred to as the "*Morton-Norwich* factors": (1) the existence of a utility patent that discloses the utilitarian advantages of the design sought to be registered; (2) advertising by the applicant that touts the utilitarian advantages of the design; (3) facts pertaining to the availability of alternative designs; and (4) facts pertaining to whether the design results from a comparatively simple or inexpensive method of manufacture. *In re Morton-Norwich, supra,* 671 F.2d at 1340-1341, 213 USPQ at 15-16. *See also* TMEP §1202.02(a)(v). *TrafFix Devices* has not altered the *Morton-Norwich* analysis. *Valu Engineering, Inc. v. Rexnord Corp.,* 278 F.3d 1268, 61 USPQ2d 1422, 1427 (Fed. Cir. 2002).

31. It is the undersigned's opinion, on the basis of the documents I have reviewed, including U.S Patent No. 4,378,116, and in view of relevant case law, that the registered trade dress in this case is not covered by the claims in that patent. Rather, those claims relate to the mechanism or inner workings of the device and not to the exterior appearance of the small cube faces and the black grid background. Trade dress protection was not sought for what was being claimed in the patent. The patent itself indicates that "[t]he surfaces of the small cubes forming each surface of the large cube are colored or carry numbers, figures or any other symbols which can be assembled into the predetermined logical order of sequence by simultaneously rotating the nine toy elements forming the surfaces of the 'large cube.'" *See* "Background of the Invention." In addition, the "Summary of the Invention" states that "[i]n such a manner the colors, figures, numbers or any other symbols (e.g. dominoes) on the outer surfaces of the toy elements forming the surface of the spatial logical toy according to the invention yield innumerable possible variations… Along the spatial axes of the spatial logical toy, six or nine toy elements can be simultaneously rotated, yielding the possibility of several variations of play by means of the symbols, numbers, colors etc. to be found on the outer surface…" Contrary to Ms. Roberts' opinion, more than the similarity of the patent and trade dress drawings in needed to show functionality of the trade dress. Moreover, the record contains opinions from District Courts and the Third Circuit holding, on motions for preliminary injunction, that the Plaintiff had a likelihood of success on the merits of demonstrating non-functionality and secondary meaning. In addition, the U.S. International Trade Commission, after a full trial, concluded that Plaintiff's trade dress was not functional and that it had achieved secondary meaning. It is also clear from the record that there are numerous alternatives to the trade dress Plaintiff has selected for its puzzle toy.

32. This case has some similarities to other cases where patents did not show that the trade dress sought to be protected was functional. In *Grote Industries, Inc. v. Truck-Lite Co., LLC*, 126 USPQ2d 1197, 1205 (TTAB 2018), a patent application made clear that any number of light-emitting diodes of the truck lights could be used in the invention. Nowhere in the patent did it specifically disclose any advantages of the 6-diode design of the trade dress sought to be protected or show that the specific design of the truck lights was essential to their use or purpose.

33. If the trade dress does not serve a function within the terms of the patent and is not

9

shown to be a useful part of the invention, then the device would function the same irrespective of the trade dress. *In re Udor U.S.A., Inc.*, 89 USPQ2d 1978, at 1982 (TTAB 2009) (finding that where the patent's language and a detailed comparison between the identified features of the patent drawing with the visible features of the trademark drawing established that the patent claims involved components neither shown nor described in the trademark design, the utility patent did not support a finding of functionality).

CONCLUSION

34. Based on my review of the prosecution history, I believe that Plaintiff did not make any false, misleading statement with the intent to deceive the USPTO. Plaintiff's responses to the Office Actions disclosed a utility patent covering the puzzle toy. Also, if the Plaintiff had a good faith belief that its trade dress mark was non-functional, then there can be no fraud. Moreover, the claims and disclosures of U.S. Patent No. 4,378,116 do not cover the trade dress of Plaintiff's registration and they involve components that are not visible in the trade dress. The patent does not show that the trade dress is essential to the use or purpose of the puzzle toy. Other courts and a tribunal have ruled that Plaintiff's trade dress is not functional because, among other reasons, there are other alternatives that have been and can be used to cover the faces of the small cubes of competitors' puzzle toys. The Examining Attorney considered Plaintiff's responses, including the previous decisions which had found that Plaintiff's trade dress was not functional, and allowed the application on the basis of Plaintiff's showing of secondary meaning, in accordance with her note to the file.

Date:   January 7, 2019

_/s/ Rany L. Simms_
Rany L. Simms

# EXHIBIT 1

# Résumé

Former Administrative Trademark Judge, Trademark Trial and Appeal Board (TTAB) of the U.S. Patent and Trademark Office (USPTO), located in Alexandria, Va.

EDUCATION

B.A. degree from the University of Illinois, Champaign-Urbana, Illinois, in 1969

J.D. degree from the University of Illinois College of Law in 1972

WORK EXPERIENCE

Trademark Examining Attorney with the USPTO from 1972-1975

Interlocutory (Motions) Attorney with the TTAB from 1975-1980

Acting Member of the TTAB from 1980-1981

Administrative Trademark Judge (formerly called Member) of the TTAB from 1981 until 2004

  As an Administrative Trademark Judge, sitting in panels of three judges, I wrote hundreds of decisions over the years in appeals from refusals to register trademarks (and service marks), in opposition proceedings brought against applications to register trademarks (and service marks), and in cancellation proceedings seeking to cancel registrations of trademarks (and service marks). Many of these decisions were published in USPQ (United States Patents Quarterly) and are available on the LEXIS database. In addition, I have written numerous articles for the <u>Trademark Reporter</u> (published by the International Trademark Association), all under the heading TIPS FROM THE TTAB, including "Whether and When to File Papers During Trademark Proceedings," 67 TMR 175 (March-April 1977), "The Concurrent User as Opposer," 67 TMR 654 (Nov.–Dec. 1977), "Some Interlocutory Hints," 70 TMR 148 (March–April 1980), "Stipulated Protective Agreements," 71 TMR 653 (Nov.-Dec. 1981), "Compelling the Attendance of a Witness in Proceedings before the Board," 75 TMR 296 (May–June 1985), and have spoken on a number of occasions to various groups about practice and procedure before the Trademark Trial and Appeal Board. I have also

been sent by the Office to help the Lithuanian and Romanian Patent Offices develop procedures for the handling of trademark applications. I have also spoken at the International Intellectual Property Institute's Intellectual Property Law Workshops held in Ho Chi Minh City and in Hanoi, Vietnam, in 2002, and at a similar program held in the Philippines in the same year. I retired from the Office in 2004.

CONSULTING WORK

Since retirement, I have been hired as an expert witness and prepared reports in the following cases (in reverse chronological order):

Adidas America, Inc., *et al.* v. TRB Acquisitions LLC, *et al.*, Civil Action No. 3:15-CV-20113-SI (D. Or.)(declaration on the issues of fraud and abandonment in connection with a Section 8 declaration of continued use)

Adidas America, Inc., *et al.* v. TRB Acquisitions LLC, *et al.*, Civil Action No. 3:15-CV-20113-SI (D. Or.)(rebuttal report discussing the fact that examining attorneys' search strategies were not broad enough to identify plaintiffs' registrations; the different types of evidence in ex parte vs. inter partes proceedings in likelihood of confusion cases; the availability of civil actions in addition to or in place of Office proceedings)(discovery deposition taken)

Edible Arrangements International, LLC *et al.* v. 1-800-Flowers.com, Inc. *et al.*, Civil Action No. 3:14-CV-01744-MPS (D of Conn.)(rebuttal report discussing examining attorney refusals of mere descriptiveness and sources of support thereof; deference given to PTO decisions; benefits of registration; disclaimers, and obtaining registrations if disclaimed matter becomes distinctive; inability to cancel Supplemental Register registrations and Principal Register registrations over 5 years old on basis of mere descriptiveness)

Flowers Bakeries Brands, LLC v. Earthgrains Baking Companies, Inc. and Bimbo Bakeries USA, Inc., Civil Action No. 7:13-cv-138 (HL)(MD GA)(differences between evidence considered in likelihood of confusion cases in ex parte examination and in inter partes cases; value of third-party registrations that are cancelled or not based on use in commerce in likelihood of confusion determination)(discovery deposition taken)

2

Anton Maier and Roger Maier v. Asos PLC and Asos.com Limited, Civil Action No. 8:13-cv-02052-RWT (DC MD) (allegations of fraud for non-disclosure of information during the prosecution of applications)(discovery deposition taken)

Simone Kelly-Brown and Own Your Power Communications, Inc. v. Oprah Winfrey, Harpo Productions, Inc., Harpo, Inc., Hearst Corporation, Hearst Communications, Inc., 1:11-CV-07875 (PAC) (SDNY )(whether registered mark is in standard characters or special form)(no report submitted)

Flamagas, S.A. v. Global Tobacco, LLC *et al,* Civil Action No. 1:11-cv-07871-JSR (inability to determine the registrations considered by an Examining Attorney under Section 2(d) of the Act; no *per se* rule with respect to likelihood of confusion)

American Express Marketing & Development Corp. and American Express Travel Related Services Company, Inc. v. Black Card LLC., 10 CIV 1605 (DLC) (SDNY) (PTO disclaimer practice)(discovery deposition taken)

Travelers Indemnity Company v. Greenumbrella.com, Inc., Opp. 91191018, (TTAB) (research on issue of abandonment) (no formal report submitted)

Hansen Beverage Company d/b/a Monster Beverage Company v. CytoSport, Inc., CV- 09-31 VBF (AGRx) (CD Cal.) (alleged prior inconsistent statement or argument made during the prosecution of an application; strength of a mark may change over time)

World Wide Sales, Inc. v. Church & Dwight Co., 08-C-1198 (ND Ill.) (effect of PTO's failure to publish a disclaimer on the face of a registration)

Levi Strauss & Co. v. Abercrombie & Fitch Trading Co., CV-07-3752 (ND Cal.)(alleged fraud in a post-registration affidavit filed during the pendency of a trademark infringement action)(discovery deposition   taken)

Life is Good, Inc. v. L.G. Electronics U.S.A., Inc., 04-11290-REK (D Mass.)(distinctiveness, whether a phrase used on clothing functions as a mark, and alleged misuse of a registration symbol)

Castro Cheese Co. Inc. v. Cacique, Inc. H-04-1581 (SD Texas) (likelihood of confusion and whether a two-color mark was distinctive at the time of registration)

# EXHIBIT 2

**DOCUMENTS REVIEWED**

Plaintiff's Complaint

Defendant's Answer, Affirmative Defenses and Counterclaims

Registration No. 1265094, issued Jan. 24, 1984, including the file prosecution history of the underlying application Ser. No. 73358308, found at
https.tsdrapi.uspto.gov/ts/cd/casedocs/bundle.pdf?sn=73358308

U.S. Patent No. 4,378,116, issued March 29, 1983

Expert Report of Jessie Roberts

Draft Discovery Deposition of Jessie Roberts taken December 12, 2018

# EXHIBIT 3

**CASES AND AUTHORITIES REVIEWED**

*TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 58 USPQ2d 1001 (2001)

*Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 34 USPQ2d 1161 (1995)

*Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 214 USPQ 1 (1982)

*In re Bose Corp.,* 580 F.3d 1240, 91 USPQ2d 1938 (Fed. Cir. 2009)

*Valu Engineering, Inc. v. Rexnord Corp.,* 278 F.3d 1268, 61 USPQ2d 1422 (Fed.Cir. 2002)

*In re Morton-Norwich Products, Inc.*, 671 F.2d 1332, 213 USPQ 9 (C.C.P.A. 1982)

*Grote Industries, Inc. v. Truck-Lite Co., LLC*, 126 USPQ2d 1197 (TTAB 2018)

*Daniel J. Quirk, Inc v. Village Car Co.,* 120 USPQ2d 1146, 1149 (TTAB 2016).

*Nationstar Mortgage LLC v. Mujahid Ahmad,* 112 USPQ2d 1361 (TTAB 2014)

*In re Udor U.S.A., Inc.*, 89 USPQ2d 1978, 1980-82 (TTAB 2009)

Other cases submitted with Plaintiff's Responses in Application SN 73358308 discussed in this Report

Relevant Sections of the Trademark Act, 15 USC §1051 *et seq*.

Relevant Sections of the Trademark Manual of Examining Procedure (Oct. 2018)

1