USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _1/31/2021_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RUBIK'S BRAND LIMITED,

Plaintiff,

– against –

FLAMBEAU, INC., et al.,

Defendants.

**REPORT & RECOMMENDATION ON
MOTION FOR SUMMARY JUDGMENT**

**17-CV-6559 (PGG) (KHP)**

**TO: HON. PAUL G. GARDEPHE, UNITED STATES DISTRICT JUDGE**
**FROM: KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

Plaintiff Rubik's Brand Limited ("RBL" or "Rubik's") owns a trademark registration on the traditional design of the Rubik's Cube puzzle.  RBL alleges that Defendant Flambeau, Inc. ("Flambeau") manufactures and sells a 3x3 puzzle cube (the "Quick Cube") that copies and emulates the distinctive appearance of the Rubik's Cube in violation of the Lanham Act, 15 U.S.C. §§ 1051 *et seq*., as well as New York state law and common law.  Discovery now having been completed, Flambeau has moved for summary judgment.  (ECF No. 156.)  RBL opposes the motion and asks the Court to, instead, grant it summary judgment on all of its claims.[1]  For the reasons set forth below, I respectfully recommend that Flambeau's motion be GRANTED in part and DENIED in part and that RBL's request be GRANTED in part and DENIED in part.

**BACKGROUND**

I.      **The Parties**

---

[1] RBL did not file a formal cross motion for summary judgment but asks for summary judgment in its opposition.

Plaintiff RBL is a United Kingdom LLC that operates out of London, England.  (ECF Nos. 176-77 ("Counter 56.1") ¶ 1.)  RBL's business model is based, at least in part, on its licensing of intellectual property rights to prominent toy manufacturers.  (*See* Counter 56.1 ¶¶ 4-6.)

Defendant Flambeau is a Wisconsin corporation with its principal place of business in Baraboo, Wisconsin.  (Counter 56.1 ¶ 2.)  Generally speaking, Flambeau is a manufacturer and seller of plastic goods.  (*See* Counter 56.1 ¶ 7.)  The well-known Duncan Toy Company (known for its line of popular yo-yos) is a division of Flambeau (Counter 56.1 ¶ 8,) and Flambeau sells the allegedly infringing product – the Quick Cube – through the Duncan Toy Company.  (Counter 56.1 ¶ 9.)

## II.   The Rubik's Cube Puzzle

As part of its business, RBL asserts federal trade dress rights over a design consisting of a black puzzle cube having nine square-shaped color patches on each of its six faces, with the color patches on each face being the same when the puzzle is in the start (or solved) position, and consisting of the colors red, white, blue, green, yellow, and orange (the "3x3 Cube Design").[2]  (Counter 56.1 ¶ 3.)  This specific design, familiarly known in popular culture as the Rubik's Cube, was introduced in the United States in 1980 by Ideal Toy Company ("Ideal").  (Counter 56.1 ¶ 83; ECF Nos. 164-65 ("Reply 56.1") ¶ 395.)[3]  Ideal was granted exclusive rights

---

[2] The modern definition of a trade dress encompasses "the design and appearance of the product . . . and all elements making up the total visual image by which the product is presented to consumers."  *O.P. Solutions, Inc. v. Intellectual Prop. Network, Ltd.*, No. 96-cv-7952 (LAP), 1999 WL 47191, at *22 (S.D.N.Y. Feb 2, 1999) (internal citation omitted).  "Elements comprising a product's trade dress may include features such as size, shape, [and/or] color combinations . . . that the purchasing public has come to associate with a single source."  *Laurel Road Bank v. CommonBond, Inc.*, No. 18-cv-7797 (ER), 2019 WL 1034188, at *3 (S.D.N.Y. Mar. 5, 2019).  While the parties seem to conflate the terms "trademark" and "trade dress" in their briefing, the Court understands the 3x3 Cube Design as a registered trade dress, not a mark.  In any event, the Court notes that the legal significance of the difference is quite limited.  *Score, Inc. v. Cap Cities/ABC, Inc.*, 724 F. Supp. 194, 197 (S.D.N.Y. 1989).

[3] Ideal Toy Company was acquired by CBS, Inc. in the early 1980s.  (Counter 56.1 ¶ 88.)  CBS acquired Ideal's

to make and sell the Rubik's Cube in the United States by Ernö Rubik—the Hungarian inventor responsible for designing the Rubik's Cube.  (Counter 56.1 ¶ 80-82.)

In August 1981, Mr. Rubik applied for a patent for his product with the U.S. Patent and Trademark Office ("USPTO").  (Counter 56.1 ¶ 51.)  Two patents were eventually granted in March of 1983 (Counter 56.1 ¶¶ 51, 56,) and both expired by the early 2000s.  (Counter 56.1¶ 55, 60.)  The patents principally addressed the mechanism of the puzzle cube; that is, how the smaller cubes are manipulated to scramble and solve the puzzle.  However, both patents mentioned the exterior appearance of the puzzle as well.  One patent disclosed that the "surfaces of the small cubes forming each surface of the large cube are colored or carry numbers, figures or any other symbol which can be assembled into a predetermined logical order . . ."  (Counter 56.1 ¶ 54.)  The other patent disclosed a "preferred embodiment" of the puzzle cube wherein the "small cubic elements forming the plane surfaces of the large cube are either colored or indicated with numbers, figures or any other symbols." (Counter 56.1 ¶ 58.)  Importantly, neither patent disclosed specific colors to be used or the color of the cube base.  (*See* ECF Nos. 159-60 ("56.1"), Exs. 23-24.)

In March of 1982, Ideal applied to register the 3x3 Cube Design as a trademark on the Principal Register of the USPTO.  (56.1, Ex. 31.)  In an addendum to its initial application, Ideal specified the scope of its requested trademark by confirming that competitors would be free to develop alternative puzzle cubes "formed of any color plastic material" besides black and that

---

intellectual property rights to the 3x3 Cube Design as part of the acquisition.

the "color patches need not be square . . . nor need they be colored . . . [a]nd, if colored, they need not be the precise colors used" for the Rubik's Cube.  (56.1, Ex. 33 at 3.)

On May 31, 1983, an examiner from the USPTO approved the 3x3 Cube Design for trademark registration.  (Counter 56.1 ¶ 121.)[4]  In the registration, the trade dress is described as consisting "of a black cube having nine color patches on each of its six faces with the color patches on each face being the same and consisting of the colors red, white, blue, green, yellow and orange."  (56.1, Ex. 37.)  Although the sketches accompanying the registration are in black and white, the drawings mark each of the cube faces with lines to denote the colors red, green, orange, blue, and yellow.  (*Id.*)

The registration was eventually issued to CBS, Inc. on January 24, 1984 under Registration No. 1,265,094.  (Counter 56.1 ¶ 122.)  Since that time, the Rubik's Cube has been consistently sold in the United States as a black-based puzzle cube with the same six exterior colors noted above.  (Reply 56.1 ¶ 396.)  In 1986, Seven Towns Limited, another United Kingdom company, acquired the U.S. intellectual property rights to the Rubik's Cube.  (Counter 56.1 ¶ 126.)  Those rights were then assigned to RBL in 2013.  (Counter 56.1 ¶ 127.)  Today, RBL licenses the rights to advertise and sell the Rubik's Cube to three licensees: (1) Hasbro, Inc., (2) Winning Moves, Inc., and (3) Super Impulse USA.  (*See* Reply 56.1 ¶¶ 421, 425, 427.)  The puzzle cubes sold by these licensees all feature the Rubik's brand logo on the center white segment of the cube.  (*See* Counter 56.1 ¶ 157.)

---

[4] Prior to this approval, the USPTO had twice refused the registration on grounds of functionality.  (Counter 56.1 ¶¶ 110-11.)

After achieving initial success in the U.S. toy market, the Rubik's Cube rose to further prominence by penetrating other areas of media and popular culture.  The 3x3 Cube Design itself has been featured in numerous movies, print advertisements, television commercials, and music videos in the U.S. (Reply 56.1 ¶ 403,) and has received many awards and other forms of recognition as an influential toy.  (*See, e.g.*, Reply 56.1 ¶¶ 399-402.)  More generally, the parties agree that puzzle cubes have recently risen to prominence thanks, in part, to the advent of "speed cubing," a competitive activity where individuals strive to solve three dimensional puzzle cubes as quickly as possible.  (Counter 56.1 ¶¶ 130-31.)[5]

Today, RBL also issues a style guide to its licensees that requires all Rubik's Cubes to have a black base and faces with uniform, square patches in the six colors laid out in the trade dress registration.  (Counter 56.1 ¶ 153.)  Further, the style guide requires that the colors incorporated on the cubes' faces adhere to specific Pantone color numbers.  (*Id.*)

In order to preserve its rights to the 3x3 Cube Design, RBL alleges that it invests substantial money, time, and effort to enforce its trademark rights.  (Reply 56.1 ¶ 430.)  These efforts include litigation, cease and desist letters, and engaging third-parties to monitor and flag potentially infringing products that enter the toy market.  (*Id.*)

### III.    The Quick Cube

In 2015, Flambeau initiated development of its own 3x3 puzzle cube.  (*See* Counter 56.1 ¶ 180.)  The result of those efforts was the Duncan Quick Cube.  The Quick Cube is a 3x3 puzzle cube with a white base.  (Reply 56.1 ¶¶ 383-84.)  Like the 3x3 Cube Design, the Quick Cube has

---

[5] Competitors at World Cubing Association events – the largest international organization for speed cubing – are permitted to use any polyhedral puzzle that uses a "color scheme with one unique color per face in the solved state."  (Counter 56.1 ¶¶ 132, 134-36.)

red, white, blue, green, yellow, and orange colored patches on each of its six faces.  (Reply 56.1

¶¶ 386-87.)  However, the Quick Cube's color patches are fluorescent shades of those colors

and are distinguishable from the primary and secondary colors used in the 3x3 Cube Design.

(*See* 56.1, Exs. 3, 6, 7, 8.)  Moreover, the inner corners of the smaller cube segments of the

Quick Cube and those segments' corresponding colored stickers are cut away from the center,

creating a slightly less linear grid than that of the Rubik's Cube.  (56.1, Ex. 3; Counter 56.1 ¶

189.)  Thus, while there is certainly a degree of similarity between the products, they are not

identical.  Both products are depicted below.



(56.1 ¶ 308.)

While developing the Quick Cube, Flambeau targeted the Rubik's Cube as a primary

competitor (Reply 56.1 ¶ 417,) hoping that the Quick Cube would be "like" the Rubik's Cube,

but at half the retail price.  (Counter 56.1, Ex. 189, ¶ 417.)  However, before putting the Quick

Cube out to market, Flambeau consulted with counsel as to whether the Quick Cube infringed

on the 3x3 Cube Design.  Based on almost 30 years' experience in intellectual property law, Flambeau's counsel opined that Flambeau would avoid infringement "by offering a white cube." (56.1, Ex. 13.)

After receiving this opinion, Flambeau began selling the Quick Cube in March 2016. (Counter 56.1 ¶ 185.)  The packaging for the first order of Quick Cubes to be sold in the U.S. displayed an image of the 3x3 Cube Design (*i.e.*, a black cube base with the distinct primary and secondary colored patches that comprise the 3x3 Cube Design).  (Reply 56.1 ¶ 392.)  Soon thereafter, the packaging was changed to depict a Quick Cube (*i.e.*, a white base with fluorescent colored patches).  (*Id.*)

Flambeau sells its Quick Cubes directly to retailers such as Target and Staples.  (Counter 56.1 ¶¶ 326-27.)  The Rubik's Cube is also sold at these retail locations (Reply 56.1 ¶¶ 416, 422, 426,) and these retailers have occasionally displayed the products side by side.  (Reply 56.1 ¶ 420.)

IV.     **The Instant Action**

RBL initiated this suit against Flambeau on August 28, 2017.  RBL alleges five causes of action, including: (i) trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1)(a); (ii) false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a); (iii) trademark dilution under the Lanham Act, 15 U.S.C. § 1125(c); (iv) unfair business practice under New York GBL § 360-l; and (v) common law trademark infringement.  (ECF No. 1 (the "Complaint").)  In the Complaint, RBL requests, *inter alia*, injunctive relief and damages under the relevant statutes and law.  (*Id.*)  Flambeau asserts the affirmative defense of non-infringement and has

counterclaimed to cancel RBL's trademark registration on grounds of functionality and fraud. The Court addresses each claim and the parties' arguments in detail below.

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, a court may grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "'material' when it 'might affect the outcome of the suit under the governing law.'" *Anderson v. Hertz Corp.*, 507 F. Supp. 2d 320, 326 (S.D.N.Y. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), *aff'd*, 303 Fed. App. 946 (2d Cir. 2008). "The movant bears the burden of demonstrating the absence of a genuine dispute of fact, and, to award summary judgment, the court must be able to find 'after drawing all reasonable inferences in favor of a non-movant' that 'no reasonable trier of fact could find in favor of that party.'" *Palmer/Kane LLC v. Rosen Book Works LLC*, 204 F. Supp. 3d 565, 568 (S.D.N.Y. 2016) (internal citation omitted) (first citing *Anderson*, 477 U.S. at 256; then quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (explaining that the moving party is entitled to summary judgment where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof").

Further, if the Court's analysis reveals that there are no genuine issues of material fact and that the law is on the side of the non-movant, the Court may grant summary judgment in favor of the non-movant even though no formal cross-motion was filed. *Orix Credit Alliance v. Horten*, 965 F. Supp. 481, 484 (S.D.N.Y. 1997) (citing *International Union of Bricklayers and*

*Allied Craftsmen v. Gallante*, 912 F. Supp. 695, 700 (S.D.N.Y. 1996)).  However, before granting

summary judgment in favor of a nonmoving party, the movant must be afforded an adequate

opportunity to present all of its evidence.  *Horten*, 965 F. Supp. at 484 (citation omitted).

Where the movant has fully raised an issue on its own, courts in this Circuit find that the "threat

of procedural prejudice [to the moving party] is greatly diminished."  *Coach Leatherware Co. v.*

*AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991) ("[i]mplicit in our earlier decisions is the

recognition that despite varying burdens of production, the threat of procedural prejudice is

greatly diminished if the court's *sua sponte* determination is based on issues identical to those

raised by the moving party").

  "In evaluating whether the parties have met their respective burdens, this Court

'examine[s] the record as a whole, just as a jury would . . . .'"  *Sealy v. Hertz Corp.*, 688 F. Supp.

2d 247, 254 (S.D.N.Y. 2009) (alteration in original) (quoting *Byrnie v. Town of Cromwell Bd. of*

*Educ.*, 243 F.3d 93, 102 (2d Cir. 2001), *superseded on other grounds by* Fed. R. Civ. P.

37(e)).  Thus, to receive consideration, evidence submitted in support of or in opposition to a

motion for summary judgment must be admissible at trial.  Fed. R. Civ. P. 56(c)(4); *see Santos v.*

*Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) ("[a]ffidavits submitted to defeat summary

judgment must be admissible themselves or must contain evidence that will be presented in an

admissible form at trial." (citing *Celotex Corp.*, 477 U.S. at 323–24)); *see also Burlington Coat*

*Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (plaintiff could not

rely on inadmissible hearsay to oppose motion for summary judgment).  Rule 56 also provides

that a "party asserting that a fact cannot be or is genuinely disputed must support the assertion

by . . . citing to particular parts of materials in the record . . . or showing that the materials cited

do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56 (c)(1).  A nonmoving party cannot create a material issue of fact to defeat summary judgment by making conclusory statements that are unsupported by admissible evidence.  *See Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012); *see also Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC*, 3 F. Supp. 3d 171, 179 (S.D.N.Y. 2014) ("There is no issue of material fact where the facts are irrelevant to the disposition of the matter. Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact.").  Additionally, any legal conclusion framed as an undisputed fact must be disregarded.  *See Wojcik v. 42nd St. Dev. Project*, 386 F. Supp. 2d 442, 448 n.5 (S.D.N.Y. 2005).

When determining whether a grant of summary judgment is appropriate, the court's decision should not hinge on whether it "'believes that the plaintiff will be unable to meet his or her burden of persuasion at trial.'"  *Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 493 (S.D.N.Y. 2010) (alteration in original) (quoting *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54 (2d Cir. 1998)).  Instead, the court must determine whether there is such a "'lack of evidence in support of the [non-movant's] position" or evidence that is "'so overwhelmingly tilted in one direction that any contrary finding would constitute clear error.'"  *Id.*  It is well-settled that "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) (alteration in original) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55–56 (2d Cir. 1997)).

## **MOTION TO STRIKE**

Flambeau requests that the Court strike various portions of RBL's submissions in opposition to summary judgment.  Specifically, Flambeau asks that the Court disregard (1) all of RBL's references to, and reliance on, third-party puzzle cube alternatives to disprove the 3x3 Cube Design's functionality; (2) statements from an RBL corporate representative that the Quick Cube causes confusion, reputational harm, and lost sales, which Flambeau asserts contradict prior deposition testimony; and (3) statements from another RBL Corporate representative related to consumer confusion, which Flambeau asserts similarly contradict prior deposition testimony.  (*See generally* ECF Nos. 168-70.)

Because a decision on a party's motion to strike may impact a movant's ability to prevail on summary judgment, as is the case here, it is appropriate to evaluate the merits of a motion to strike concurrently with the summary judgment motion.  *Faulkner v. Arista Records*, 797 F. Supp. 2d 299, 305 (S.D.N.Y. 2011) (citing *Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 213 (S.D.N.Y. 2007)).  RBL opposes Flambeau's motion to strike claiming that the motion is procedurally improper because Federal Rule of Civil Procedure 12(f) – which governs motions to strike – only permits a Court to strike pleadings, not briefs, declarations, or exhibits. However, the Court possesses the inherent authority to strike any submission it determines to be "abusive or otherwise improper under the circumstances."  *See Sierra v. United States*, No. 97-cv-9329 (RWS), 1998 WL 599715, at *9 (S.D.N.Y. Sept. 10, 1998).  Indeed, notwithstanding the language of Rule 12, Courts in this District have entertained motions to strike while ruling on related motions for summary judgment.  *See, e.g.*, *Faulkner*, 797 F. Supp. 2d at 305; *Davis v. Carroll*, 937 F. Supp. 2d 390, 411 (S.D.N.Y. 2013) ("[i]t is well settled that courts may rule on evidentiary determinations, including motions to strike expert testimony for failure to comply

with Federal Rule of Evidence 702, on motions for summary judgment") (citation omitted).

Accordingly, the Court will consider, to the extent necessary, each of Flambeau's arguments in

support of striking certain evidence in conjunction with the Court's assessment of the claims to

which those portions of the record relate.

## DISCUSSION

To prove trademark infringement or false designation of origin under 15 U.S.C. §

1114(1) and § 1125(a), a plaintiff must show that (1) its mark is protectable, and that (2) there

is a likelihood of consumer confusion as to the origin or sponsorship of the defendant's goods.

*Virgin Enters. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003).  Courts typically find that registered

marks are presumptively distinctive and automatically protectable.  *Nabisco v. Warner-Lambert*

*Co.*, 32 F. Supp. 2d 690, 696 (S.D.N.Y. 1999).  The same is true for registered trade dresses, like

the 3x3 Cube Design.  *Vox Amplification Ltd v. Meussdorffer*, 50 F. Supp. 3d 355, 372-73

(E.D.N.Y. 2014).  While Flambeau concedes that the 3x3 Cube Design is registered, Flambeau

nevertheless seeks to rebut the presumption of protectability by arguing that the trade dress is

functional and/or that it was obtained through fraud.  Accordingly, in order to determine the

initial threshold issue of whether the 3x3 Cube Design is protectable, the Court must assess

these defenses.

### I.    Functionality

If a plaintiff's trade dress is deemed functional, the doctrine of functionality precludes

the asserted trade dress from protection under the relevant statutes.  This doctrine "prevents

trademark law from inhibiting legitimate competition by giving monopoly control to a producer

over a useful product."  *Nora Beverages, Inc. v. Perrier Grp. of Am.*, 269 F.3d 114, 120 n.4 (2d

Cir. 2001) (citation omitted).  Specifically, a trade dress is considered "functional" where a

competitor will be put at a significant disadvantage because the feature at issue is "essential to

the use or purpose" of the product or "affects its cost or quality."  *Landscape Forms, Inc. v.*

*Columbia Cascade Co.*, 70 F.3d 251, 253 (2d Cir. 1995) (citing *Qualitex Co. v. Jacobson Prods.*

*Co.*, 514 U.S. 159 (1995)) (alteration omitted).

In assessing functionality, a court should examine "(1) the degree of functionality of the

similar features of the product, (2) the degree of similarity between the non-functional

(ornamental) features of the competing products, and (3) the feasibility of alternative designs

that would not impair the utility of the product." *Fabrication Enters., Inc. v. Hygienic Corp.*, 64

F.3d 53, 59 (2d Cir. 1995).  Further, when an asserted trade dress involves the overall

impression created by a combination of product features, the Court must evaluate the

functionality of those features taken together, not individually.  *LeSportsac, Inc. v. K Mart Corp.*,

754 F.2d 71, 76 (2d Cir. 1985).  Because RBL's registration of the 3x3 Cube Design is prima facie

evidence of its right to use the trade dress in commerce, it is Flambeau's burden to prove its

functionality defense by a preponderance of the evidence.  *Mech. Plastics Corp. v. Titan Techs.,*

*Inc.*, 823 F. Supp. 1137, 1145 (S.D.N.Y. 1993); *see also LeSportsac, Inc.*, 754 F.2d at 76.

There are two types of functionality: "utilitarian" and "aesthetic".  *Christian Louboutin*

*S.A. v. Yves Saint Laurent Am. Holding, Inc.*, 696 F.3d 206, 217, 219 (2d Cir. 2012).  Flambeau

asserts that the 3x3 Cube Design at issue is both utilitarian and aesthetically functional and,

therefore, not a protectable trade dress. I address each argument in turn below.

A. **Utilitarian Functionality**

The test for "utilitarian" functionality in this Circuit mirrors the definition of the functionality defense outlined above.  It assesses: (1) whether a particular feature or appearance is "essential" to the use or purpose of a product; or (2) whether that feature or appearance affects the cost or quality of the product.  *Christian Louboutin*, 696 F.3d at 219.  A trade dress is considered "essential" if it is dictated by the functions to be performed by the product.  *Id.* (citing *LeSportsac, Inc.*, 754 F.2d at 76).  And a trade dress affects the cost or quality of a product when it allows the product to be manufactured more cheaply or improves the product's performance or operation.  *Id.* (citation omitted).

*Evidence of Utilitarian Functionality:*

Before addressing the parties' arguments, the Court must first evaluate the extent to which it can consider RBL's evidence opposing utilitarian functionality.   As noted above, Flambeau moves to strike all exhibits, testimony, and statements of fact related to one of RBL's counterarguments—*i.e.*, that various non-infringing alternatives to the 3x3 Cube Design evidence the non-functionality of the trade dress.  Specifically, RBL offers screenshots and catalogs of alternative puzzle cubes as exhibits (annexed to an attorney declaration) to show that these non-infringing 3x3 puzzle cubes are currently sold in the market.  (*See* Counter 56.1, Exs. 77, 174-78.)  In support of its motion to strike this evidence, Flambeau points to the deposition testimony of RBL's president and corporate representative, David Kremer, and RBL's expert witness, Richard Gottlieb, arguing that these witnesses failed to conclusively testify as to whether RBL considered certain alternative puzzle cubes to "infringe" on RBL's trademark rights.  Flambeau argues that RBL cannot now rely on examples of non-infringing alternatives to defeat summary judgment in light of these prior equivocations.

14

It is true that neither an expert nor a lay witness can plead ignorance while testifying at a deposition only to later offer a firm opinion on the same issue under the cover of a sworn declaration.  *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 117 F. Supp. 3d 276, 295 (S.D.N.Y. 2015) (refusing to consider an expert's declaration that clearly contradicted his prior sworn deposition testimony); *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193-94 (2d Cir. 2013) (holding that the District Court was entitled to disregard a witness's testimony due to contradictions between her first and second deposition that were unequivocal, unexplained, material, and prompted by a motion for summary judgment).  But, the evidence at issue here does not clearly contradict these witnesses' prior deposition testimony.  Kremer testified that he was "not competent" to determine whether other puzzle cubes infringe on RBL's trade dress rights.  (ECF No. 171, Ex. B, 243:23-245:17.)  Indeed, counsel for RBL objected to this line of questioning on the ground that it called for a legal conclusion.  (*Id.*)  Gottlieb similarly declined to comment as to whether these alternative cube designs infringed on the trade dress at issue.  (ECF No. 171, Ex. D, 290:11-292:25.)  While these witnesses certainly failed to provide concrete answers detailing the scope of RBL's trademark rights, it cannot be said that these equivocations clearly contradict the arguments now asserted by RBL in opposition to summary judgment or that they render the catalogs inadmissible.[6]  Moreover, Flambeau consistently relies on the heavily saturated 3x3 puzzle cube market to support various arguments throughout its briefing.  (*See, e.g.*, ECF Nos. 157-58 ("MOL in Supp.") at 16.)

---

[6] RBL also points out that Kremer was not questioned at his deposition about any of the specific alternative product designs that Flambeau seeks to strike.  This too provides another ground for denial of this portion of the motion to strike.

Flambeau cannot cite to this evidence and then, in the same stroke, ask that RBL be precluded from using similar information to dispute functionality.

To the extent Flambeau also argues that the exhibits referencing these non-infringing alternatives are inadmissible hearsay and that RBL's attorney lacks the requisite personal knowledge to authenticate the alternative products at issue, the case law holds otherwise. Courts in this District have found that an attorney declaration provides an adequate basis to render screenshots of advertisements and websites admissible for purposes of summary judgment. In *Giggle, Inc. v. netFocal Inc.,* the Court explained that evidence of third-party marks can be relevant if indicative of how the third parties actually use the marks in commerce. 856 F. Supp. 2d 625, 632-33 (S.D.N.Y. 2012). Further, the Court held that the screenshots were not themselves hearsay and were properly authenticated by an attorney affidavit. *Id.* at 633.

In another case, *Luv N' Care, LTD v. Regent Baby Prods. Corp.*, the court permitted use of website images as evidence to show that the contested mark had long been used in the market. 986 F. Supp. 2d 400 (S.D.N.Y. 2013). Citing *Giggle*, the court held that the website images were admissible because they were authenticated by an attorney declaration and were not offered for the truth of any assertion contained within the exhibits. Rather, the evidence was offered merely to show that the product at issue was readily available in the market. *Id.* at 408 n.40. Here, much like in *Luv N' Care*, RBL offers screenshots and catalogs of alternative puzzle cubes as exhibits (annexed to an attorney declaration) to show that these products currently exist in the market. Consistent with the case law, these exhibits would be admissible at trial and, therefore, may be considered in connection with the instant motion for summary judgment. Accordingly, I recommend that this portion of Flambeau's motion to strike be denied.

_Whether the Trade Dress is Essential to the Cube's Function:_

Reverting back to the analysis of utilitarian functionality, as stated above, Flambeau bears the burden of showing that the features of the 3x3 Cube Design are "essential" to the use or purpose of the Rubik's Cube.  In other words, Flambeau must show that the trade dress itself is dictated by the functions to be performed by the Rubik's Cube.  _Christian Louboutin_, 696 F.3d at 219.

On this point, both parties agree that the purpose of RBL's product is to "twist and turn the Rubik's Cube" in order to solve the puzzle.  (Counter 56.1 ¶ 164.)  Thus, Flambeau argues that the 3x3 Cube Design is essential to that purpose because its "smaller cubes allow the puzzle to be twisted and turned" and its "six distinct colors allow the puzzle to be scrambled and solved."  (MOL in Supp. at 10.)  This argument, however, misconceives the scope of the appropriate inquiry.

First, RBL does not seek to protect the smaller cube elements of the Rubik's Cube that allow it to be physically scrambled nor the design style that uses distinct color faces to signal whether the cube has been solved.  Such general elements of the product are undoubtedly functional as they are central to most 3x3 puzzle cube designs and, if protected, would effectively grant RBL a monopoly on the puzzle cube market.  Rather, RBL seeks to protect what it contends is its unique combination and arrangement of product elements: namely, "a black cube . . . with the color patches on each face being the same and consist[ing] of the colors red, white, blue, green, yellow, and orange."  (Compl. Exs. 2-A, 2-B; 56.1, Ex. 37; _see also_ Counter 56.1 ¶ 3.)[7]  Second, it is the overall impression of these elements defining the trade dress,

---

[7] Indeed, counsel for RBL acknowledged at oral argument that the 3x3 Cube Design only encompasses the specific

taken together, that Flambeau must prove to be functional. By focusing on the "smaller cubes" and the use of "distinct colors" Flambeau fails to proffer any evidence that the black grid and the specific Pantone colors of the 3x3 Cube Design are essential to the purpose of solving the puzzle. Thus, Flambeau's argument misses the mark (literally and figuratively).

Flambeau also argues that RBL's prior utility patents disclose the functional advantage of the 3x3 Cube Design and provide strong evidence that it is essential to the product. As the Supreme Court has explained: "[a] utility patent is strong evidence that **the features therein claimed** are functional." *Traffix Devices v. Mktg. Displays*, 532 U.S. 23, 29 (2001) (emphasis added). In *Traffix*, the central feature claimed in the expired utility patents – a dual-spring design – was also the essential feature of the trade dress rights advanced by the respondent. The Court in *Traffix* noted the substantial functional advantages of the dual-spring design versus a single-spring design, as evidenced by prior patent applications and specifications. *Id.* at 31-32. Thus, the Court found that the respondent could not overcome the strong evidentiary inference of functionality based on the expired utility patents and "based on the disclosure of the dual-spring design in the claims of [those] patents." *Id.* at 30.

*Traffix* is distinguishable from the case at bar because RBL's prior utility patents do not disclose the specific color combination of the 3x3 Cube Design, which encompasses the central features of the trade dress at issue in this case. Indeed, the record clearly shows, and Flambeau admits, that this is the case. (56.1, Exs. 23-24; Counter 56.1 ¶¶ 38, 44, 50, 54, 58, 125; MOL in Supp. at 11-12.)

---

Pantone colors employed by the Rubik's Cube—not any and all shades of those colors. (*See* Oral Arg. Tr. from Jan. 25, 2021.)

Flambeau nevertheless cites to *Schutte Bagclosures, Inc. v. Kwik Lok Corp.*, 193 F. Supp. 3d 245, 267 (S.D.N.Y. 2016), for the proposition that this level of specificity in prior patents is unnecessary to impose a presumption of functionality on the 3x3 Cube Design.  In *Kwik Lok*, the court found that prior patents referencing a smooth-edged narrow opening located in a longitudinal side edge of the product were sufficiently specific to evidence the functionality of the 90-degree V-shaped opening feature of the asserted trade dress.  *Id.*  But even that level of specificity in the prior patents is not evident in this case.  Although some of the patents cited by Flambeau reference color generally, none of them specify any of the colors RBL currently seeks to protect as part of an enforceable trade dress and many list alternatives to color, such as symbols or numbers.  (*See, e.g.*, 56.1, Exs. 23-24; *see also* MOL in Supp. at 12.)  Nor do any of these prior patents claim a black base.  Thus, no reasonable trier of fact could find that these patents evidence utilitarian functionality of the 3x3 Cube Design.

*Whether the RBL Design Affects Cost or Quality:*

With regard to the other method of demonstrating utilitarian functionality—showing that the 3x3 Cube Design affects the cost or quality of the product—Flambeau argues that the trade dress's black base and colored stickers affect the Rubik's Cube's cost and that the specific primary and secondary colors used in the 3x3 Cube Design maximize the speed by which the puzzle can be solved, thereby affecting its quality.

1. *Cost*

With regard to cost, Flambeau asserts that black plastic, which forms the base of the 3x3 Cube Design, is cheap and widely available compared to other color alternatives.  (*See* Counter 56.1 ¶ 273.)  Flambeau's only support for this proposition is the deposition testimony of Mark

Cippola, one of its experts.  Cippola testified that, as a general matter, the color "black is typically the easiest and cheapest color to achieve in plastic . . ."  (56.1, Ex. 65 at 88:15-20.)  But Flambeau offers no evidence specifically concerning the cost of a black versus a white (or any other color) *puzzle cube base* or as to whether there are alternative materials, besides plastic, that might be used to create a 3x3 puzzle cube.

Flambeau likewise asserts that colored stickers are a cost effective means of creating the external indicia of a puzzle cube as opposed to, for example, making the base components different colors so as to avoid the use of stickers altogether.  (*Id.* ¶ 274.)  However, Flambeau offers no evidence concerning the comparative cost of stickers with the primary and secondary colors used by Rubik's versus alternative stickers, such as those with figures or symbols or with different shapes or colors.  (*See* 56.1, Ex. 65 94-96; *see also* Oral Arg. Tr. from Jan. 25, 2021.)  Absent such evidence, or some other evidence that the 3x3 Cube Design meaningfully stifles competition in the manufacturing of competing cubes, Flambeau cannot demonstrate that the 3x3 Cube Design is utilitarian functional based on cost.  *See Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 166 (1995) (finding that colors can sometimes be entitled to trade dress protection, in part, because "[a]lthough it is important to use *some* color . . . to avoid noticeable stains, the court found 'no competitive need in the press pad industry for the green-gold color, since other colors are equally usable'") (emphasis in original) (citation omitted).  Accordingly, no reasonable trier of fact could find that the 3x3 Cube Design affects the cost of the Rubik's Cube for purposes of establishing functionality.

    *2.  Quality*

With regard to quality, Flambeau contends that the color combination comprising the 3x3 Cube Design is superior to all possible alternative designs made up of different external indicia.  Flambeau's expert, Lee Loetz, analyzed the specific color combination of the Rubik's Cube and opined that it provides "maximum contrast" and that such visual contrast makes solving the puzzle quicker and easier for typical consumers.  (56.1, Ex. 16 ("Loetz Report") ¶ 73; *see also* 56.1 ¶ 234.)  The "maximum contrast" colors also afford speed cubers a competitive advantage, according to Flambeau.  In other words, the specific colors, by virtue of their contrast, impact both solvability and the speed with which a competitive cuber can solve the puzzle.

With respect to solvability per se, no reasonable trier of fact could find that the specific colors of the 3x3 Cube Design affect the quality of the Rubik's Cube.  Indeed, a Court in this District previously found that, while there may be minor functional justifications for the colors RBL chose for the 3x3 Cube Design, "[w]here there are a great number of available colors, shades of colors, and color combinations, plaintiff's distinct color combination must be considered non-functional."  *Ideal Toy Corp. v. Chinese Arts & Crafts, Inc.*, 530 F. Supp. 375, 378 (S.D.N.Y. 1981).  Although the court made this finding in the context of a request for a preliminary injunction, it is no less applicable here.  *See Victorinox AG v. B&F Sys.*, 709 Fed. App. 44, (2d Cir. 2017) (summary order) (citing *Louboutin*, a preliminary injunction case, for the functionality standard to be employed on review of a decision rendered on summary judgment).  Flambeau does not offer any evidence that warrants a different finding.  The vast number of alternative colors, shades, and combinations referenced by the Court in *Chinese Arts & Crafts* still exist today, and there are many contrasting combinations that can be used to

adequately distinguish the faces of each side of the cube for purposes of solving it. *Cf. Banff LTD v. Limited Inc.*, 869 F. Supp. 1103, 1114 (S.D.N.Y. 1994) (holding that protecting plaintiff's particular sweater design was not a bar to competition since it was only one of "numerous possible 'overall' combinations").

On this issue, Flambeau argues that this Court cannot rely on the limitless color combination alternatives cited in *Chinese Arts & Crafts* in light of the Supreme Court's intervening decision in *Traffix*.  However, the determination in *Traffix* that there is no need to "engage . . . in speculation about other design possibilities" in ruling on functionality was *predicated* on the Supreme Court's baseline finding that the dual-spring design at issue was functional.  532 U.S. at 33.  Stated otherwise, the Court held that once utilitarian functionality is established courts are not required to extend the inquiry into hypothetical design alternatives. Importantly, however, functionality has not been established with respect to the 3x3 Cube Design, as discussed above.  Thus, *Traffix* does not preclude consideration of the decision in *Chinese Arts & Crafts* or this Court from finding that the numerous color combinations available to cube puzzle makers render the 3x3 Cube Design non-essential to its function.

Additionally, Flambeau has not offered evidence to support the notion that the speed with which a lay purchaser can reach the puzzle cube's solved state is the appropriate metric to measure the "quality" of the Rubik's Cube.  Puzzle solvability runs on a continuum of easy to hard, which arguably is not a measure of "quality" at all, but rather a factor that distinguishes different puzzles for consumers based on their desired puzzle difficulty.

In the context of speed cubing, however, it is abundantly clear that competitors will seek out the cube that will help them solve the puzzle as fast as possible.  The Quick Cube has

cut-away edges to improve twisting and turning speed.  (*See* Counter 56.1 ¶ 189.)  Additionally, according to Flambeau's expert, speed cubers seek out cubes with maximum color contrast since it will help them solve their cubes most quickly.  (*See* Loetz Report ¶¶ 101, 103.)[8]  The question arises, however, whether it is appropriate to evaluate quality and functionality only with respect to the subset of consumers who are involved in speed cubing.  At least one court in this District has stated that, when assessing a trade dress's functionality, a Court should analyze the trade dress in the context of how it is most commonly used in the market.  *Kwik Lok Corp.*, 193 F. Supp. 3d at 262-63.  The weight of the evidence strongly suggests that speed cubing is fairly uncommon for most purchasers of the Rubik's Cube.  (*See* 56.1, Ex. 61 ("Kremer Dep. Tr.") 224-25) (testifying that RBL licenses the rights to a separate cube with a different licensee to target "the small segments of the population that are involved in" speed cubing).  Indeed, while Flambeau touts that the 24,000 first-time competitive cubers at World Cubing Association events in 2017 was an all time high (56.1 ¶ 133,) RBL certifies that it sold 3.5 *million* 3x3 Rubik's Cubes that same year.  (Counter 56.1, Ex. 75 ("Kremer Decl.") ¶ 19.)  Accordingly, it would be inappropriate for the Court to consider Flambeau's quality-based functionality argument to the extent it specifically applies to the limited arena of competitive speed cubing, as this is clearly not how the cube is most commonly used.

In light of the above, no reasonable trier of fact could find that the 3x3 Cube Design affects the quality of the Rubik's Cube for purposes of establishing functionality.

---

[8] While RBL concedes that color may influence memory as a general matter, it cites to literature covering the competitive subculture of speed cubing which demonstrates that speed cubers tend to rely on cube positioning algorithms, muscle memory, and reflexes – not colors – to solve puzzle cubes at a competitive clip.  (Counter 56.1 Ex. 193 at FLAMBEAU002212-13; *see also* Counter 56.1 ¶ 214.)  However, these are out of court statements offered for their truth.  Thus, they are classic hearsay and cannot be considered on summary judgment.  *See* Fed. R. Evid. 801.

B. **Aesthetic Functionality**

Where a party asserts that a product is aesthetically functional, courts must inquire as to whether acknowledging the contested trademark or trade dress would "put competitors at a significant non-reputation-related disadvantage." *Christian Louboutin*, 696 F.3d at 221 (quoting *Traffix*, 532 U.S. at 32-33). Simply put, "a mark is aesthetically functional, and therefore ineligible for protection under the Lanham Act, where protection of the mark *significantly* undermines competitors' ability to compete in the relevant market." *Christian Louboutin*, 696 F.3d at 222 (emphasis in original). Therefore, courts must weigh the benefits of protecting the aesthetic, source-identifying aspects of the mark against the cost to competition if competitors were precluded from utilizing the feature at issue. *Fabrication Enters.*, 64 F.3d at 59.

As mentioned above, the contemplated trade dress is limited to the distinct colors of the 3x3 Cube Design (*i.e.*, the white, blue, green, yellow, and orange colors on the square stickers and a black base). (Compl., Exs. 2-A & 2-B.) The exterior colors in the trade dress are further limited to the specific Pantone color numbers highlighted in RBL's style guide. (*See* Counter 56.1 ¶ 153.) Indeed, Ideal's trademark application to register the 3x3 Cube Design was premised on this limited conception of the trade dress. The application confirms that competitors are free to develop puzzle cubes "formed of any color plastic material" besides black and that the "color patches need not be square . . . nor need they be colored . . . [and] need not be the precise colors used" by RBL. (56.1, Ex. 33 at 3.) Further, the Third Circuit previously found that these colors are not aesthetically functional. *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78 (3d Cir. 1982). In that case, the Court noted:

> this case presents no issue of aesthetic functionality. Moreover, the
> district court – having been presented with exhibits showing various

24

> manufacturers' cube puzzle versions marked with numbers, domino
> designs, and pictures of fruit – observed that there are a 'wide variety' of
> colors, shapes, and markings which could be used to differentiate the
> faces of a cube puzzle. Therefore, the concern for competition that we
> expressed in *Keene* does not extend to the circumstances of this case in
> which the possible trade dress variations are limited only by the
> designers' imaginations.

*Id.* at 81 n.4; *see also Banff LTD*, 869 F. Supp. at 1113-15 (holding product non-functional, in part, because "Banff is seeking protection for its particular expression of the elements of an Aran sweater; it is not seeking to foreclose others from competing in the broader market"). Flambeau has cited no authority – and I am aware of none – that supports a different conclusion with respect to aesthetic functionality on the facts of this case.[9]  Nor is there sufficient evidence demonstrating that the 3x3 Cube Design significantly hinders competitors from competing in the United States puzzle cube market.

*        *        *

Based on the above, no reasonable trier of fact could conclude that the 3x3 Cube Design is functional.  Accordingly, I respectfully recommend that Flambeau's first counterclaim as well as its fourth and fifth affirmative defenses, all of which assert trade dress invalidity due to functionality, be dismissed as a matter of law.

## II.    Fraud

A party fraudulently obtains a trademark registration when he/she "knowingly makes false, material representations of fact in connection with his application."  *MPC Franchise, LLC*

---

[9] Flambeau does cite to *Jay Franco & Sons, Inc. v. Franek*, 615 F.3d 855 (7th Cir. 2010), for the proposition that "the more rudimentary and general the element," such as all shades of a particular color, "the more likely it is that restricting its use will significantly impair competition."  However, insofar as RBL's trade dress is specifically limited to the Pantone colors that comprise the 3x3 Cube Design (as RBL confirmed during oral argument), it does not encompass all secondary colors, all tertiary colors or all shades of the colors and, therefore, does not significantly inhibit competition. Thus, this case does not aid Flambeau's argument.

*v. Tarntino*, 826 F.3d 653, 658 (2d Cir. 2016) (citing *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009). The trademark applicant in question must have done so "with the intent to deceive the" USPTO. *MPC Franchise*, 826 F.3d at 659. Thus, it is Flambeau's burden to prove by clear and convincing evidence that RBL's predecessors had a subjective intent to deceive the USPTO; this standard must be applied strictly. *Haggar Int'l Corp. v. United Co. for Food Indus. Corp.*, 906 F. Supp. 2d 96, 127 (E.D.N.Y. 2012); *see also Privado Mktg. Grp. LLC v. Eleftheria Rest. Corp.*, No. 13-cv-3137 (ER), 2017 WL 1167332, at *8 (S.D.N.Y. Mar. 27, 2017) ("subjective intent to deceive can be inferred from indirect and circumstantial evidence") (citation omitted); *Orient Express Trading Co. v. Federated Dep't Stores, Inc.*, 842 F.2d 650, 653 (2d Cir. 1988) (collecting cases). If a court finds that a trademark registration was, in fact, obtained through fraud, the court must cancel the fraudulently obtained registration. 15 U.S.C. § 1064(3).

Flambeau attempts to prove the requisite fraudulent intent by demonstrating that in May 1983, Ideal was "well aware of many patents covering puzzle cubes when the examiner asked for them" and that the decision to omit these prior patents was a deliberate attempt to mislead the USPTO. (MOL in Supp. at 22.) RBL does not dispute that the patents were not provided to the USPTO, (*see, e.g.*, Counter 56.1 ¶¶ 350-51, 355-58, 360-61, 365-68), but argues instead that the failure to disclose the patents was immaterial to the decision of the examiner to grant trade dress protection because the patents did not specify the distinct color combination of the 3x3 Cube Design (*i.e.*, the limited scope of the asserted trade dress). As discussed above regarding functionality, RBL has the better argument here because none of the various now-expired patents referenced by Flambeau claim functionality of the black grid or the specific exterior color combination of the 3x3 Cube Design. Rather, they make clear that any

color or pattern or symbol can be used to distinguish each of the six exterior faces of the puzzle. Thus, no reasonable trier of fact could find that this omission was material to the USPTO's determination.

But, even assuming the patents would have proved material to the examiner's determination, this is not dispositive. "[P]roof of such materiality is not in itself sufficient to demonstrate the requisite intent" to prove fraudulent procurement of a mark. *Metrokane, Inc. v. Built NY, Inc.*, No. 6-cv-14447 (LAK) (MHD), 2008 WL 11397767, at *34 (S.D.N.Y. Sept. 3, 2008) (citing *DeBeers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*, 440 F. Supp. 2d 249, 266-67 (S.D.N.Y. 2006)), *report and recommendation adopted*, 2009 WL 10695618 (S.D.N.Y. Jan. 22, 2009). The crux of the inquiry is whether the trade dress applicant *intended* to deceive the USPTO examiner. *Privado Mktg.*, 2017 WL 1167332, at *8. Flambeau has offered no evidence from which a reasonable trier of fact could infer such an intent to deceive, as is required under 15 U.S.C. § 1064. Notably, Jessie Roberts, one of Flambeau's expert witnesses, testified that she could not ascertain the mental state of the representatives from Ideal who failed to provide the USPTO examiner with the patents in question. (*See* Reply 56.1 ¶ 539; ECF No. 174-75 ("MOL in Opp'n") at 14.) Although the record may establish that Ideal was cognizant of the undisclosed patents, mere awareness is insufficient to raise a genuine issue of fact as to intent given the "clear and convincing" standard of proof. *Metrokane*, 2008 WL 11397767, at *33-34 (holding that simply demonstrating a trademark applicant's awareness of patents is insufficient to prove the requisite intent for this sort of fraud claim).

Flambeau's reliance on the *Specialized Seating* case is also unavailing. This case out of the Northern District of Illinois involved the defendant's trademarked folding chair, a mark

which the plaintiff claimed was procured by fraud.  The court found that the defendant failed to disclose various prior patents, many of which affirmatively *claimed* functional elements of the trademark at issue and were, thus, material to the trademark application.  472 F. Supp. 2d 999, 1016 (N.D. Ill. 2007).  For instance, the expired patents claimed an x-frame design, a double-tube and channel frame, and protruding feet—all features incorporated into the defendant's registered trademark.  Conversely, in the instant case, RBL's prior utility patents do not disclose the specific grid and color combination of the 3x3 Cube Design; rather, they indicate that there are options as to the aesthetic design of the exterior of the cube.

And far more importantly, in *Specialized Seating* there was clear and convincing evidence of an intent to defraud the USPTO.  The court found that the plaintiff satisfied its burden to prove fraudulent intent based on evidence showing that the defendant trademark applicant chose to bury functional information claimed in its undisclosed prior patents.  The applicant hid this information in a trademark application exhibit rather than simply present the USPTO with the patents, as requested.  Further, there was additional evidence that the defendant made a material misrepresentation to the USPTO.  Instead of disclosing the functional attributes of its product, the defendant in *Specialized Seating* falsely attested that the proposed trademark was merely a slightly modernized version of a previous product.  There is simply no comparable evidence in this case that warrants a similar conclusion.

Based on the lack of evidence with respect to intent, no reasonable trier of fact could find that the 3x3 Cube Design registration was procured by fraud.  Therefore, I respectfully recommend that Flambeau's second counterclaim and eleventh affirmative defense be dismissed as a matter of law.

28

Having now determined that Flambeau's defenses of functionality and fraud on the

USPTO are without merit, I next address whether there are material issues of fact to be tried as

to RBL's claims of infringement.

### III.    Trade Dress Infringement and False Designation of Origin Under the Lanham Act

As already outlined, because the 3x3 Cube Design is registered with the USPTO, it is

presumptively protectable as a matter of law.  Based on my recommendations above,

Flambeau has failed to rebut that presumption.  Nevertheless, to prevail on its trademark

infringement and/or false designation of origin claims, RBL must prove a likelihood of consumer

confusion as to the origin or sponsorship of the Quick Cube.  *Virgin Enters.*, 335 F.3d at 146.

### A.    Likelihood of Confusion – Balancing the Polaroid Factors

The Lanham Act requires a plaintiff alleging trademark infringement to prove a

probability – not simply a possibility – of consumer confusion affecting "numerous ordinary

prudent purchasers."  *Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 383 (2d Cir. 2005) (citation

omitted).  Confusion in this sense includes confusion of all kinds, including confusion as to

source, sponsorship, affiliation, connection, or identification of a product.  *Id.* (citing *Guinness

United Distillers & Vintners B.V. v. Anheuser-Busch, Inc.*, 2002 U.S. Dist. LEXIS 12722 (S.D.N.Y.

July 12, 2002)).  Thus, the public's belief that a trademark owner approved the contested use of

its mark or trade dress would satisfy the confusion requirement.  *Dallas Cowboys Cheerleaders,

Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979).

In order to determine whether there is a likelihood of confusion, courts in this Circuit

consider the eight-factor balancing test detailed in *Polaroid Corp. v. Polarad Elecs. Corp.* 287

F.2d 492, 495 (2d Cir. 1961).  The *Polaroid* balancing test considers: (1) the strength of the trade dress; (2) the similarity between the two products at issue; (3) the proximity of the products and their competitiveness; (4) the likelihood that the original user of the trade dress might "bridge the gap" by developing a product to be sold in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) whether the new trade dress was adopted in good or bad faith; (7) product quality; and (8) the sophistication of the buyers in the relevant market.  *Id.*  Each factor must be assessed through the lens of the ultimate question: whether, based on the products and the evidence submitted to the Court, consumers are likely to be confused.  *Nora Bevs.*, 269 F.3d at 119.  No one factor is necessarily dispositive but any factor may prove to be so.  *Id.* (citation omitted).  And "[w]here the predicate facts are beyond dispute, the proper balancing of these factors is considered a question of law."  *Playtex Prods. v. Georgia-Pacific Corp.*, 390 F.3d 158, 162 (2d Cir. 2004).

Six *Polaroid* factors are highly probative of consumer confusion while the other two factors – whether the trade dress was adopted in good or bad faith and the quality of the products – are, comparatively, less relevant.  *Virgin Enters.*, 335 F.3d at 146-47.  Importantly, the *Polaroid* balancing test is "merely [a] tool[] designed to help grapple with the vexing problem of resolving the likelihood of confusion issue," which is "not to be determined in accordance with some rigid formula."  *Bristol-Myers Squib Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1044 (2d Cir. 1992) (internal quotations and citation omitted).

*Preliminary Considerations:*

Before turning to the *Polaroid* factors that are central to RBL's claims, I briefly address those factors which are relatively insignificant or that are not in serious dispute.  In assessing

the proximity of the products at issue a court analyzes whether, and to what extent, the parties' products compete with one another. *Virgin Enters.*, 335 F.3d at 150 (citing *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480-81 (2d Cir. 1996)). Both the Rubik's Cube and the Quick Cube are 3x3 puzzle cubes. Both are sold in Target and Staples and were previously sold at Toys "R" Us before it declared bankruptcy. (Reply 56.1 ¶¶ 415-16.) Further, the products have been displayed and sold side by side in at least three retail settings. (Reply 56.1 ¶ 420.) Thus, it is clear that Flambeau sells its products in the same market as, and is in direct competition with, RBL.[10]

Relatedly, "bridging the gap" concerns protecting a plaintiff's interest in being able to enter into competition with a defendant at a later time. Since the products here are already in direct competition, there is no gap to bridge. Accordingly, both the proximity and bridging the gap factors tip in favor of RBL. *Waddington N. Am. Bus. Tr. v. EMI Plastics, Inc.*, No. 2-cv-3781 (FB), 2002 WL 2031372, at *7 (E.D.N.Y. Sept. 5, 2002).

Given that the products are sold side by side and in competition, evidence of actual consumer confusion can be an effective tool to prove a likelihood of confusion between two products. *Nabsico, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir. 1999). If consumers are exposed to two similar products for an extended period of time and no actual confusion can be shown through reported instances of confusion or survey evidence, this is strong evidence against likelihood of confusion. *Id.* (citing *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126,

---

[10] To the extent that Flambeau emphasizes the fact that RBL does not sell directly to retailers and, instead, licenses the rights to sell the Rubik's Cube to toy companies like Hasbro, ordinary consumers are not privy to that information when deciding between the products in a retail location. Thus, this argument does not alter the Court's analysis.

1136 (2d Cir. 1979)).  Here, RBL plainly admits that it has no evidence of, and therefore cannot prove, actual confusion.  (*See* Counter 56.1 ¶¶ 286-89.)  Accordingly, this factor weighs in favor of Flambeau.  *See McGregor-Doniger*, 599 F.2d at 1136 (holding that, while a plaintiff need not prove actual confusion, "it is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion") (quoting *Affiliated Hosp. Prod., Inc. v. Merdel Game Mfg. Co.*, 513 F.2d 1183, 1188 (2d Cir. 1975)).[11]

*Strength of the Trade Dress:*

Courts in this District evaluate the strength of a plaintiff's trade dress based on its tendency to identify the source of the product bearing the trade dress in the eyes of the purchasing public.  *Best Cellars, Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431, 454 (S.D.N.Y. 2000); *McGregor-Doniger Inc.*, 599 F.2d at 1131-32.  In other words, the commercial strength of a trade dress is measured by its level of "distinctiveness" in the marketplace. *Winner Int'l LLC v. Omori Enters.*, 60 F. Supp. 2d 62, 68 (E.D.N.Y. 1999).

In this Circuit, a trade dress's distinctiveness is typically categorized along a spectrum. Arranged in ascending order of strength, the categories of distinctiveness are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful.  *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976).  In most cases, both arbitrary and suggestive trade dresses are deemed "inherently distinctive" and presumptively entitled to trademark protection, while a descriptive trade dress is protectable only if it has "acquired distinctiveness"

---

[11] The Court reaches this recommendation without crediting any of Mr. Kremer's conclusory assertions alleging consumer confusion.  (*See* Kremer Decl. ¶ 24.)  Accordingly, the Court need not address Flambeau's motion to strike these statements as the Court's recommendation renders that portion of the motion moot.  (*See* ECF Nos. 169-70 ("Mot. to Strike") at 13-14.)

through secondary meaning.  *McGregor-Doniger Inc.*, 599 F.2d at 1131; *Banff LTD*, 869 F. Supp. at 1115.  Generic marks and trade dresses can never be protected.

Generally speaking, while the individual elements of a trade dress may not be inherently distinctive, it is "the combination of elements and the total impression that the trade dress gives to the observer that should be the focus of a court's analysis . . ." *Paddington Corp. v. Attiki Imps. & Distribs.*, 996 F.2d 577, 584 (2d Cir. 1993).  "Since the choices that a producer has for packing its products are . . . almost unlimited, typically a trade dress will be arbitrary or fanciful and thus inherently distinctive." *Id.* at 583.  However, that general rule is counterbalanced by the Supreme Court's suggestion that a product's color is unlikely to be inherently distinctive.  *Qualitex Co.*, 514 U.S. at 162-63.

### 1.   *The 3x3 Cube Design is not Generic*

While Flambeau generally contends that the 3x3 Cube Design is generic, it offers limited proof to support that claim.  In order to demonstrate that the 3x3 Cube Design is generic, Flambeau must show that the 3x3 Cube Design was generic by March 2016, the time the Quick Cube entered the market.  *Focus Prods. Grp. Int'l v. Kartri Sales Co.*, No. 15-cv-10154 (PAE), 2021 WL 22630, at *7 (S.D.N.Y. Jan. 4, 2021).  To do so, Flambeau mostly focuses on the myriad non-RBL 3x3 puzzle cubes currently being sold in the United States toy market, which, Flambeau argues, prove that RBL's trade dress has become generic and indistinct in recent years.

In support of this position, Flambeau once again relies on the expert report of Lee Loetz. (*See* MOL in Supp. at 18.)  Loetz opines, based on his review of the collection of 3x3 puzzle cubes offered by major U.S. retailers, that the 3x3 Cube Design "lacks distinctiveness because it

no longer indicates to the purchasing public that a puzzle cube bearing the design is sourced from any one particular manufacturer or seller . . . [and] simply indicates that the puzzle cube is a generic 3x3 puzzle cube, not any particular brand of puzzle cube." (Loetz Report ¶ 176, 179, 182.) In essence, Loetz observes that prospective consumers see a puzzle cube market saturated with non-Rubik's alternatives when determining which cube they should purchase and concludes that, as a result, the 3x3 Cube Design cannot possibly be distinctive. (*Id.* ¶¶ 182-86.)

Flambeau also cites to the *Giggle* case referenced above to show that the 3x3 Cube Design is a weak, generic trade dress. In *Giggle*, the plaintiff was a retail seller of children's products with various registered and pending marks before the USPTO involving the "GIGGLE" title. The defendant offered a service providing trade information related to the children's goods industry under the name: "The Giggle Guide." To show that consumers were not likely to confuse its service with the plaintiff's marks, the defendant submitted substantial evidence of third parties actively using the "Giggle" mark in the children's goods space. 856 F. Supp. 2d at 633. This evidence was particularly convincing to the court because many of these third-party uses of the "Giggle" mark *predated* the plaintiff's entrance into the market and registration of its marks. *Id.*

To be sure, there are dozens of non-Rubik's 3x3 puzzle cubes available for purchase in the United States – some that may infringe on the 3x3 Cube Design and some that do not. (Counter 56.1 ¶¶ 315-16.)[12] For those products that debatably employ the 3x3 Cube Design,

---

[12] Having reviewed these alternative products, the Court notes that many of the cube designs do not closely adhere to the qualities of the 3x3 Cube Design. For instance, the D-FantiX Qiyi Warrior 3x3 Speed Cube (sold on Amazon), the Qiyi Puzzle Cube (sold on Walmart.com), the Hellraiser Lament Cube (sold on Target.com), and the

there is no evidence that any of them predated the 3x3 Cube Design's registration, which distinguishes this case from *Giggle*.  Similarly, the screenshots underpinning Loetz's opinion on this issue – those showing the numerous puzzle cube alternatives sold by major retailers – do not show that these alternatives were sold at the time the Quick Cube entered the market in March 2016.  (*See* Loetz Report App. 7.)  The only dates displayed in these exhibits are from late November 2018, approximately two and a half years after the alleged infringing activity began. (*Id.*)  Thus, there are genuine issues of fact that preclude finding the 3x3 Cube Design to be generic as a matter of law.  *See Kartri Sales Co.*, 2021 WL 22630, at *7 (denying summary judgment, in part, because evidence on genericism did not conclusively establish that the alternative products were sold as of the date the alleged infringement began).

Furthermore, while the Court acknowledges that, as a general matter, imitation in the marketplace should be encouraged, intentional copying might also constitute persuasive evidence that a mark or trade dress is distinctive in the eyes of consumers.  *New Colt Holding Corp. v. RJG Holdings of Fla., Inc.*, 312 F. Supp. 2d 195, 208-09 (D. Conn. 2004); *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 243 (S.D.N.Y. 2004).  The key question "is whether the copying was done deliberately, so as to benefit from the plaintiff's name and good will." *Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 838 F. Supp. 2d 141, 159 (S.D.N.Y. 2011). Here, the motivations of these third-party cube developers are not in dispute and the record lacks evidence as to their intent.  Lastly, there is no evidence that consumers are unable to differentiate between the Rubik's Cube and these third-party alternatives.  *See Jaret Int'l, Inc. v. Promotion in Motion Inc.*, 826 F. Supp. 69, 75-76 (E.D.N.Y. 1993) (denying summary judgment

---

Brybelly 3x3 Emoji Cube (sold on Kmart.com) do not emulate the 3x3 Cube Design.

on inherent distinctiveness because there was no evidence that consumers were unable to differentiate between the trade dress at issue and that of third-party alternatives).  Lacking all of this information, the Court is poorly positioned to determine how this evidence should affect the strength of the 3x3 Cube Design; this is a decision better left for a trier of fact.

Based on these evidentiary shortcomings and the other materials presented, there is sufficient evidence from which a reasonable trier of fact could find that the 3x3 Cube Design is descriptive and not generic.  Thus, to the extent the trade dress could be found to be descriptive, the Court must assess whether the 3x3 Cube Design has acquired distinctiveness through secondary meaning.

     2.  *The 3x3 Cube Design May Have Acquired Secondary Meaning*

Again, the ultimate inquiry with respect to the strength of a mark turns on the "origin-indicating" quality of the trade dress in the eyes of consumers.  *McGregor-Doniger*, 599 F.2d at 1131.  Even if the 3x3 Cube Design were found to be descriptive, it could still be considered a strong mark for purposes of the likelihood of confusion analysis if it has acquired secondary meaning.  *Id.*  Relevant evidence of secondary meaning includes: (1) advertising expenditures, (2) unsolicited media coverage, (3) sales, (4) examples of competitors seeking to imitate the product, and (5) length and exclusivity of the mark, among others.  *Focus Prods. Grp. Int'l v. Kartri Sales Co.*, 454 F. Supp. 3d 229, 250 (S.D.N.Y. 2020) (citation omitted).  Additionally, "the strength of a descriptive mark made incontestably distinctive for protectability purposes by registration for more than five years is a matter also properly considered by a trial court on the issue of likelihood of confusion."  *Gruner + Jahr USA Publ. v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993).

Based on the record evidence, it is clear that the 3x3 Cube Design has acquired secondary meaning.  To start, in the year 2016 alone, Rubik's Cube sales totaled $22.9 million. Further, between 2008 and 2012, licensees of the Rubik's Cube spent over $4.5 million to develop, launch, and expand the You CAN Do the RUBIK's Cube Program—a marketing initiative designed to promote the 3x3 Cube Design that teaches consumers how to solve a Rubik's Cube. (Counter 56.1, Ex. 76 ("Riehl Decl.") ¶¶ 22, 25.)  RBL also has expended significant resources to protect its trade dress from infringing products.  (Kremer Decl. ¶¶ 14-18.)  Further, the Rubik's Cube was (1) inducted into the National Toy Hall of Fame in 2014 (Riehl Decl. ¶ 15,) (2) recognized by Time Magazine as one of the 13 most influential toys of all time (Riehl Decl. ¶ 16,) and (3) featured in the Design Collection of the Museum of Modern Art in New York City (Riehl Decl. ¶ 14).  RBL has implemented advertising initiatives for the 3x3 Cube Design across a wide array of industries.  (*See* Section V *infra.* for a more detailed analysis of this evidence.) Moreover, the fact that the 3x3 Cube Design was registered with the USPTO decades ago provides some additional evidence that the trade dress is strong.  *Gruner + Jahr*, 991 F.2d at 1078.  And finally, the 3x3 puzzle cube alternatives referenced above and cited by Flambeau could lend further support to a finding that the 3x3 Cube Design has acquired secondary meaning.  *Chinese Arts & Crafts, Inc.*, 530 F. Supp. at 380 (holding that RBL's predecessor, Ideal, was likely to succeed on the merits in proving secondary meaning in light of sales figures, advertising expenditures, consumer surveys, and the substantial number of imitator products).

Flambeau argues that this evidence merely demonstrates the popularity of the Rubik's brand, as opposed to the 3x3 Cube Design.  It further protests that secondary meaning cannot be attributed to RBL's trade dress absent survey evidence indicating the 3x3 Cube Design

identifies RBL in the minds of consumers.  However, most of the evidence outlined above

pertains to sales figures, advertising initiatives, and widespread recognition specifically linked to

the Rubik's Cube, which, of course, is the commercial manifestation of the 3x3 Cube Design.

(*See also* 56.1, Ex. 31) (Ideal's trademark application describing the proposed trademark as the

"Rubik's Cube Design").  While it is true that "[p]roof of a product's popularity should not be

equated with proof of secondary meaning," *20th Century Wear, Inc. v. Sanmark-Stardust, Inc.*,

747 F.2d 81, 90 n.9 (2d Cir. 1984), the extensive evidence of secondary meaning referenced

above (and discussed in more detail in Section V *infra*,) could support a finding, even without

survey evidence, that consumers identify the Rubik's Cube and its 3x3 Cube Design as source

identifiers.

In short, when weighing all of the evidence and drawing factual inferences in favor of

RBL as the non-movant, a reasonable trier of fact could find that the 3x3 Cube Design is a strong

trade dress and that this factor weighs in RBL's favor.

*Similarity of the Trade Dresses:*

The next factor—similarity—assesses whether it is probable that the similarity between

two trade dresses will cause confusion among ordinarily prudent consumers as to the origin or

affiliation of the goods in question.  *Best Cellars, Inc.*, 90 F. Supp. 2d at 455 (citing *Morgningside

Grp., v. Morningside Capital Grp.*, 182 F.3d 133, 140 (2d Cir. 1999)).  When competing trade

dresses are similar, but not identical, courts must consider the degree of similarity between the

two products in assessing the likelihood of consumer confusion.  *Virgin Enters.*, 335 F.3d at 149.

Close similarity between the products does not dispose of the issue.  The crucial question,

again, is whether the apparent similarities are likely to provoke confusion as to origin or

affiliation for prospective purchasers.  *McGregor-Doniger*, 599 F.2d at 1133.  In cases that

feature well-known brand names, prominent markings or logos will typically dispel confusion

that might otherwise be expected.  *Bristol-Myers Squibb Co.*, 973 F.2d at 1045-46.

Flambeau attests that the Quick Cube is significantly different from the 3x3 Cube Design.

For one, whereas the 3x3 Cube Design employs a black base (Counter 56.1 ¶ 195,) the Quick

Cube has a white base.  (56.1, Ex. 3.)  Loetz testified that, in his professional opinion, white and

black are opposites when it comes to branding strategy and that, therefore, the "opposite"

base colors suggest a lack of sponsorship or affiliation between the products.  (Loetz Report ¶

191.)  Also, the inner corners of each outer segment of the Quick Cube and those segments'

corresponding colored stickers are cut away from the center, unlike the perfect square

segments and stickers that make up the Rubik's Cube, resulting in a slightly less linear grid.

(56.1, Ex. 3.)

The Court also notes that the Quick Cube incorporates fluorescent colors distinct from

the Pantone colors that make up the 3x3 Cube Design, as specified in RBL's style guide.  (*See*

56.1, Exs. 3, 6, 7; Counter 56.1 ¶ 153.)  Indeed, although one of RBL's 30(b)(6) witnesses

maintained that the Quick Cube utilizes the same general colors as the 3x3 Cube Design, she

nevertheless acknowledged that the shades of the colors used are different.  (56.1, Ex. 60

("Riehl Dep. Tr.") at 265:16-266:12.)  Thus, there are notable differences between these

products.

Cutting in the other direction, both products are similarly sized 3x3 puzzle cubes with

nine individual colored patches on each face.  Both incorporate the same general six colors –

red, orange, yellow, blue, green, and white – albeit different shades.  Thus, despite the

aforementioned differences, there is undoubtedly a degree of similarity between the products.

However, in a trade dress case such as this one, "the question is not how many points of similarity exist between the two [products] but rather whether the two" create the same overall impression. *Bristol-Myers Squibb Co.*, 973 F.2d at 1046 (citation omitted). Any confusion that might result from the similarities between the Rubik's Cube and the Quick Cube could be easily dispelled by the products' respective prominent logos. There is no dispute that both products prominently display their respective brand affiliations on their packaging as well as on the cubes themselves. (Counter 56.1 ¶¶ 308-09.) The fact that both products do so – especially considering the fact that both brand names are well-known in the toy industry – lends itself to finding that the products are not likely to confuse consumers. *See Bristol-Myers Squibb*, 973 F.2d at 1046 (holding that the medications Tylenol and Excedrin had similar trade dresses but nevertheless would not cause consumer confusion due to prominent display of well-known trade names on the product packaging); *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 395 (2d Cir. 1995) (holding that, when two marks are not identical, the presence of a trade name will tend to militate against a finding of confusion); *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993) (finding no confusing similarity between "Right Guard Sport Stick" and "Sportstick" because "when a similar mark is used in conjunction with a company name, the likelihood of confusion may be lessened"), *narrowed on other grounds by Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 46 & n.10 (2d Cir. 1994).

While it is true "courts have concluded that the addition of the infringer's name to the cloned trade dress may actually *add* to consumer confusion because a 'consumer might also conclude that it was added pursuant to a licensing agreement,'" *Majestic Drug Co. v. Olla*

*Beauty Supply, Inc.*, No. 97-cv-0046 (LAP), 1997 WL 37955, at *7 (S.D.N.Y. Jan. 31, 1997)

(emphasis in original), this is not the case when the brand names are well known.  In this case,

the undisputed record evidence demonstrates that the parties' respective brand names are

well known, widespread, and familiar to consumers.  (*See* Counter 56.1 ¶¶ 176, 380.)[13]

Accordingly, this factor weighs in favor of Flambeau.

<u>Sophistication of Buyers:</u>

Moving on to the the sophistication of buyers, this factor assesses the care and

attention a typical consumer exercises when evaluating a product before deciding whether to

make a purchase.  *Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 133

(S.D.N.Y. 1993).  In the Second Circuit, "the greater the value of an article the more careful the

typical consumer can be expected to be."  *McGregor-Doniger*, 599 F.2d at 1137.  Further, when

a product's typical consumers are highly trained professionals they are more familiar with the

relevant market and less likely to be misled or confused by the similarities between two

products compared to an ordinary purchaser.  *Virgin Enters.*, 335 F.3d at 151; *see also Kraft

Gen. Foods*, 831 F. Supp. at 133 (citing *Plus Prods. v. Plus Disc. Foods, Inc.*, 722 F.2d 999, 1007

(2d Cir. 1983)).  It follows that untrained and/or ordinary retail consumers take much less care

in evaluating a product before making a purchase.  *Pretty Girl Inc. v. Pretty Girl Fashions, Inc.*,

778 F. Supp. 2d 261, 268 (E.D.N.Y. 2011).

Both 3x3 puzzle cubes in the instant case are relatively low-priced.  Their retail prices

range from $5.99 to $13.95.  (Reply 56.1 ¶¶ 418-19.)  Thus, purchasing either product is not a

---

[13] Although Flambeau moves to strike RBL's response to 56.1 ¶ 380, it does so for reasons unrelated to the paragraph's assertions with respect to the Rubik's brand's renown.  (*See* Mot. to Strike at 12-15.)

major expenditure for most consumers.[14]  In these circumstances, there is greater likelihood

that a consumer will assume that the Quick Cube is affiliated with the Rubik's brand.  *Kraft Gen.*

*Foods*, 831 F. Supp. at 133 (finding the likelihood of consumer confusion "substantially

increased" because consumers would be unlikely to devote much time and attention to

evaluate and differentiate between two barbecue sauce products, given their low prices).

      Flambeau asserts that, although the ultimate purchasers of the Quick Cube may be

unsophisticated, the retail stores that initially acquire the cubes are sophisticated entities that

negotiate with toy-makers, like Flambeau, at arms-length.  (MOL in Supp. at 19.)  This argument

is not persuasive.  The consumer sophistication factor of the *Polaroid* balancing test relates to

the sophistication of *ultimate* purchasers, not sophisticated entities that purchase products

wholesale and then re-sell them directly to consumers.  *Cf. Funrise Canada (HK) Ltd. v. Zauder*

*Bros., Inc.*, No. 99-cv-1519 (ARR), 1999 WL 1021810, at *24 (E.D.N.Y. July 2, 1999) (focusing the

sophistication of consumers inquiry on the "ultimate purchasers"); *see also* 4 McCarthy on

Trademarks and Unfair Competition § 23:91 (5th ed.).  Thus, drawing all reasonable factual

inferences in favor of RBL, a trier of fact could find that this factor favors RBL.

<u>Flambeau's Intent and the Quality of its Product:</u>

      As for the remaining two factors, neither Flambeau's intent nor the quality of its product

are particularly relevant to the issue of likelihood of confusion, as they do not directly bear on

whether consumers are, in fact, likely to be confused.  *Virgin Enters.*, 335 F.3d at 151.  That

said, these factors may "tip the balance" in one party's favor if the question of likelihood of

---

[14] Further, to the extent that these toys are purchased for children, extensive consumer sophistication is doubtful. *CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 156 (E.D.N.Y. 2011) ("[p]urchasing inexpensive toys for children does not require any sophistication on the part of the buyer") (Reply 56.1 ¶ 443).

confusion is a close call.  *Id.*  While the similarity and actual confusion factors cut in favor of

Flambeau, a trier of fact could reasonably find that the strength, proximity, bridging the gap,

and sophistication factors favor RBL.  Furthermore, in this case, the first three factors

enumerated in *Polaroid* (strength, similarity, and proximity) are the most important for the

likelihood of confusion analysis and, per the above, these factors are divided between the

parties.  *See Bath & Body Works Brand Mgmt. v. Summit Entm't, LLC*, 7 F. Supp. 3d 385, 399

(S.D.N.Y. 2014) ("the Second Circuit has explained that strength, similarity, and proximity are

generally the three most important *Polaroid* factors") (citation omitted).  In other words, a trier

of fact could, when weighing these factors, come out in favor of either side.  Accordingly,

analysis of the two remaining factors may decidedly "tip the balance" in one party's favor.

With respect to intent, Flambeau attests that it acted in good faith when it decided to

produce the Quick Cube because it received opinions from legal counsel confirming that the

Quick Cube would not infringe on the 3x3 Cube Design.  More specifically, the record reveals

that Flambeau's lawyer, Bennet Berson, opined that the 3x3 Cube Design trademark

registration was limited to a black cube base, and that, therefore, Flambeau could avoid

trademark infringement by selling a white cube.  (56.1, Exs. 12-13; *see also* Counter 56.1 ¶¶

310-13.)

RBL goes to great lengths to argue that Berson's opinion should be discredited because

it was prepared with incomplete information.  Berson formulated his opinion based on his

review of the 3x3 Cube Design trademark registration and pictures of the cubes and their

packaging.  Even if Berson did not assess physical samples of the cubes at issue (although

Flambeau contends otherwise), it was reasonable for him – an attorney with almost 30 years'

experience in intellectual property law – to render an opinion based on the information before him.  Likewise, it was reasonable for Flambeau to rely on that opinion and proceed to sell the Quick Cube to consumers.  This provides some evidence of good faith on the part of Flambeau.  *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, No. 94-cv-2663 (RPP), 1999 WL 108739, at *2-3 (S.D.N.Y. Mar. 3, 1999) (holding that defendant's conduct did not justify a finding of bad faith, especially in light of its reliance on the advice of counsel).

RBL suggests that certain documents produced by Flambeau during discovery show bad faith insofar as they state that the Rubik's Cube was the "target competitor" of the Quick Cube (Reply 56.1 ¶ 417,) and that the Quick Cube would be "like" the Rubik's Cube.  (Counter 56.1, Ex. 189.)  This evidence could be reasonably interpreted to merely evidence Flambeau's intent for the Quick Cube to compete with the Rubik's Cube.  A desire to compete with RBL is not the same as a bad faith attempt to appropriate the goodwill inherent in the 3x3 Cube Design.  *See Streetwise Maps v. VanDam, Inc.*, 159 F.3d 739, 745 (2d Cir. 1998) ("[t]he intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product") (citation omitted).  Alternatively, a reasonable fact-finder could find that these representations evidence Flambeau's bad-faith attempt to plagiarize the 3x3 Cube Design and confuse consumers.

Thus, the evidence does not clearly point to one side or the other and a genuine dispute exists with respect to Flambeau's intent.

Moving next to product quality, RBL notes various quality control issues with the initial shipment of Quick Cubes that Flambeau received from China.  However, as the Honorable Paul G. Gardephe has already held in this case, while there is circumstantial evidence that Flambeau

shipped toxic Quick Cubes to U.S. distributors and retailers, RBL has not offered any evidence that U.S. consumers purchased toxic cubes or associated any would-be injury with RBL such that the goodwill associated with the 3x3 Cube Design would be, or was, damaged.  (ECF No. 147 at 15.)  Moreover, Judge Gardephe found that "no reasonable jury could find that Plaintiff suffered 'actual and direct harm' to the reputation of the Rubik's Cube and associated goodwill as a result of Defendant's Quick Cube."  *Id.* at 16.  Accordingly, and in line with the Court's prior ruling, the product quality factor weighs in Flambeau's favor.

*Balancing the Factors:*

As noted above, the *Polaroid* balancing test cannot be reduced to a mechanical process wherein the Court simply counts the number of factors favoring each party.  Here, a reasonable trier of fact could conclude that a number of factors weigh in the non-moving RBL's favor and potentially find for RBL.  Thus, the issue of likelihood of confusion must be left to the trier of fact rather than decided by the Court on summary judgment.  Accordingly, I recommend that Flambeau's motion for summary judgment on RBL's federal infringement and false designation of origin claims be denied and that these claims proceed to trial.

**IV.    Common Law Trademark Infringement**

I now turn to RBL's common law claim.  "The elements of a successful New York common law claim of trademark infringement parallel the elements required for a Lanham Act trademark infringement claim."  *AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 479 (S.D.N.Y. 2020); *Estate of Mickey Mantle v. Rothgeb*, No. 4-cv-4310 (KMW) (HBP), 2007 WL 9815913, at *17 (S.D.N.Y. Aug. 22, 2007) (same).  That is, to prove common law trademark infringement under New York law a plaintiff must show a likelihood of confusion as to the origin

45

or sponsorship of the defendant's product, just as under federal law.  *Lopez v. Gap, Inc.*, 883 F.

Supp. 2d 400, 430 (S.D.N.Y. 2012) (citing *Standard & Poor's Corp. v. Commodity Exch., Inc.*, 683

F.2d 704, 708 (2d Cir. 1982)).  Thus, the analysis is the same as above.  *Activision Blizzard*, 450 F.

Supp. 3d at 485-86.  Accordingly, I recommend that summary judgment be denied with respect

to RBL's common law trademark infringement claim for the same reasons I recommend denying

summary judgment on the federal infringement and false designation of origin claims (*see*

Section III *supra*).

### V.    Federal Trademark Dilution

RBL's remaining claims concern alleged trademark dilution.  To make out a claim for

*federal* trademark dilution under the Lanham Act, a plaintiff must prove that: "(1) the mark is

famous, (2) the defendant is making use of the mark in commerce, (3) the defendant's use of

the mark began after the mark became famous, and (4) the likelihood of dilution."  *Miss*

*Universe, L.P. v. Villegas*, 672 F. Supp. 2d 575, 591 (S.D.N.Y. 2009) (citation omitted); 15 U.S.C. §

1125(c).  In the context of its motion for summary judgment, Flambeau contests RBL's ability to

show the first and fourth factors—that the 3x3 Cube Design is famous and that there is a

likelihood of dilution.

For a mark to be considered famous, it must be "widely recognized by the general

consuming public of the United States as a designation of source of the goods or services of the

mark's owner."  15 U.S.C. § 1125 (c)(2)(A).  In assessing whether a particular mark or trade

dress meets this threshold, courts may consider "all relevant factors," including (1) the duration

and extent of the mark's advertising and publicity; (2) the amount, volume, and geographic

extent of sales of goods under the mark; (iii) the extent of actual recognition of the mark; and

(iv) whether the mark is registered. *Id.* In light of these statutory criteria, courts in this Circuit tend to limit famous marks to "those that receive multi-million dollar advertising budgets, generate hundreds of millions of dollars in sales annually, and are almost universally recognized by the general public." *Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 48 F. Supp. 3d 675, 702 (S.D.N.Y. 2014) (collecting cases).

RBL has established the requisite level of fame to support a federal trademark dilution claim. First, the record reveals that RBL and its business partners have expended substantial resources to advertise the 3x3 Cube Design since its inception. By way of example, in the year 2019 alone the two United States-based licensees of the 3x3 Rubik's Cube – Hasbro and Winning Moves – contributed approximately $849,000 to promote the Rubik's brand and the 3x3 Cube Design specifically. (Kremer Decl. ¶ 10.) Moreover, RBL's president attests that RBL and its licensees have "poured several millions into advertising and promoting the Rubik's Cube puzzle in the United States." (Kremer Decl. ¶ 11.) Holly Riehl, a primary marketing agent for RBL in the United States, provided additional evidence representing that, between 2008 and 2012, licensees spent over $4.5 million to develop, launch, and expand the You CAN Do the RUBIK's Cube Program—the most substantial marketing effort in recent years to promote the 3x3 Cube Design. (Riehl Decl. ¶¶ 22, 25.) Interested parties have invested over $8.5 million in this Program to date. (Riehl Decl. ¶ 27.)

Second, RBL has sold millions of units of "twisty puzzle cubes" in each of the last six years. (Kremer Decl. ¶ 19.) Since 2016, RBL has sold over 13 million twisty puzzle cubes. (*Id.*) Although these statistics pertain to RBL cubes more generally – not just those that strictly adhere to the 3x3 Cube Design at issue – the record reveals that 3x3 Rubik's Cube sales totaled

$14.3 million in the year 2015 and $22.9 million in 2016.  (Riehl Decl. ¶ 32.)  Further, the Rubik's

brand is centered around the 3x3 Cube Design, which RBL asserts is its most valuable

intellectual property asset.  (Kremer Decl. ¶ 5.)  Thus, although annual sales in recent years are

not in the hundreds of millions as contemplated by the District Court in *Kwik Lok Corp.*, the

aforementioned sales and advertising numbers, taken together, indicate that the Rubik's Cube

is a prominent toy in the United States, especially given the relatively low per-unit price of the

product.  (*See* Reply 56.1 ¶ 419.)

Additionally, there is substantial evidence showing RBL's extensive integrated marketing

initiatives featuring the 3x3 Cube Design, widespread product circulation and use, and various

awards—all of which demonstrate that the 3x3 Cube Design is almost universally recognized by

the general public.  The 3x3 Cube Design has been incorporated into advertising ventures with

notable third parties across a diverse array of industries including, but not limited to, Puma and

Converse (footwear and apparel), Kia Motors (automotive manufacturing), Apple and Google

(technology), and Office Depot (office supplies).  (Riehl Decl. ¶ 5.)  The 3x3 Cube Design also has

appeared in a Super Bowl commercial as well as numerous music videos, television shows, and

movies, such as Toy Story 4.  (Riehl Decl. ¶¶ 5-6.)  Further, the 3x3 Cube Design has received

awards and other forms of recognition for its success in the United States.  For instance, the 3x3

Rubik's Cube (1) was inducted into the National Toy Hall of Fame in 2014 (Riehl Decl. ¶ 15,) (2)

was recognized by Time Magazine as one of the 13 most influential toys of all time (Riehl Decl.

¶ 16,) and (3) was featured in the Design Collection of the Museum of Modern Art in New York

City (Riehl Decl. ¶ 14).  Finally, the 3x3 Cube Design is used across the country (and throughout

the world) through RBL sponsored competitions and instructional programs.  (Riehl Decl. ¶¶ 30, 33-35.)

Flambeau's reliance on *Ty Inc. v. Perryman*, 306 F.3d 509 (7th Cir. 2002) to argue that the 3x3 Cube Design is not famous is misplaced.  In *Ty Inc.*, the manufacturer of Beanie Babies (a well-known brand of beanbag stuffed animals) brought a trademark dilution claim against an individual who resold Beanie Babies in an online secondary market.  The case merely makes a passing reference to the threshold issue of fame.  The court stated clearly that there was no dispute that "Beanie Babies" was a famous mark.  *Ty Inc.*, 306 F.3d at 511.  Thus, it is factually distinguishable.  And, although the decision is certainly instructive with respect to the policy considerations underlying federal trademark dilution claims, it is of no value to Flambeau's legal argument against the fame of the 3x3 Cube Design.

Accordingly, I recommend finding that the Rubik's Cube is famous for purposes of the federal trademark dilution analysis, as no reasonable trier of fact could find otherwise.

Moving to the other disputed factor – likelihood of dilution – pursuant to 15 U.S.C. § 1125(c)(2)(B)-(C), a plaintiff may prove its case by showing either: (1) dilution by "blurring" or (2) dilution by "tarnishment."  *See also Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 105 (2d Cir. 2009).  First, I assess RBL's claim of dilution by tarnishment.

<u>Dilution by Tarnishment:</u>

Dilution by tarnishment occurs when an "association arising from the similarity between a mark or trade name and a famous mark . . . harms the reputation of the famous mark."  15 U.S.C. § 1125(c)(2)(C).  "A trademark may be tarnished when it is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public

will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *Starbucks*, 588 F.3d at 110 (citing *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 507 (2d Cir. 1996)).

RBL attempts to prove dilution by tarnishment by highlighting alleged quality issues with the Quick Cube.  However, the Court already rejected RBL's claims that there are quality issues with the Quick Cube and held that "no reasonable jury could find that Plaintiff suffered 'actual and direct harm' to the reputation of the Rubik's Cube and associated goodwill as a result of Defendant's Quick Cube."  (ECF No. 147 at 15-16; *see also* Section III *supra*.)  Accordingly, I recommend finding that no reasonable trier of fact could find a likelihood of dilution by tarnishment.

Flambeau moves to strike statements in RBL president David Kremer's Declaration opining that the Quick Cube (1) confuses RBL's trading partners and consumers, (2) causes RBL to lose sales, (3) harms RBL's reputation, and (4) "dilutes the distinctiveness" of the 3x3 Cube Design.  (*See* Mot. to Strike at 12-13; Kremer Decl. ¶ 24; Counter 56.1 ¶ 380.)  Kremer asserts that, because the Quick Cube is sold in the same mass retail stores as the Rubik's Cube, consumers purchase the Quick Cube because they view it as a lower priced version of the Rubik's Cube. (Kremer Decl. ¶ 24.)  There is no support in the record substantiating these conclusory statements other than conversations Kremer alleges to have had with RBL licensees, who have "expressed their concern" about the promotion and sale of the Quick Cube.  Of course, concern over competition is to be expected in an active marketplace.  Thus, even if the Court were to consider Kremer's lay perspective as to whether the Quick Cube harms RBL's reputation, his unsupported statements do not alter the foregoing analysis with respect to

dilution by tarnishment.  Accordingly, as I have not relied on Kremer's statements, this portion

of Flambeau's motion to strike should be denied as moot.

*Dilution by Blurring:*

Dilution by blurring is an "association arising from the similarity between a mark . . . and

a famous mark that impairs the distinctiveness of the famous mark."  15 U.S.C. § 1125(c)(2)(B).

Federal law provides six non-exhaustive factors for courts to consider when assessing whether

there is dilution by blurring.  They include: (1) the degree of similarity between the marks; (2)

the degree of inherent or acquired distinctiveness of the famous mark; (3) the extent to which

the owner of the famous mark exclusively uses that mark; (4) the degree of recognition of the

famous mark; (5) whether the alleged infringer intended to create an association with the

famous mark; and (6) any actual association between the competing marks.  *Id.*

Many of these factors overlap with the likelihood of confusion analysis discussed above.

As stated, while the parties' products are similar in some respects, there are notable

differences as well.  First, the Quick Cube employs fluorescent color shades distinguishable

from the primary and secondary colors used in the 3x3 Cube Design.  (*See* 56.1, Exs. 3, 6, 7, 8.)

Second, the inner corners of the smaller cube segments of the Quick Cube and those segments'

corresponding colored stickers are cut away from the center, creating a slightly less linear grid

than that of the Rubik's Cube.  (56.1, Ex. 3; Counter 56.1 ¶ 189.)  Third, each product centrally

displays its respective brand logo.  (56.1 ¶ 308.)  Fourth, and perhaps most importantly, the

Quick Cube has a white base whereas the Rubik's Cube has a black base.  (*Id.*)  Thus, I have

already recommended that this evidence of dissimilarity favors Flambeau on the issue of

confusion.  Accordingly, I make the same recommendation with respect to the degree of

similarity factor for purposes of the dilution by blurring analysis.  *See Miss Universe, L.P.*, 672 F. Supp. 2d at 593 (treating the "degree of similarity" prong under the confusion and dilution tests similarly).

With regard to the "actual association" factor, RBL concedes it offers no evidence of consumers mistakenly associating the Quick Cube with the 3x3 Cube Design or RBL.  (Counter 56.1 ¶¶ 286-89.)  Based on this concession, the "actual association" factor also weighs in Flambeau's favor and against dilution by blurring.

However, as laid out in greater detail above, the 3x3 Cube Design is widely recognized and could be found to have acquired distinctiveness.  Thus, a reasonable trier of fact could find that both the "degree of distinctiveness" factor and the "degree of recognition" factor for dilution by blurring weigh in RBL's favor.

As for the "intent to associate" factor, unlike the "bad faith" factor linked to likelihood of confusion inquiry, the court considers only "[w]hether the user of the mark . . . intended to create an association with the famous mark."  15 U.S.C. § 1125(c)(2)(B)(v).  Evidence that Flambeau intended to target the Rubik's Cube as a competitor (Reply 56.1 ¶ 417,) and to design the Quick Cube to be "like" the Rubik's Cube (Counter 56.1, Ex. 189) suggests an intent to create an association.  That the Quick Cube's initial packaging included a picture of the 3x3 Cube Design similarly suggests Flambeau's intent to associate its product with the Rubik's Cube. (Reply 56.1 ¶ 392.)  Accordingly, a trier of fact could possibly find that this factor cuts in favor of RBL.

Finally, whether RBL engages in substantially exclusive use of the 3x3 Cube Design turns on whether RBL affirmatively protects its right to the exclusive use of its trade dress through

enforcement efforts.  *See Miss Universe, L.P.*, 672 F. Supp. 2d at 594 (holding that the plaintiff maintained substantially exclusive use of its mark through its substantial investment in enforcing its trademark).  Flambeau rehashes its arguments with respect to the plethora of puzzle cube alternatives that saturate the U.S. toy market to argue that RBL's use of its trade dress is not exclusive.  However, RBL's corporate representatives attest to the substantial enforcement efforts RBL undertakes to protect the 3x3 Cube Design.  The evidence shows that RBL and its affiliates sent at least 40 cease and desist letters to allegedly infringing third parties between the years 2000 and 2014.  (Kremer Decl. ¶ 14.)  RBL also has expended substantial resources in litigation and engaged in various other defensive tactics to protect its mark in recent years.  (Kremer Decl. ¶¶ 15-18.)  Thus, based on this evidence, a trier of fact could reasonably find this factor to weigh in RBL's favor.

\*        \*        \*

When viewing the evidence in RBL's favor, as the Court must on Flambeau's motion for summary judgment, a trier of fact could find four of the six dilution by blurring factors to weigh in RBL's favor.  Accordingly, I recommend finding that RBL has proffered sufficient evidence to defeat summary judgment with respect to its federal trademark dilution claim, but not enough evidence to prevail on that claim at this stage, as reasonable triers of fact could disagree as to the outcome, especially in light of the noted differences between the products.

## VI.    New York Trademark Dilution

Finally, RBL seeks injunctive relief for trademark dilution under New York General Business Law § 360-l.  Injunctive relief is warranted under this law when a plaintiff can show "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark . .

. notwithstanding the absence of . . . confusion as to the source of [the] goods."  N.Y. Gen. Bus.

§ 360-l.  To succeed on a claim under this law, RBL must prove (1) that its mark is truly

distinctive and (2) a likelihood of dilution.  *Strange Music, Inc. v. Strange Music, Inc.*, 326 F.

Supp. 2d 481, 496 (S.D.N.Y. 2004).  To be clear, New York requires only that a plaintiff's mark be

"truly distinctive," not that it be famous.  *Id.*  And much like claims for federal trademark

dilution under the Lanham Act, Section 360-l protects against both dilution by tarnishment and

dilution by blurring.  *Hormel Foods Corp.*, 73 F.3d at 506.

In examining the distinctiveness of the 3x3 Cube Design, the court looks to the same

factors used to assess the strength of the mark under 15 U.S.C. § 1125(a).  *Mead Data Cent.,*

*Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1030 (2d Cir. 1989) ("[d]istinctiveness for

dilution purposes often has been equated with the strength of a mark for infringement

purposes").  Having already examined the distinctiveness, fame, and strength of the 3x3 Cube

Design above, a reasonable trier of fact could also find that the 3x3 Cube design is sufficiently

distinctive for purposes of making out RBL's state trademark dilution claim.

Additionally, as laid out in further detail above, I recommend finding that RBL's mark has

not been "tarnished" by the Quick Cube.

As for whether the Quick Cube is likely to "blur" the 3x3 Cube Design as that term is

defined under New York law, six factors are relevant.[15]  These include: (1) the similarity of the

marks; (2) the similarity of the products covered; (3) the sophistication of the consumers; (4)

whether defendant acted with predatory intent; (5) the renown of the senior mark; and (6) the

---

[15]The factors considered under New York law to determine dilution by blurring are not coextensive with the factors listed in 15 U.S.C. § 1125(c)(2)(B).  *Starbucks*, 588 F.3d at 114. RBL incorrectly conflates these analyses in its opposition brief.  (*See* MOL in Opp'n at 23-24.)

renown of the junior mark. *New York Stock Exchange, Inc. v. New York, New York Hotel LLC*, 293 F.3d 550, 558 (2d Cir. 2002) (citing *Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 966 (2d Cir. 1996)).  More importantly for the purposes of this motion, and unlike federal law, New York does not permit a dilution claim under Section 360-l unless the two marks are "substantially" similar. *Starbucks*, 588 F.3d at 114 (citing *Playtex Prods.*, 390 F.3d at 167).  To show "substantial similarity," RBL must demonstrate that the Quick Cube is sufficiently similar to the 3x3 Cube Design that a "substantial segment" of target consumers see the two products as essentially the same. *Miss Universe, L.P.*, 672 F. Supp. 2d at 595-96.

This Court has already recommended finding, based on the record evidence, that there are meaningful differences between the Quick Cube and the Rubik's Cube.  The Quick Cube's white base, fluorescent exterior colors, cut-away squares, and prominently featured Duncan brand logo differentiate it from the Rubik's Cube.  Consistent with these undisputed facts, I have already twice recommended that this evidence favors Flambeau to the extent federal law requires the Court to consider the degree of similarity between the products at issue.  But New York law requires an even *greater* degree of similarity than federal law, requiring "substantial similarity" between the products to the point where consumers see them as essentially the same.   The Quick Cube is not sufficiently similar to the Rubik's Cube to dilute RBL's trade dress under New York law based on the differences noted above. *See Mobileye, Inc. v. Picitup Corp.*, 928 F. Supp. 2d 759, 782 (S.D.N.Y. 2013) (holding, on summary judgment, that the plaintiff could not make out a New York dilution claim under GBL § 360-l in light of the Court's prior determination in the likelihood of confusion analysis that the marks at issue were only

somewhat similar and thus "far from being so similar that any consumer will view them 'as essentially the same'").

Thus, in light of the evidence and the onerous similarity standard under Section 360-l, no reasonable trier of fact could find that the Rubik's Cube and the Quick Cube are "substantially similar" under New York law.  Therefore, I recommend granting Flambeau summary judgment dismissing RBL's New York trademark dilution claim.

## VII.    Flambeau's "Ill-Gotten" Profits

Because I do not recommend granting RBL summary judgment with respect to any of its asserted claims, there is no need to, and I do not, address RBL's request for Flambeau's ill-gotten profits at this time.  *See* 15 U.S.C. § 1117(a).[16]

### <u>CONCLUSION</u>

For the reasons set forth above, I respectfully recommend that Flambeau's motion for summary judgment be GRANTED in part and DENIED in part, that RBL's request for summary judgment be GRANTED in part and DENIED in part, and that Flambeau's motion to strike be denied for the reasons set forth in this Report and Recommendation.

Specifically, I recommend that summary judgment be denied concerning RBL's federal trademark infringement and false designation of origin claims under the Lanham Act, RBL's common law trademark infringement claim, and RBL's federal trademark dilution claim under the Lanham Act.  These claims should proceed to trial.

---

[16] To the extent that Flambeau moves to strike paragraphs 38 and 39 of the Riehl Declaration and Reply 56.1 ¶¶ 414, 467, the Court finds that this evidence is not material to the Court's recommendation.  Accordingly, that final portion of Flambeau's motion to strike should be denied as moot.

Separately, I recommend that summary judgment be granted in favor of RBL with respect to Flambeau's counterclaims and affirmative defenses claiming trademark invalidity due to functionality and fraud.  And finally, I recommend that RBL's trademark dilution claim under New York law be dismissed.

Respectfully submitted,

Dated:  January 31, 2021
        New York, New York

KATHARINE H. PARKER
United States Magistrate Judge

<u>Notice</u>

**The parties shall have fourteen days from the service of this Report and Recommendation to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)).**

**If any party files written objections to this Report and Recommendation, the opposing party may respond to the objections within fourteen days after being served with a copy.  Fed. R. Civ. P. 72(b)(2).  Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul G. Gardephe at the United States Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be addressed to Judge Gardephe.  The failure to file these timely objections will result in a waiver of those objections for purposes of appeal.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).**