```
                   UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK
In re:                              :
                                       Docket #17cv6559
 RUBIK'S BRAND LIMITED,             : 1:17-cv-06559-PGG-KHP

                      Plaintiff,    :

  - against -                       :

 FLAMBEAU, INC. et al.,             :
                                       New York, New York
                     Defendants.    : January 25, 2021

------------------------------------:  REMOTE ORAL ARGUMENT

                    PROCEEDINGS BEFORE
            THE HONORABLE KATHARINE H. PARKER
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:      PEROFF SAUNDERS, PC
                    BY:  MARK PEROFF, ESQ.
                         DARREN SAUNDERS, ESQ.
                         JASON KASNER, ESQ.
                         CASSANDRA TAM, ESQ.
                    745 Fifth Avenue, Suite 500
                    New York, New York 10151


For Defendants:     QUARLES & BRADY, LLP
                    BY:  MATTHEW J. DUCHEMIN, ESQ.
                         ANITA M. BOOR, ESQ.
                         EDGAR MATTHIAS, ESQ.
                    33 East Main Street, Suite 900
                    Madison, WI 53703

                    QUARLES & BRADY, LLP
                    BY:  EDGAR MATIAS, ESQ.
                    300 N. LaSalle Street, Suite 4000
                    Chicago, Illinois 60654

Transcription Service: Carole Ludwig, Transcription Services
                       155 East Fourth Street #3C
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Email:  Transcription420@aol.com


Proceedings conducted telephonically and recorded by
electronic sound recording;
Transcript produced by transcription service
```

<u>**INDEX**</u>

<u>**E X A M I N A T I O N S**</u>

| <u>**Witness**</u> | <u>**Direct**</u> | <u>**Cross**</u> | <u>**Re-Direct**</u> | <u>**Re-Cross**</u> | <u>**Court**</u> |
|---|---|---|---|---|---|

None

<u>**E X H I B I T S**</u>

| <u>**Exhibit Number**</u> | <u>**Description**</u> | <u>**ID**</u> | <u>**In**</u> | <u>**Voir Dire**</u> |
|---|---|---|---|---|

None

1

```
 1                        PROCEEDINGS                3

 2            THE CLERK:  Calling case 17-civil-6559, Rubik's

 3   Brand versus Flambeau, the Honorable Katharine H. Parker,

 4   presiding.

 5            Beginning with counsel for the plaintiffs, can you

 6   please make your appearance for the record?

 7            MR. MARK PEROFF:  Mark Peroff, Darren Saunders,

 8   Jason Kasner, and Cassandra Tam.

 9            THE HONORABLE KATHARINE H. PARKER (THE COURT):

10   Good afternoon, everyone. Who'll be doing the argument for

11   RBL?

12            MR. PEROFF:  This is Mark Peroff, and I'll be

13   doing the principal argument. To the extent that we require

14   to supply document information and exhibits, I will be

15   assisted by the other attorneys in the room.

16            THE COURT:  Okay.  Thank you, Mr. Peroff.

17            THE CLERK:  And, counsel for the defendants, can

18   you please make your appearance for the record?

19            MR. MATTHEW J. DUCHEMIN:  Yes.  Good afternoon. My

20   name is Matt Duchemin, spelled D-u-c-h-e-m-i-n. I'm from

21   Quarles & Brady. And along with me is my associate,  Anita

22   Boor, B-o-o-r, and our associate Edgar Matias, who hasn't

23   appeared but just recently joined us at the firm and wanted

24   to get a sense for how these things go. I'll be --

25            THE COURT:  Welcome.
```

1                        PROCEEDINGS                    4

2              MR. DUCHEMIN:  Oh, thank you, Judge.

3              THE COURT:  I'm sorry, I didn't mean to cut you

4    off. You'll be primarily doing the argument, Mr. Duchemin?

5              MR. DUCHEMIN:  Yes, your Honor.  Thank you. As

6    Mr. Peroff suggested, if I need some supplementation of the

7    record and other things, I might ask Ms. Boor for some help.

8              THE COURT:  Okay. No problem.

9              Welcome, everyone. Happy New Year.  Normally, I

10   like to have oral arguments in the courtroom; it's easier

11   for everyone to see one another. But, unfortunately, we're

12   still amidst this pandemic. So just a few preliminary

13   matters before we get started. I'd ask counsel to keep

14   their phones on mute unless they are speaking.  That allows

15   for the best clarity of reception for everyone; it

16   minimizes echoing.  So please keep your phones on mute. And

17   we are making a recording of this call so that you can

18   order a transcript. It has to be ordered within three days

19   of today because of the platform that we're using. This

20   line is open to the press and public on a listen-only

21   basis, and I want to remind everyone on the call that the

22   Court prohibits others from making recordings of and

23   rebroadcasting court proceedings and that violations of

24   this rule may result in sanctions. And, finally, although

25   Mr. Peroff is going to be principally arguing for RBL and

```
 1                        PROCEEDINGS                    5
 2  Mr. Duchemin is going to be principally arguing for
 3  Flambeau, to the extent there are other attorneys who are
 4  asked to speak or invited to speak, I ask that you state
 5  your name clearly for the benefit of any court reporter
 6  who's asked to transcribe this proceeding.
 7            So I want to thank you all for your excellent
 8  briefing on both sides. I did think it would be helpful to
 9  have argument, and I'm going to invite Mr. Duchemin, since
10  it's your client's motion, to start.
11            MR. DUCHEMIN:  Thank you very much, your Honor.
12  And just perhaps one housekeeping issue, is there a
13  specific time limit on today's argument, so that I might be
14  able to focus my lengthy outline on the issues, your Honor,
15  I would really like to focus on?
16            THE COURT:  Yes. I'd like you to -- I want to
17  devote no more than an hour to today's arguments. So I'm
18  going to give you plenty of time to make your point, but if
19  you could limit our time to, you know, 20 minutes to half
20  an hour, that would be appreciated.  And the same for RBL.
21            MR. DUCHEMIN:  Will do, your Honor. Thank you very
22  much.
23            And so let me begin by just starting sort of with
24  an overall framework for this motion and this case. We've
25  obviously moved for summary judgment on all of RBL's
```

```
 1                        PROCEEDINGS              6
 2   claims.  Those claims essentially assert various trade
 3   dress-related claims, and in Flambeau's mind do so really
 4   in an anticompetitive manner, to the detriment of the
 5   marketplace for puzzle cubes.
 6            Essentially, RBL is attempting to extend a
 7   monopoly afforded by expired patents by trying to claim
 8   trade dress protection for purely functional features.  And
 9   this effort to double-dip is not supported by the law and
10   should not be sustained. Now, for --
11            THE COURT:  Well, let me stop you for a second. Am
12   I correct that RBL applied for the trade dress protection
13   prior to the expiration of the patents?
14            MR. DUCHEMIN:  That's true, your Honor. They did
15   so, although that, we believe, is legally irrelevant when
16   it comes to assessing the functionality of those features.
17            THE COURT:  Okay.
18            MR. DUCHEMIN:  So the case, obviously, is large
19   and complex, 543 proposed material facts, 60 pages of
20   briefing, dozens of cases.  But, really, what I'd like to
21   focus us on I think is the issue that can resolve this case
22   in its entirety, and that's functionality. Functionality is
23   a complete statutory defense here. It's case dispositive,
24   and so I'm going to focus, you know, the beginning of my
25   remarks on that issue. However, even if the Court does find
```

2   the trade dress in this case functional, we believe it

3   should still dismiss the case because RBL cannot meet its

4   burden of proving a probability of likelihood of confusion.

5   And that evidence, that analysis of confusion, also reveals

6   undisputed evidence which makes clear that RBL cannot prove

7   dilution.

8          We also, as your Honor knows, make an argument

9   that this registration was procured by fraud and should be

10  cancelled, so I'll try to address that probably more

11  briefly. And if we get there, we believe that there are

12  good reasons for the Court at this stage, even, to preclude

13  an effort by RBL to recover profits in this case based on

14  the equity.

15         So with that in mind, I'm going to focus right

16  away on trade dress.

17         THE COURT:  Okay.

18         MR. DUCHEMIN:  And functionality, I should say,

19  your Honor. And as your Honor knows, trademark law is

20  primarily concerned with protecting source identification,

21  the origin of a product. And this case is about trade

22  dress, the design and packaging of a product. It is not a

23  case about a word mark, it's not a case about the brand of

24  Rubik's or the word mark "Rubik's Cube." Those are not

25  asserted in this case.  What is asserted in this case is a

PROCEEDINGS                    8

1
2  trade dress involving the product, the 3 x 3 puzzle cube.
3  And in the context of trademark law this is important
4  because, you know, copying is not always discouraged or
5  disfavored by the laws. RBL will argue that Flambeau copied
6  the product. It didn't; we don't think it did. But even if
7  that's the case, that's not discouraged. Trade dress
8  protection has to subsist with the recognition that there
9  is no prohibition against copying goods and products unless
10 it's protected by a patent or a copyright. And the purpose
11 of functionality and the functionality defense is to help
12 draw the line in between those various frameworks for
13 protecting intellectual property.
14       You know, in this case -- and the Southern
15 District has found this in the *Schutte Bagclosures* case --
16 the nonfunctionality requirement for trade dress protects
17 competition, and it does so even at the cost of potential
18 consumer confusion. Stated another way, the law allows for
19 potential confusion when it comes to functional products.
20 And it's critical --
21       THE COURT:  Well, let me ask -- let me interrupt
22 you on the issue of functionality. Do you have any evidence
23 of functionality based on the cost? Specifically speak to
24 the comparative cost of colored stickers in the 3 x 3 cube
25 design versus other colors. In other words, you did make

```
 1                            PROCEEDINGS                    9
 2   some arguments about the cost of black plastic being
 3   cheaper, but I didn't see any comparative evidence, what
 4   the cost is to do a black versus white puzzle cube or the
 5   specific color patches used by or color patches used by
 6   Rubik's versus the ones used by Flambeau.
 7               MR. DUCHEMIN:  So, yes, your Honor. As it respects
 8   costs, there is evidence in the record -- and I'm going to
 9   have Ms. Boor [indiscernible] -- sorry, I accidentally hit
10   the mute button -- find that for me. But the cost in the
11   record pertains to the black plastic used to manufacture a
12   cube versus white plastic used to manufacture a cube.  And
13   so just by definition of the opinion evidence that's in the
14   record that the black plastic is less costly, that is
15   comparative. It is comparative to all other plastics.  And
16   so the evidence does in fact support that the design
17   selected by RBL solely with respect to the black plastic
18   has a cost advantage.  We're not making the same claim with
19   respect to the colored stickers.
20               THE COURT:  Okay. All right. I wanted to get
21   clarification with regard to the colored stickers.
22               I did see some general statements that primary-
23   colored stickers are cheaper and that red dye is expensive,
24   but I didn't see any more details about the particular --
25   the context of the stickers at issue here.
```

1                            PROCEEDINGS                    10

2           MR. DUCHEMIN:  That's a good reminder for me, your

3    Honor. Yes, that is in the declaration, I believe, of

4    Mr. Loets, that that's in there, as well, so yes.

5           And importantly, I don't want to lose sight

6    of sort of the first and we think most important

7    inquiry on functionality because your Honor is

8    moving into really questions about the Morton-

9    Norwich factors and other evidence. But we don't

10   think your Honor even needs to get there in this

11   case if we follow the established framework for

12   assessing functionality as taught by the *TrafFix*

13   case and the *Schutte* case. And those two cases,

14   your Honor -- and we're talking about utilitarian

15   functionality initially --

16          THE COURT:  Yes.

17          MR. DUCHEMIN:  -- those two cases really

18   make clear that the first and most important

19   question is to look at the use and purpose of the

20   puzzle cube as claimed in the registration and as

21   used, at least in the context of the common law

22   claims in this case, and to ask the question

23   looking at that product only is it essential to

24   the use or purpose of the product.

25          And so we could talk about that, but the

analysis in this case, it's our contention, can

really stop there because we believe the evidence,

the undisputed evidence, clearly supports a

finding of utilitarian functionality.  And so all

of the other arguments and evidence about

alternatives and the Morton-Norwich factors and

other things, the Court is not obligated to

consider those in deciding the utilitarian

functionality question. And we really --

THE COURT:  Let me ask you a question

about this functionality because you talk about and

you have experts talking about this maximum color

contrast, making the design of the -- making it

easier to solve and to solve faster. And -- but you

would concede, would you not, that you can still

solve the puzzle if other colors were used. I mean,

your colors are not the exact same as Rubik's. And

there are other decisions involving the Rubik's

Cube discussing the fact that there are limitless

color combinations. So do you concede that there

are other colors out there, that it's not -- I

mean, why are you saying it would be essential to

the function to --

MR. DUCHEMIN:  Sure, your Honor. Thank you.

2  Right. So the evidence I believe you're talking

3  about are the other alternatives in the

4  marketplace. And so we believe that looking to

5  those first in the context of what *TrafFix* teaches

6  is not appropriate.  Those are alternatives, and

7  what *TrafFix* says is you don't look at all the

8  alternatives -- and, yes, you know, a puzzle cube

9  can be solved by matching symbols or matching

10  raised features or matching other colors, but those

11  are alternatives.  What we have to start with

12  here -- and *TrafFix* and the Supreme Court are clear

13  on this -- is that we have to start with a product

14  as asserted in the registration and ask looking at

15  that registration, looking at that product, are the

16  features essential to the use or purpose of the

17  article or does it affect the cost or quality of

18  the article.  And *TrafFix* -- just to be clear,

19  *TrafFix* is very clear on this. *TrafFix*, the Supreme

20  Court says that, you know, if you look at that and

21  you conclude that they're functional, quote, "There

22  is no need, furthermore, to engage, as did the

23  Court of Appeals, in speculation about other design

24  possibilities, such as using three or four springs

25  which might serve the same purpose." And it goes

1

2  on, Here, the functionality of the spring design

3  means that competitors need not explore whether

4  other spring juxtapositions might be used.  The

5  dual-spring design is not an arbitrary flourish in

6  the configuration of MBI's product; it is the

7  reason the device works. Other designs need not be

8  attempted."

9          And that's really important here. I'm happy

10 to talk about the alternatives because I do think

11 that they can't be done as quickly, they can't be

12 done easily.  And there are serious competitive

13 disadvantages that are undisputed in the record.

14         THE COURT:  Well, so in that regard, in

15 looking at -- if I were to say that I did need to

16 look at alternatives, hypothetically, if I said

17 that, notwithstanding your argument about *TrafFix*,

18 why is the puzzle, the quickness by which it can be

19 solved an appropriate metric to measure this? Isn't

20 the speed cubing population just a small subset of

21 the buyers of the cubes?

22         MR. DUCHEMIN:  While the buyers may be a

23 small subset, it is the speed cubing, as addressed

24 in various articles and in various press clippings,

25 it's the speed cubing and the world cubing

associations and others like it that are now
driving the marketing of these devices.  That's
what you're reading about. You're reading about,
you know, popular people like this Mr. Park, who
has autism but competes in these World Cubing
Association events. These are the things that are
getting the headlines, these are the things that
are driving the marketing and the sale of these
cubes. And it's undisputed in the record that
trying to or having a cube that is more difficult
to solve, either because it uses similar shades of
colors or because it uses numbers or symbols, which
incidentally aren't even allowed by the World
Cubing Association rules, that that is a serious
competitive disadvantage.  And it's not as
though --

THE COURT:  Well, but, again, I ask is it
appropriate to evaluate quality and functionality
just with respect to speed and speed cubing,
because the *Schutte* case that you mention says that
the Court should analyze trade dress functionality
in the context of how it is most commonly used in
the market.  And given that there are millions and
millions and millions of these puzzles sold and

2  that, I think, in the record you indicate that

3  there's less than 100,000 in the speed cubing

4  arena, how is your argument consistent with that

5  proposition from *Schutte*?

6           MR. DUCHEMIN:  Sure. So I think that the

7  relevant question, I believe, is how is the

8  registration that's asserted in this case used in

9  the marketplace, and so we need to look to the

10 registration and the cost and quality issues as to

11 the registration.

12          Jumping ahead to all of the potential

13 alternatives, it puts the cart before the horse as

14 it respects *TrafFix* -- that's very clear in

15 *TrafFix*.  And so when we look at -- just take cost

16 and quality by looking at the registration in this

17 case, you know, we can go to the words of Mr. Rubik

18 himself. On the question of color he says, "It's

19 very simple and very easy to distinguish. It's the

20 most simple way to mark the solve state." It

21 doesn't have to use numbers, so order -- he doesn't

22 say this, but, you know, this is other evidence in

23 the case that, unlike numbers, color doesn't

24 require ordering it in the brain.  That means it's

25 a better-quality cube; setting aside the cost

PROCEEDINGS                    16

1

2    question, it's a better-quality cube.

3          THE COURT:  Well, again, why is that

4    quality? I mean, puzzles, don't puzzles range from

5    easy to more difficult? Is it possible that some

6    people might want a more difficult puzzle that

7    required more brain power? Who says that quality is

8    just the speed in which the puzzle can be solved?

9          MR. DUCHEMIN:  All of the target audience

10   of the accused product, your Honor. I mean, the

11   accused product is designed and marketed solely for

12   the purpose of speed cubing competitions and fast

13   cubing.  And so when we're comparing the asserted

14   registration against that, that becomes an

15   extremely relevant consideration in this case.

16          There are other --

17          THE COURT:  I see, then your client's

18   product is only focused on speed cubing? You're

19   saying that's its focus?

20          MR. DUCHEMIN:  Yes, your Honor.

21          And there are other quality issues here.

22   So, you know, the maximum contrasting color issue

23   that your Honor mentioned is important, not just

24   for speed, because it makes it more easily -- to

25   just solve the puzzle. You know, the fact that you

2  can use primary and secondary colors instead of

3  tertiary colors helps with that. Complementary

4  colors on the color wheel provide that maximum

5  contrast.  These are undisputed facts.

6          And these go to the heart of the

7  utilitarian functionality of it. But it does --

8          THE COURT:  So let me ask you a question.

9  How does the color depletion doctrine -- and you

10 talk about, you know, there only being three

11 primary and three secondary colors -- how does this

12 color depletion doctrine play into functionality,

13 if at all?

14         MR. DUCHEMIN:  So, really, I think that is

15 a factor -- that's really an issue that goes to the

16 arguments regarding aesthetic functionality, so,

17 again, I would consider that sort of step four in

18 my analysis. I think we need to look at utilitarian

19 functionality by looking at the registration.  Then

20 we can look at the patent issue. Then we can look

21 at alternatives, and then we look at aesthetic

22 functionality.  And so the color depletion

23 doctrine, from a competitive standpoint, if we get

24 all the way there, which I don't think your Honor

25 needs to, what the result of that is is that it

1                          PROCEEDINGS                    18

2  makes there be an extremely limited number of

3  choices for cubes that competitors can make. I

4  think that the evidence supports the conclusion

5  that it would essentially be about five different

6  cubes, you have to limit yourself to six colors,

7  and the six colors being the primary and secondary

8  colors asserted.  Remember, RBL's position in this

9  case isn't just that you can't use those six

10  colors; you can't use any shade of those colors,

11  which we think is not supported by the law in this

12  case like the *J. Frankl* case.

13           So the color depletion issue is really one

14  about reducing the available options for

15  competitors to use to make a cube that can be used

16  in these popular speed cubing and other events.

17           THE COURT:  Okay.

18           MR. DUCHEMIN:  So just briefly, your Honor,

19  on the question of sort of where we think that the

20  analysis should begin and end, it's really looking

21  at the design as a whole; a black cube, nine square

22  color patches on six spaces; both being all the

23  same color in the solve state and the starting

24  state; and then the red, white, blue, green,

25  yellow, and orange colors.  And what I found

interesting initially about RBL's opposition is
they don't really talk about anything other than
the colors. It's almost as though they concede that
the black cube and the nine square patches and the
ability to put them in a solved and mixed state is
functional. I'm not seeing a real argument that
it's not.  And they focus on the color not being
functional.

        So the evidence in this case, you know, is
pretty clear that this whole design is functional.
I mean, there are admissions from RBL's own
witnesses.  Statement of Fact 205 there's an
admission that the play value of the 3 x 3 Rubik's
Cube, the play value of the cube is to scramble the
smaller colored segments and then solve the puzzle
by matching the light-colored segments on each
side.  That shows that the nine segments are
functional.  There's evidence that the color is the
way to gauge whether the cube is solved or not.  So
the color's functional, and, you know, so on and so
forth.

        And the analysis can really stop there.
There's no question that this cube cannot be solved
in the absence of using the registered -- you know,

 1
 2    the registration and the design. Ms. Riehl, RBL's
 3    corporate designee on this topic, confirmed that
 4    functionality in Statements of Fact 210 and 211,
 5    which cite to her deposition, Exhibit 60, at pages
 6    75 to 76 and 215 to 216. So if you look at the way
 7    this cube works, it's a 3 x 3 color-matching
 8    puzzle -- that's how they describe it -- color-
 9    matching puzzle.  And you mix it and match the
10    colors; that's functional.  And then I would
11    supplement that by just reiterating the quality
12    issues and the cost issues that we just discussed.
13             And our position is --
14             THE COURT:  Right. Let me interrupt you for
15    a second about the distinction between the 3 x 3
16    puzzle design, because the function of the cube is
17    to provide a puzzle and to have a -- is a puzzle to
18    solve. And if your cube is white with different
19    shades of colors but still can be solved, does that
20    not undercut your argument about functionality?
21             MR. DUCHEMIN:  I don't think so, your
22    Honor, because our design is equally functional.
23    It's not even equally functional; our design is
24    also functional. I would argue that our design with
25    a white base is not as good as using a black base

1

2    because of the maximum-contrast issue, but I would

3    argue that our cube is functional for the same

4    reasons that the Rubik's Cube is functional.

5             THE COURT:  Okay.

6             MR. DUCHEMIN:  So if we go beyond -- and

7    this is the inward formulation, right? *TrafFix*

8    talks about the inward formulation and makes clear

9    that you can stop there and you don't have to

10   consider alternatives and other evidence.  So

11   that's where we think it should stop, the inward

12   formulation.

13            If we go beyond that, the first thing I

14   would mention are the utility patents, your Honor.

15   And I think the law is pretty clear here that this

16   is -- utility patents are of vital significance in

17   resolving trade dress claims because things in

18   utility patents claim and discuss functional

19   features by definition.

20            And there's a couple of things I want to

21   just make clear at the top. The law allows us to

22   look to not just claims, which is what RBL argues,

23   but the law also allows us to look at the

24   specification and the figures and comments made in

25   the prosecution history.  Even the -- and I

apologize I don't cite this -- but even the
Trademark Manual of Examining Procedure makes that
extremely crystal clear by citing *TrafFix*.  And
*TrafFix* says that; *TrafFix* says, you know,
statements made in the patent applications and in
the course of procuring the patents demonstrate the
functionality of the design.

          So if we look at all the patents that have
been tendered in the record in this case, your
Honor, you'll see not only claims but discussions
in the specifications about all of the registered
features.  And it's the Nichols patent, the four
Rubik's patents and the Gustafson patent, and there
are other patents.  And so I'm not going to --
obviously, I don't have time to go through each of
them and show you, but our brief cites to the
record where each of the registered features, the
asserted features, are discussed in the patent. And
RBL takes issue with our citation to specification
because they're not claimed, but it's important to
recognize that, you know, not everything's going to
be claimed in a patent because, guess what, there's
a whole bunch of prior art, and color as a concept
had been claimed in a prior art.  There's a

1

2    discussion in the specifications about that.

3            But even if we need to find a claim

4    involving color, there is one. Claim 8 in the

5    Rubik's 387 patent, the second Hungarian patent,

6    Docket 159-23, Claim 8 claims color as an element

7    of the invention.  That -- and these patents, in

8    our view, strongly support that these are

9    utilitarian functions.  And so I would say, you

10   know, if you go beyond the inward formulation, you

11   go to patents, and then you can stop there.

12           THE COURT:  Well, what about the fact that

13   the patents don't specify the particular colors and

14   even specify that other things could be used? I

15   mean, can the patents be read as relating to the

16   twisting mechanism rather than the particular color

17   combination claimed as RBL's trade dress?

18           MR. DUCHEMIN:  Yes, good question, your

19   Honor. So, number one, I think the claim that I've

20   just cited is broad enough to include all of the

21   six colors; it just says "color." So I would argue

22   that it's covered by the patent, number one. Number

23   two, *TrafFix* deals with this, right. So *TrafFix*

24   involved a case of the dual-spring design.  And

25   what the Supreme Court saw was a dual-spring design

1

2 in the patent that was, quote, "very different,"

3 end quote, than the dual-spring design used in the

4 asserted trade dress.  And the Court said it didn't

5 matter; it's functional because it's a dual-spring

6 design that operates to help keep a sign upright in

7 the wind. And the same thing is true here. The

8 colors on the cube are functional, as admitted by

9 their witnesses, because they allow the cube to be

10 solved, period.

11          THE COURT:  So are you saying the Court in

12 the prior cases involving the Rubik's Cube got it

13 wrong when they found that there was a likelihood

14 of success on the merits and that the design was

15 not functional?

16          MR. DUCHEMIN:  I'm glad you reminded me of

17 those cases.  What I'm saying about those cases,

18 which are really old, in the '80s -- I wouldn't say

19 real old, because that makes me seem younger than I

20 am --

21          THE COURT:  But they involve this

22 particular product.

23          MR. DUCHEMIN:  Well, here's the problem,

24 your Honor; they all predated *TrafFix*.  And *TrafFix*

25 was really sort of a pronouncement by the Supreme

2   Court as to how this analytical framework should

3   work and how this analysis should be done.  The

4   other problem with those cases is that they were

5   involved on preliminary injunction type relief and

6   they weren't findings by the Court on summary

7   judgment or findings by a jury after a trial.  And

8   I would say the last issue is that they involve a

9   very limited discussion of certain patents; they

10  don't involve a discussion of the broad scope of

11  all of the dozen or so, maybe even more, patents

12  that we cite in the record in this case.  So it's

13  an incomplete record, in our view, of what the

14  utility patents disclose to the world.

15          THE COURT:  Okay. Let me ask you another

16  question because we're coming to the close of half

17  an hour. Suppose I were to reject your arguments

18  concerning functionality and fraud, would you then

19  concede that the 3 x 3 cube design is presumptively

20  protectable due to the trademark registration?

21          MR. DUCHEMIN:  Fraud and functionality --

22          THE COURT:  Assume I -- if I were to reject

23  that, do you concede that the 3 x 3 cube design is

24  presumptively protectable because it was

25  registered?

 1

 2          MR. DUCHEMIN:  Well, I would say this.

 3 There's a presumption that the registration is

 4 valid, which is rebuttable, and I want to talk

 5 briefly about that, but not the common law portion

 6 of the claims; there wouldn't be a presumption

 7 there.  And so as it respects the presumption, I

 8 want to make clear that the law, I think, is pretty

 9 strong on this, that your Honor really shouldn't

10 give this particular registration any weight. And

11 the reason is because the patent and trademark

12 office, when it prosecuted this registration, it

13 issued two separate denials on functionality, and

14 then a different examiner was assigned and the

15 registration was published and allowed without any

16 comment. And the case law, I believe it's -- oh,

17 it's the *Schutte* case, which has almost identical-

18 type circumstances, where there was absolutely no

19 discussion as to why it was allowed after a

20 functionality rejection.  And the Court said under

21 those circumstances, we don't give the registration

22 really any weight. And I don't think you should

23 give this registration any weight for the same

24 reason. We don't know why the patent and trademark

25 office decided the features were not functional;

there's no explanation.

THE COURT:  Okay.

MR. DUCHEMIN:  Briefly, on likelihood of
confusion, if I have time, your Honor?

THE COURT:  Yes.

MR. DUCHEMIN:  I really want to highlight
two -- well, a couple of things with that. Number
one, there's no argument about actual confusion in
this case. Four years of coexistence, three years
of litigation, not one shred of evidence that says
there was actual confusion.  And this has been
recognized by the courts as, you know, allowing for
the conclusion that there isn't a probability of
likelihood of confusion.  So that's point one.

Point two, the similarity of the marks
analysis. Your Honor, if we look at these -- and
this really involves looking at not only just the
product at issue but the product as packaged and
sold -- and if we look at the products and we look
at how they're packaged, we see two, you know,
distinctly different products. Yes, they're both
3 x 3 puzzle cubes, but one has a white base and
one has a black base.  Why is that issue important?
To get their registration, RBL, its predecessors,

1

2  told the patent office that the design of its

3  product -- what did it say -- the design features

4  of applicant's product as shown in the drawings are

5  not essential to effective competition or to any

6  other factor. Cube puzzles such as manufactured by

7  applicant can be formed of any color plastic

8  material desired. They need not be formed of black.

9       So they got their registration by saying

10  people can compete by using colors other than

11  black, and now they're asserting the registration

12  against the 3 x 3 cube that's not black; it's

13  white, it's the opposite.

14       And they say the same thing about the shape

15  of the segments; they say square segments.  And

16  they say colors, right? People don't have to use

17  square segments, people don't have to use colors.

18  Well, Flambeau doesn't. Flambeau uses segments that

19  have corners cut out of them -- this is the speed

20  cubing context.  And Flambeau uses fluorescent

21  versions of these colors, not the typical primary

22  and secondary versions of these colors that are

23  designated in the Pantone Color Guide that Rubik's

24  uses.  And the law says you shouldn't be able to

25  claim trademark protection over shades of every

color.  That would severely limit competition. Or

geometric shapes.

          And then --

          THE COURT:  So are you saying the

[indiscernible] doctrine applies in that regard, if

I were to get to the Polaroid test, that this also

plays into your argument that their trade dress

shouldn't be viewed to protect all shades of their

colors?

          MR. DUCHEMIN:  I think yes, your Honor. I

think what it is is it's a balance.  They're trying

to claim extremely broad trademark rights when it

comes to making an infringement argument, but they

only obtained a registration by confirming that

they were seeking narrow rights. It's really the

*have your cake and eat it too* argument, and I don't

think that's sustainable here. I think that when

you're weighing the Polaroid factors, you should

consider the scope that RBL's predecessors conveyed

to the offices what the scope of their invention

would be, which is not -- not invention --

registration, which is not a registration over

every single shade of the color red, white, blue,

etc. And that's not how they use it, right.  Their

1
2  rights are defined by how they use the product, and
3  they haven't used it with fluorescent colors. So if
4  you look at these products side by side, they're
5  different.
6            THE COURT:  Right.
7            MR. DUCHEMIN:  And then also on similarity,
8  I think it's really, really important here that
9  well-known house brands are emblazoned on these
10  packaging and on the cubes themselves. It's
11  undisputed the Duncan brand, which has been used
12  since 1929, Duncan Toys Company is a well-known
13  name in the toy industry. It's been continuously
14  used; they have a product in the hall of fame.  And
15  that name, the Duncan Quick Cube, is on every
16  single package.  And so that really strongly
17  counsels for a finding of no confusion, and, you
18  know, there's a reason why nobody's been confused.
19  And they have to come forward with evidence that
20  just doesn't show it's possible there'd be a
21  likelihood of confusion; they have to prove -- it's
22  their burden of proof -- it would be probably on
23  these facts.
24            So I've got a --
25            THE COURT:  Why --

1

2          MR. DUCHEMIN:   -- lot of other things.

3          THE COURT:  Yes. Make your last point, and

4    then I'm going to hear from Mr. Peroff.

5          MR. DUCHEMIN:  Sounds good. One more point

6    on the likelihood-of-confusion factors.  You're

7    going to hear a lot about the strength of the mark

8    or how this mark is a famous mark. And what's

9    important, I think, to note there, your Honor, is

10   there is no evidence tendered in this case tying

11   these fame and strength arguments to the specific

12   design that's claimed in the registration, as

13   opposed from the alleged fame or recognition of

14   Rubik's or Rubik's Cube, you know, these trademarks

15   and this brand in general.  And the law requires a

16   very specific level of proof when it comes to

17   demonstrating the strength or the secondary meaning

18   of a mark. It has to be vigorously applied here,

19   and they don't have testimony that ties it

20   specifically to the design.  So that's that issue.

21         THE COURT:  So are you saying that when a

22   consumer looks at your cube next to the Rubik's

23   Cube, that the consumer would not know the black-

24   space cube to be Rubik's, would not assume that to

25   be Rubik's; is that what you're saying?

1                          PROCEEDINGS                  32

2          MR. DUCHEMIN: Well, I don't -- there's no

3 evidence that --

4          THE COURT: That's the trade dress that

5 they're claiming in the registration, the color,

6 right?

7          MR. DUCHEMIN: Yes. And this is where I

8 have to be -- I was really careful when I first

9 started working on this case because, you know, I

10 grew up playing with a Rubik's Cube. And so we have

11 to set aside, you know, our predispositions about

12 that and look at what the evidence actually shows.

13 And there's no survey in this case, there's no

14 survey evidence, there's nothing that ties the

15 evidence to the design specifically, as opposed to

16 the brand. So even though a cube is in a movie or

17 somebody might refer to a black base with these

18 colors as a Rubik's Cube, that's not tied

19 specifically to the design; it could be tied to the

20 brand or the use of the Rubik's Cube name as a

21 whole. And so the really -- the issue here is a

22 failure of proof. In the absence of some survey

23 that shows that customers tie it to the asserted

24 registration, they can't prove the mark has

25 secondary meaning or is strong.

1

2          THE COURT:  But in all of the -- the images

3    of the cube don't necessarily involve the mark or

4    the logo of Rubik's, so I guess I don't understand

5    your point about the lack of -- how the evidence of

6    the Rubik's Cube being in all of these various

7    product placements, advertisements, hall of fame,

8    etc., with this design, how that doesn't -- how

9    that isn't evidence of fame.

10         MR. DUCHEMIN:  It's really an issue --

11         THE COURT:  I guess I don't understand the

12   distinction that you're making between the Rubik's

13   logo or Rubik's as opposed to the trade dress.

14         MR. DUCHEMIN:  Yes, as I think RBL

15   concedes, the market is saturated with other 3 x 3

16   puzzle cubes that are black and use the same

17   colors, and there's evidence of that.  And they're

18   not Rubik's Cubes. And so the requirement of proof

19   in this case is to come forward with evidence that

20   ties the specific trade dress to a single source.

21   And so when Rubik's makes and sells cubes or

22   authorizes people to do so, they always use their

23   name; they put "Rubik's" on the packaging.  And in

24   these movies and things, you'll hear them called

25   "the Rubik's Cube." And so there's no apportionment

2  or specific tying of that evidence to the small

3  number of specific features in the registration, as

4  opposed to some other sort of more general, "Oh,

5  it's the Rubik's Cube." And that's important when

6  you have a market that's saturated with cubes that

7  look a lot alike; there has to be some proof that

8  those features are, you know, tied to the

9  registration.

10         And I would say this doesn't apply to the

11  Flambeau Quick Cube or the Duncan Quick Cube,

12  because it doesn't look anything like the Rubik's

13  Cube; it's white and has fluorescent colors and has

14  different shapes and whatnot. But I mean, I guess

15  that's where I would leave that one, your Honor.

16         THE COURT:  Okay. Thank you.

17         Mr. Peroff, I'll hear next from you.

18         MR. PEROFF:  Hello, your Honor. I don't

19  want to be funny, but I'm a little puzzled by the

20  arguments that have been advanced, to use a play on

21  words. I look at the case very differently than the

22  counsel for the defendant. In the short period of

23  time that you have allotted me today I would like

24  to focus my remarks on the underpinning of this

25  dispute that's currently before the Court, in other

2   words, explaining the protection that RBL is

3   seeking if they would obtain an injunction barring

4   the defendant from continuing to sell the Rubik's

5   Cube as it's currently designed.

6           To do so, we really have to begin by

7   defining the trademark and trade dress; and, as the

8   Court is aware, this Rubik's Cube was developed and

9   designed by Mr. Rubik in 1974 and was first sold in

10  the United States in 1980, over 40 years ago, and

11  35 years before the defendant even contemplated

12  entering the cube puzzle market with its cube

13  puzzle that would directly compete with the Rubik's

14  Cube toy puzzle. One has to question why a business

15  would select to enter into a market for a product

16  that is very, very, very, very similar to the

17  existing product that has been wildly successful

18  and well-recognized as one of the most famous

19  brands and trademarks in the world if it hadn't

20  really acquired a distinctiveness.

21          The lawsuit here only concerns the

22  trademark and trade dress of one product, and

23  that's the classic 3 x 3 version of the Rubik's

24  Cube puzzle, which has the nine small cubes on each

25  of its sides, 54 small cubies, that has a grid

PROCEEDINGS                    36

 1

 2    appearance [indiscernible], etc. The Rubik's Cube

 3    predecessor filed an application, the Ideal Toy

 4    Company, to register the outward appearance of the

 5    cube puzzle toy as a configuration of the product

 6    in the USPTO two years after it launched the

 7    product in the United States and was granted a

 8    registration a year and a half thereafter, after, I

 9    would say, a rather extensive prosecution history.

10          The Certificate of Registration defines the

11    trademark as follows:  A mark that consists of a

12    black cube having nine color patches on each of its

13    six faces, with the color patches on each face

14    being the same, and consists of the colors, red,

15    white, blue, green, yellow, and orange. To be

16    clear, it is important to understand that the

17    Rubik's Cube design mark is made up of a

18    combination of all of the elements that I just

19    mentioned; in other words, the trademark and trade

20    dress is not merely a black cube, nor is it merely

21    a cube that has nine color patches on each of its

22    faces that could be any color, nor is it a cube

23    having nine color patches in which each of the

24    patches on their respective faces are the same, nor

25    is the mark -- consists of a cube having the colors

2   red, white, blue, green, orange and yellow patches.

3   No, rather, it's a unique combination of each of

4   these elements that creates the distinctive

5   appearance of the Rubik's Cube that the USPTO

6   accepted for registration on the principal register

7   38 years ago, with the recognition that the trade

8   dress of this cube was entitled to be registered as

9   a trademark because the mark as a whole had

10  acquired distinctiveness as the result of

11  substantial sales, advertising promotion.

12          The Rubik's Cube --

13          THE COURT:  Can I ask -- Mr. Peroff --

14          MR. PEROFF:  Yes.

15          THE COURT:  -- let me direct you for a

16  second with respect to the [indiscernible] because

17  the --

18          MR. PEROFF:  Respect to what?

19          THE COURT:  -- registration itself does not

20  specify the particular Pantone colors that RBL has

21  been using and specifies that be used --

22          MR. PEROFF:  That's true.

23          THE COURT:  -- to your licensees. So are

24  you claiming that every shade of these colors is

25  subsumed within your trade dress?

1                          PROCEEDINGS                    38

2          MR. PEROFF:  No, no, not at all.  What we

3    are claiming is that, to the extent that a

4    competitor is selling a 3 x 3 cube that is so

5    similar in its overall appearance and the

6    commercial impression that's created, that there's

7    a likelihood of confusion.

8          THE COURT:  Okay.

9          MR. PEROFF:  Now, red can come in all

10   shades of red; it can come in, you know, pale pink,

11   it can come in rouge, it can come in all kinds of

12   colors. Of course not.  But when you look at the

13   combination of the elements that I just mentioned,

14   that is the mark.  And you must look at the mark,

15   not by individual elements to determine likelihood

16   of confusion, but as the mark as a whole.  And in

17   our view, when you look at the Flambeau product and

18   compare that to our product, there is a substantial

19   similarity. Are they identical? No, I'm not

20   claiming they're identical. But that's not where

21   the test for trademark infringement or likelihood

22   of confusion. Consumers rarely see products side by

23   side and deliberate what the individual

24   characteristics are.

25          Rather, consumers, and particularly these

1                           PROCEEDINGS                    39

2    consumers, who are unsophisticated for the most part, look

3    how the general sense of what a product looks like and

4    react to that.  And in this respect we believe that the

5    Flambeau cube is far too close.  There was a world of

6    colors they could have chosen, a world of shades they could

7    have chosen, perhaps. But they didn't do that.  They came

8    as close as they possibly could to the Rubik's Cube,

9    thinking that they could get away with it. With no

10   investment in product development, 35 years after our

11   client's product had been on the market, they

12   stepped into a premade cube that was being

13   manufactured by a Chinese manufacturer and selected

14   one of a number of different models, like, this is

15   great, we'll use this one.

16          So I think it's a very important concept

17   for you to grasp or for the Court to grasp that

18   it's the combination that we're talking about and

19   must be viewed when determining whether or not

20   there is a --

21          THE COURT:  So --

22          MR. PEROFF:  -- functionality and would be

23   a likelihood of confusion.

24          I'm sorry, go ahead.

25          THE COURT:  So let me ask you this

question, Mr. Peroff. Let's say, hypothetically,

that the Court rejects Flambeau's arguments as to

functionality and fraud, and gets to the various

factors on confusion, the Polaroid factors, do you

agree that not all the factors need to be in

Flambeau's favor for it to be granted summary

judgment?

MR. PEROFF:  Do I agree that not all of the

factors --

THE COURT:  Need to be met.

MR. PEROFF:  -- yes, I do, but -- that's

true. But I would also say that there has to be a

balancing of the factors. Some factors are more

important than others, so it depends upon which

factors you're talking about. If you're relying

upon that there's been no evidence of actual

confusion, that is not a factor that I put great

emphasis on.  But if you're talking about --

THE COURT:  What factors do you put -- what

factors do you put the greatest emphasis on?

MR. PEROFF:  Well, number one is the

defendant's intent in adoption of the trade dress

for their product.  The record is full of obvious

efforts to simulate the Rubik's Cube product -- the

1
2  Rubik's Cube trade dress, I should say.  That's
3  number one. Number two, the goods are identical,
4  you know, legally identical; and the appearance,
5  the overall commercial appearance of the products
6  are very, very similar.  So I would say those three
7  factors to me are very compelling.  And the fourth
8  factor, which is equally compelling, is that they
9  are sold through the same channels of trade to an
10 unsophisticated population of parents of kids that
11 are eight to fifteen.  The vast majority of the
12 millions of cubes that have been sold have been
13 sold to that market, not to the very small market
14 of competitors, cuber competitors.  That's a very,
15 very tiny market, which both sides would admit.
16          And, in addition to that, the relative
17 cost; I mean, the products are not expensive
18 products and are very often purchased on impulse,
19 so that there's a greater chance of confusion.  And
20 because of the low cost of these products, it's
21 sort of a reason why there isn't really evidence of
22 actual confusion because who's going to return a
23 product that costs 5.99 in todays world, especially
24 during COVID. So it sort of undercuts it.  And if
25 the buyer thought -- the buyer purchased the

1

2   defendant's product, that's proof of actual

3   confusion, because they would have bought ours.

4           So we really contend that every sale that

5   has been made by the other side has really been a

6   diversion of sales because they chose to adopt the

7   appearance and trade dress of a product that is so

8   similar there was no need to do so.  This case

9   never had to be brought to Court; it could have

10  been settled 1, 2, 3. Just change the colors; just

11  make some other adjustments that avoid the -- which

12  we think is the probability of likelihood of

13  confusion.

14          THE COURT:  So how do you address the

15  defendant, Flambeau's, argument about

16  [indiscernible]? You heard what Mr. Duchemin said,

17  and he was trying to make a distinction between

18  Rubik's as the source or the brand versus the trade

19  dress.  So what do you say to that?

20          MR. PEROFF:  What I say is there are so

21  many countless examples in the record where the

22  word "Rubik's" does not appear and the product does

23  appear.  The fame of the product is synonymous with

24  the iconic appearance, the unique, distinctive

25  appearance of this product.  So I don't think one

1

2  relies on the other at all.

3         THE COURT:  Okay.

4         MR. PEROFF:  Obviously, every product has

5  to have a name, but -- and I'm not saying the

6  Rubik's mark is not well-known -- but the

7  appearance of the design of the product can

8  certainly stand on its own two feet.

9         THE COURT:  Where would you say the Rubik's

10 design falls on the Abercrombie inherent

11 distinctiveness scale?

12        MR. PEROFF:  Well, I can tell you --

13        THE COURT:  Is it [indiscernible] or

14 descriptive, and why?

15        MR. PEROFF:  No, no, well, if you look at

16 the trademark registration as a guide, the mark is

17 arbitrary, but it was registered on the basis of

18 that acquired distinctiveness and on the Principal

19 Register.  And during the first five years of

20 registration, that creates a rebuttable

21 presumption, but after five years it's conclusive

22 evidence that the mark is distinctive, conclusive.

23 There's no distinction between a registration that

24 is granted under Section 2(f) of the Trademark Act

25 and one that is not on the Principal Register. Both

2  are considered to be distinctive.

3          THE COURT:  So is it your position, then,

4  that the Court need not get into any kind of

5  secondary-meaning analysis, given this -- the

6  registration?

7          MR. PEROFF:  Well, absolutely. It need not

8  do so legally or technically; however, to the

9  extent there's any doubt whatsoever, there is

10  ample, ample, evidence of acquired distinctiveness.

11  But it's not necessary at all because the

12  registration now is conclusive evidence; nothing

13  further is needed.

14          THE COURT:  Okay. Can you address

15  Flambeau's argument related to *TrafFix*? It spent a

16  great deal of time saying that the Court need not

17  look at the -- need not even get to alternatives

18  and relying on the patent that specifies this as

19  being a color-matching puzzle?

20          MR. PEROFF:  Well, yes, I can.  First of

21  all, they keep mentioning that -- the defendant

22  keeps mentioning that there's no need for the Court

23  to address alternative designs. But on page 5 of

24  the brief, they fully support this, that there's no

25  functionality.  The *TrafFix* case states

1                              PROCEEDINGS                    45

2   unequivocally that in this examination of

3   functionality, you look at the claims set forth in

4   the patent. Now, you may also look at other aspects

5   of the [indiscernible] for more -- to further

6   explain what the claims are, but it is the claims

7   that are being asserted in the patent and that it

8   registers is what is really the fundamental

9   consideration. And in that regard, every case has

10  to be decided on a case-by-case basis.  The facts

11  of the *TrafFix* case are totally different from the

12  facts in our case.  So to me, it's a very clear

13  statement of what the law should be, but it really

14  has to be applied to what the facts are in the

15  case. And --

16          THE COURT:  All right --

17          MR. PEROFF:  -- in this particular case, no

18  one's claiming that -- we're not -- we have a

19  unique combination of colors that appear in a grid

20  format on a black background that constitutes the

21  mark. So the entirety of the claimed trade dress

22  that was claimed in the patent is just different.

23  Here, colors are not being claimed in any -- were

24  never claimed in any patent, none of the patents,

25  and certainly not these particular colors.

2          THE COURT:  Okay. And you have not

3   separately cross-moved for summary judgment,

4   although you state that the Court can grant summary

5   judgment in your favor. But why -- what evidence do

6   you think would permit the Court to grant summary

7   judgment as a matter of law --

8          MR. PEROFF:  The same evidence --

9          THE COURT:  -- [indiscernible]

10          MR. PEROFF:  -- that's already in the

11   record.

12          THE COURT:  -- on the issue --

13          MR. PEROFF:  I'm sorry. I just --

14          THE COURT:  Yes, on this issue of

15   confusion, the --

16          MR. PEROFF:  I'm sorry. I'm --

17          THE COURT:  -- [indiscernible]. I'm just --

18   what do you think is your strongest evidence that

19   you would succeed under the Polaroid factors or

20   should succeed under the Polaroid factors on

21   summary judgment versus trial?

22          MR. PEROFF:  So let me -- if I may state it

23   in other words?  What you're asking me is what

24   would be the basis for my client to ask for a

25   ruling in its favor on the likelihood of confusion

 1

 2  aspect of the case; is that what you're asking me?

 3          THE COURT:  Yes. I'm sorry -- yes, that's

 4  what I'm asking.

 5          MR. PEROFF:  That's all right.  That's

 6  okay. I just wanted to make sure I understood you

 7  correctly.

 8          Well, basically, when you look -- it's the

 9  same set of facts.  And one has to evaluate, when

10  you look at the record, which is, you know,

11  hundreds if not thousands of pages, that to me

12  evidence is and supports findings for each one of

13  the Polaroid factors, with the exception of one,

14  that they favor us.  And the one that does not

15  favor us is one that we think is mutual, and that's

16  the factor of actual confusion, which is clearly

17  not a requirement in finding likelihood of

18  confusion, never has been and just isn't. So I

19  think there's enough there for the Court to grant

20  summary judgment in our favor because if we --

21  let's say we -- let's assume that we didn't make

22  that request and we go forward in the case, we're

23  going to be putting in the same evidence, the same

24  thing that we have already before the Court;

25  there's nothing more to add.

```
 1                       PROCEEDINGS                48
 2            THE COURT:  Okay.
 3            MR. PEROFF:  Did I answer your question? I
 4  want to --
 5            THE COURT:  You did. You did. Thank you
 6  very much.
 7            I will give Flambeau five minutes for any
 8  significant points it would like to make in reply.
 9            MR. DUCHEMIN:  Thank you, your Honor. So
10  just to clarify -- and I'll go sort of in reverse
11  order, I think -- to clarify, you had raised the
12  question about TrafFix and whether we should go to
13  a discussion of alternatives.  And I think counsel
14  answered maybe about patents, and there was a
15  little confusion there. So I just want to clear
16  that up. You know, TrafFix is clear, as is the
17  Christian Louboutin case, as is Specialized
18  Seating, that if under the Inwood formulation, you
19  look at the registration and you determine, as
20  RBL's own witness said, that that puzzle cannot be
21  solved in the absence of those features -- and
22  that's functional -- then here's the specialized
23  statement of it.  The existence of available
24  alternative designs cannot turn a feature that is
25  functional under the traditional definition into a
```

nonfunctional feature which is the exclusive trade
dress of one seller. So the inquiry can end. If it
doesn't end there for you and you move on, then
that becomes a question about the patents.

And I want to make sure I clear a couple of
things up. The law in this is clear that you're
allowed to consider things beyond the claims, and
you're allowed to consider prosecution history and
other portions of the patent. Even if the features
aren't claimed, those other things can be evidence
of functionality. And it really makes common sense
because an individual patent may not have a claim
over something that had already been invented 20,
30 years ago. And the idea of the cube being
functional was already invented.

I want to talk briefly about good faith,
because they claim that we don't have good faith,
which is not supported by the record at all. To be
clear, copying is not evidence of good faith.
Copying doesn't mean -- excuse me, bad faith --
copying doesn't mean bad faith. Copying is
encouraged and allowed by the law. What Flambeau
did was it had a product idea, and before it
launched it for sale, it went to its attorney and

1
2   said, "Can we do this?" And the attorney, who was
3   somebody that had been practicing trademark law for
4   30 years, looked at the registration, looked at a
5   product sample, looked at some patents and said,
6   you know what, you're allowed to do what's in the
7   patents because they're expired.  So that's a
8   nonissue. And RBL's predecessors told the patent
9   office that you can use a white cube because that
10  won't infringe.  And that's what they did.  And
11  then they used different shades of colors because
12  they told the patent office that the colors could
13  be different.  So that's not bad faith; that's good
14  faith.  That's Flambeau saying I'm going to use a
15  white base, not a black, because that doesn't
16  infringe; and I'm going to use a functional design
17  and a patent.  That's exactly what's supposed to be
18  allowed.
19          Okay, as far as this consumer purchaser
20  sophistication issue that was referenced, I want to
21  make clear that the channels of trade are somewhat
22  different. Flambeau sells to retailers directly,
23  like Target and Staples.  And those retailers, the
24  evidence shows, have sophisticated purchasers in
25  their departments, and they purchase in bulk

1                              PROCEEDINGS                    51

2  pursuant to arm's length contracts. Yes, there are

3  some direct sales to consumers, but you can't just

4  gloss over that the majority of sales by Flambeau

5  aren't being made directly out to the general five-

6  to-eight-year-old and their moms and dads public;

7  they are made to sophisticated consumer purchasers.

8         THE COURT:  But ultimately, isn't it the

9  ultimate consumer that the Court is supposed to

10  look at? I mean, these products are sold side by

11  side in major retail stores.

12         MR. DUCHEMIN:  I think it's both, your

13  Honor.  And I just didn't want to gloss over the

14  point that the retail purchasers that purchase the

15  vast bulk of the products from Flambeau are simply

16  not confused.  They are sophisticated retail

17  purchasers. And there is no evidence of any

18  confusion among any of these other consumers.  They

19  like to say consumers think or consumers believe or

20  consumers -- but there is not a shred of evidence

21  from a consumer in this case.  There's no survey. I

22  mean, most trademark cases will involve a survey

23  where the consumer is found to say to some

24  probability that they associate the design and the

25  registration and the competitive product.  And they

2   don't have that here.

3           They said every sale is a diversion of an

4   RBL sale.  To be clear, they aren't even seeking

5   compensatory damages in this case measured by

6   diverted sales or lost sales.  Their

7   interrogatories and their 26 disclosures do not

8   seek their own lost profit.  So to now suggest that

9   somehow sales are diverted, when there's not even

10  any evidence of that in the record, is a little bit

11  disingenuous.

12          As far as the Abercrombie test, it's a

13  rebuttable presumption.  And, you know, and it's

14  not in a vacuum.  Here we have a puzzle cube -- the

15  evidence is overwhelming that there are 3 x 3

16  puzzle cubes on the market that RBL admits practice

17  its design that are out there and continue to be

18  sold.  And they're not doing anything about it --

19  well, they're doing something.  They have an

20  enforcement program --

21          THE COURT:  Well, isn't there evidence in

22  the record about the significant efforts RBL has

23  undertaken to send cease-and-desist letters and

24  bring litigation to imitators?

25          MR. DUCHEMIN:  They've done some of that.

PROCEEDINGS                53

1

2    But if you look at the record, there are dozens and

3    dozens of cubes that we've identified that practice

4    the RBL design that are not being shut down.  They

5    are sold side by side with all of the other puzzle

6    cubes. And it's almost as though it's become

7    ubiquitous in a certain sense. So as far as whether

8    something might have started out as descriptive or

9    something less, it's almost as though -- like it's

10   transformed into generic. You know --

11           THE COURT:  Are you saying that the

12   asserted trade dresses, if it ever was anything

13   more than generic, it was descriptive?

14           MR. DUCHEMIN:  That's right, your Honor.

15   And they don't have evidence that currently it's

16   strong with secondary meaning.  And your Honor does

17   have to consider secondary meaning in the context

18   of the analysis.  And, correct, currently, or at

19   least at the time that Flambeau's alleged

20   infringement began is a different question.  And

21   that's the time period you look at, not back in

22   1981, when the Rubik's Cube exploded on the market

23   for about two years before it fell completely off a

24   cliff, is what the evidence shows.

25           THE COURT:  So with respect to the issue of

1                           PROCEEDINGS                    54

2   generic versus descriptive, doesn't the case law

3   say that almost all trade dress would be fanciful

4   and not descriptive or generic?

5           MR. DUCHEMIN:  Exact -- well, what it says,

6   your Honor, is that, yes, trade dress in general,

7   unlike a word mark or a brand, is -- it's not

8   fanciful; it's just -- it's -- you have to apply a

9   much more rigorous analysis of it because typically

10  it's utilitarian. It's not really arbitrary; it's

11  because typically trade dress is functional. It's

12  not a presumption, but that's what the cases say.

13  Because trade dress is not a word mark and involves

14  features of a product, it's usually utilitarian and

15  functional, and therefore you have to do a very

16  vigorous analysis of it. So it's a little bit

17  related with, I think, the strength analysis but

18  not the same.

19          THE COURT:  Okay. Thank you.

20          MR. DUCHEMIN:  I'm just looking through my

21  notes. I think I've covered just about everything.

22  I guess -- I was going to touch on the fraud, but I

23  think that's covered in the briefs.

24          And our Motion to Strike, we're happy to

25  stand on the briefs there.  We think -- I just

1                              PROCEEDINGS                        55

2   should mention all of these alternatives that are

3   being proffered as evidence of things in the

4   market, you know, they're being sponsored almost

5   entirely by an attorney.  And we just don't think

6   that's appropriate in the context of summary

7   judgment.  That shouldn't be allowed, although I

8   don't think it swings the decision either way, your

9   Honor, for the reasons we've discussed.

10           THE COURT:  All right, I want to thank both

11  sides for their excellent arguments and their

12  excellent briefing.  And the Court will take this

13  matter under consideration.

14           Thank you, both, very much.

15           MR. PEROFF:  Thank you very much, your

16  Honor.

17           MR. DUCHEMIN:  Thank you, your Honor.

18           THE COURT:  All right, we're adjourned.

19           (Whereupon the matter is adjourned.)

20

21

22

23

24

25

56

## C E R T I F I C A T E

     I, Carole Ludwig, certify that the foregoing transcript of proceedings in the United States District Court, Southern District of New York, Rubik's Brand Limited versus Flambeau, Inc., et al., Docket #17cv6559, was prepared using PC-based transcription software and is a true and accurate record of the proceedings.

Signature  *Carole Ludwig*

Date:  February 2, 2021